Michael C. TURPEN, Attorney General of Oklahoma, Appellant,

v.

OKLAHOMA CORPORATION COMMISSION and Southwestern Bell Telephone Company, Appellees.

Nos. 66038, 66686.

Supreme Court of Oklahoma.

Nov. 8, 1988.

Rehearing Granted in Part and Denied in Part Jan. 17, 1989.

Dissenting Opinion Jan. 17, 1989, Corrected Jan. 19, 1989.

---

Michael C. Turpen, Atty. Gen., Marc Edwards, Robert A. Butkin, Asst. Attys. Gen., Oklahoma City, for appellant.

Lindil C. Fowler, Jr., Gretchen P. Hoover, Jane P. Olson, Oklahoma Corp. Com'n, Oklahoma City, for appellee Corp. Com'n.

G. Michael Bauer, Oklahoma City, for appellee Southwestern Bell Telephone Co.

OPALA, Justice.

Two issues are presented for review: [1] Did the Corporation Commission [Commission] err by dismissing the Attorney's General motion to modify its rate order? and [2] Is the Commission's order authorizing Southwestern Bell Telephone Company [SWBT] to implement new rates and charges to recover a revenue deficiency sustained by law and substantial evidence?

To resolve the second issue we must consider whether the Commission acted within its discretion by: (a) investigating and addressing the impact on Oklahoma ratepayers of SWBT's status qua subsidiary of a holding company; (b) deciding to address in SWBT's next rate relief request what imputed benefit or value the other Southwestern Bell Corporation [SWBC] subsidiaries receive from the use of the Southwestern Bell name; (c) investigating and addressing whether revenues and expenses were properly imputed from Southwestern Bell Publications, Inc. to SWBT; [d] deciding to address in SWBT's next rate relief request whether SWBT's transfer of its directory operations to Southwestern Bell Publications, Inc. was properly effected at the assets' net book value; [e] basing SWBT's authorized rates on a capital structure of 55.32% equity and 44.68% debt; [f] not addressing the disposition to be made of reimbursements received by SWBT from AT & T; [g] adopting a Universal Service Option plan; and [h] including prepaid expenses in SWBT's rate base.

We give a negative response to the first question. We answer the second question by affirming the Commission's rate decision as to parts (a), (b), (c), (e) and (g), *supra;* but because the Commission failed either to address or treat adequately issues material to that decision in parts (f) and (h), we *reverse the rate order with regard to these parts and remand this proceeding with directions to conduct further inquiry and make additional findings;* and although part (d) is legally efficacious we direct that the Commission on remand address whether SWBT's transfer of its direc-

tory operations to SWB Publications was properly effected at the assets' net book value.

## THE IMPACT OF DIVESTITURE

On August 11, 1982 the U.S. District Court for the District of Columbia entered a "modified final judgment" [MFJ] in the government antitrust case against A.T. & T. The MFJ was later examined and amended in *United States v. American Tel. & Tel. Co. [A.T. & T.]*.[1]

The MFJ required A.T. & T. to divest itself of the portions of its twenty-two operating companies that supplied local telephone service. These divested operating companies were reorganized into seven new operating companies that would supply local telephone service in an "exchange area." SWBT is one of these seven new operating companies whose primary roll is to provide quality, economical local telephone service.[2]

The present case is the first Oklahoma decision to address the impact of the national telecommunications network's restructuring. While attempting to conform to whatever past precedent is still applicable, the court recognizes the fundamental changes in rate regulation necessitated by divestiture.

The general principles in *A.T. & T.* provide insight into the present matter, but it must be remembered that *A.T. & T.* dealt with antitrust, not rate regulation, and addressed issues quite different from the ones before us today.

■ *A.T. & T.* was decided by a federal district court. Unless that court's decision is affirmed by the U.S. Supreme Court, it is not binding upon state courts as precedent.[3] When *A.T. & T.* was summarily affirmed by the U.S. Supreme Court, it became a source of authority for state courts,[4] but the precedential weight of that summary disposition is confined to the narrowest possible grounds.[5] As was stated by the U.S. Supreme Court in *Mandel v. Bradley*,[6] "a summary affirmance is an affirmance of the judgment only."

In sum, this court, while bound by the result of the federal antitrust divestiture cases, is not required to adhere to their reasoning and specific pronouncements.

## FACTS

■ Shortly after divestiture the newly independent SWBT filed an interim rate

1. 552 F.Supp. 131 [D.C.C.1982], aff'd 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 [1983].

2. In *United States v. American Tel. and Tel. Co., supra* note 1 at 141, the court stated:
 "The Operating Companies would provide telephone service from one point in an exchange area to other points in the same exchange area—'exchange telecommunications' —and they would originate and terminate calls from one exchange area to another exchange area—'exchange access.' The interexchange portion of calls from one exchange area to another exchange area would, however, be carried by A.T. & T. and the other interexchange carriers, such as MCI and Southern Pacific Co." [Footnote references deleted]

3. *Blackmon v. State*, Tex.Cr.App., 642 S.W.2d 499, 500 [1982]; *State v. McKay*, 680 S.W.2d 447, 450 [Ten.1984]; *Holland v. Independent Fire Ins. Co.*, 168 Ga.App. 761, 310 S.E.2d 297, 298 [1983]; *State v. Harmon*, 107 Idaho 73, 685 P.2d 814, 817 [1984]; *Nandorf, Inc. v. CNA Ins. Companies*, 134 Ill.App.3d 134, 88 Ill.Dec. 968, 479 N.E.2d 988, 993 [1985].

This court acknowledged in *Dority v. Green Country Castings Corp.*, Okl., 727 P.2d 1355, 1359 n. 24 [1986], that an inferior federal court's pronouncement on a *federal*-law question is "highly persuasive" even though not binding on a state court of last resort. In the present case, we deal with state rate regulation not *federal* antitrust law. Hence, the principles of *A.T. & T.* provide insight into but are not determinative of the issues before us today.

4. *Hicks v. Miranda*, 422 U.S. 332, 344–345, 95 S.Ct. 2281, 2289–2290, 45 L.Ed.2d 223, 236 [1975].

5. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 499, 101 S.Ct. 2882, 2888, 69 L.Ed.2d 800, 809 [1981]; *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199, 204 [1977].

6. *Supra* note 5 97 S.Ct. at 2240.

# 1316

increase request with the Oklahoma Corporation Commission.[7] On May 24, 1983 the Commission granted SWBT an interim rate increase of $43.7 million which was followed by interim rate increases of $135,-197,000.00 on December 29, 1983 and $32,-520,695.00 on February 13, 1985.

■ On January 29, 1986 the Commission issued Order No. 292337, the rate or-

7. Rate regulation is designed to prevent a public utility from making excess monopoly profits and to assure fair prices and adequate service to consumers. The most common method of rate regulation, and the method used in Oklahoma, is to control the utility's aggregate revenue by application of the formula $R = O + B(r)$. *Application of Oklahoma Natural Gas Company,* Okl., 406 P.2d 273, 277 [1965] and *State ex rel. Cartwright v. Okl. Natural Gas,* Okl., 640 P.2d 1341, 1349 [1982].

"R" represents the utility's allowed revenue requirements.

"(r)" is the utility's allowed rate of return on its rate base. A public utility is entitled to earn a rate of return sufficient to enable it to operate successfully, maintain its financial integrity, attract capital and compensate its investors for the risk assumed. *Lone Star Gas Co. v. Corporation Com'n.,* Okl., 648 P.2d 36, 39 [1982].

"O" represents the utility's operating expenses. It encompasses both out-of-pocket costs, such as wages and raw materials, and depreciation of capital assets used to provide the regulated product. Since rates are determined prospectively, "O" should theoretically represent the firm's future operating expenses, but since the future is difficult to forecast, "O" traditionally has been based upon actual expenses incurred by the utility during a recent past period referred to as the "test year." This is the method employed in Oklahoma. *Southwestern Public Service Co. v. State,* Okl., 637 P.2d 92, 98 [1981]. The test year in the present case was 1984. "B" represents the utility's rate base. This is the amount upon which the utility is permitted to make a profit. *Application of Oklahoma Natural Gas Co., supra* at 277. In Oklahoma this amount is based upon the value of the property "used and useful in [the utility's] public service business at the time the inquiry was made." *Southwestern Public Service Co. v. State, supra* at 97. Consideration is given to both original cost and present reproduction cost, less depreciation, together with all other facts and circumstances which could have a bearing upon the value of the property. *Lone Star Gas Co. v. Corporation Com'n, supra* at 38. The Commission used the following data in applying the basic formula:

$$\text{Basic formula:} \quad \boxed{\begin{array}{c}\text{Required}\\\text{Revenues}\end{array}} = \boxed{\begin{array}{c}\text{Operating}\\\text{Costs}\end{array}} + \boxed{\begin{array}{cc}\text{Rate} & \times & \text{Fair Rate}\\\text{Base} & & \text{of Return}\end{array}}$$

R
| Required Revenues | = | $582,799,267 | Test year revenues |
|---|---|---|---|
| | | + 32,520,695 | Interim rate increase |
| | | 47,544,561 | Additional rate increase |
| | | $662,864,523 | |

O
| Operating Costs | = | $480,272,919 | Total expenses |
|---|---|---|---|
| | | 22,040,996 | Income taxes before rate increases |
| | | + 37,877,932 | Income taxes applicable to rate increases |
| | | 1,346,160 | Municipal inspection fees |
| | | 735,073 | Uncollectible allowance |
| | | $542,273,080 | |

(r)
Fair Rate of Return = 11.981%

B
| Rate Base | = | $1,006,522,353 |
|---|---|---|
| $662,864,523 | = | $542,273,080 + (11.981% × $1,006,522,353) |
| $662,864 | = | $542,273 + (11.981% × $1,006,522)* |

*rounded off to thousands

der under examination here, which authorized SWBT to implement permanent rates and charges to recover a revenue deficiency of $47,544,561.00 in addition to the previously granted interim relief. As noted in the dissents, the Commission incorporated previous interim rate increases into the order by reference only. Although this *indirect* approval of interim rate increases appears to have been the Commission's past practice, *in the future the Commission must provide better disclosure of the total rate increase by listing in its orders the number and amount of previous interim rate increases it is making permanent.*

On February 11, 1986 the Attorney General and SWBT filed separate motions to modify the rate order; on February 28, 1986 the Attorney General brought an appeal from the order. The Commission granted its Staff's request for dismissal of the Attorney's General and SWBT's modification motions on May 12, 1986; in a second appeal the Attorney General seeks review of this ruling. The two appeals were consolidated for disposition by a single opinion.

## INTRODUCTION

Under Art. 9, § 18, Okl. Const., the Commission has the duty of "supervising, regulating, and controlling" SWBT in all public service matters. The bottom-line question on this appeal is whether the Commission adequately performed that duty in the rate proceeding below.

The terms of Art. 9 § 20, Okl. Const., address this court's responsibility when it reviews a rate proceeding to determine whether the Commission fulfilled its constitutional duty:

"* * * The *Supreme Court's review* of appealable orders of the Corporation Commission shall be judicial only, and ... *shall not extend further than to determine* whether the Commission has regularly pursued its authority, and whether *the findings and conclusions* of the Commission *are sustained by the law and substantial evidence....*" [Emphasis supplied.]

■ Substantial evidence is more than a scintilla of evidence; it possesses something of substance and of relevant consequence that is fit to induce conviction and may lead reasonable men fairly to differ on whether it establishes a case.[8] In determining if the Commission's findings and conclusions are supported by substantial evidence, the court will review all the evidence found in the record including that which fairly detracts from its weight.[9]

■ A presumption of correctness accompanies the Commission's findings in matters it frequently adjudicates and in which it possesses expertise.[10] The Commission has wide discretion in the performance of its duties.[11] When the Commission fixes rates, it acts in a legislative capacity and is not limited to any particular theory or method.[12]

## I

## THE COMMISSION ACTED PROPERLY WHEN IT DISMISSED THE ATTORNEY'S GENERAL MOTION FOR MODIFICATION OF ITS RATE ORDER

The Attorney General asserts that the Commission improperly dismissed his modi-

---

**8.** *Application of Valliant Tel. Co.,* Okl., 656 P.2d 273, 275 [1982] and *State ex rel. Cartwright v. Okl. Natural Gas, supra* note 7 at 1347.

**9.** *State ex rel. Cartwright v. Okl. Natural Gas, supra* note 7 at 1347 and *Application of Valliant Tel. Co., supra* note 8 at 275.

**10.** *Teleco, Inc. v. Corporation Com'n.,* Okl., 653 P.2d 209, 212 [1982].
The terms of 52 O.S.1981 § 111 provide in pertinent part:
"* * * On appeal *every* such [Commission] *order,* rule or regulation *shall be regarded as*

*prima facie, valid, reasonable and just.* * * *"* [Emphasis supplied.]

**11.** *Arkansas La. Gas Co. v. Sun Oil Co. of Pa.,* Okl., 554 P.2d 14, 16 [1976]; *State v. Southwestern Bell Tel. Co.,* Okl., 662 P.2d 675, 679 [1983]; *Teleco, Inc. v. Corporation Com'n., supra* note 10 at 212, and *Bishop v. Corporation Commission,* Okl., 394 P.2d 235, 236 [1964].

**12.** *Application of Valliant Tel. Co., supra* note 8 at 275 and 277.

fication motion. His argument rests on 12 O.S. 1981 § 1031.1,[13] which provides that within 30 days of a judgment a *district court* may modify, correct, open or vacate its judgment sua sponte or upon motion of a party. If the motion is filed within the 30–day span, the district court is empowered to consider it after the lapse of that period.[14]

Under Commission Rule 24 [15] a party litigant may file a motion to modify, reopen or rehear a Commission order within ten days of the order's rendition. The Attorney General asserts that the procedural analysis used in determining the effect of § 1031.1 should apply to Commission Rule 24—i.e. the Commission should be empowered to consider motions to modify *after* the lapse of the maximum time (30 days) for the commencement of an appeal.

While the Attorney General correctly restates the law with respect to district court jurisdiction after a timely § 1031.1 motion has been filed, he fails to recognize the difference between motions to modify district court judgments and motions to modify Commission orders.

■■■■ Oklahoma jurisprudence treats a motion to modify a Commission order differently from that of a district court.[16] Commission orders *automatically become final after 30 days.*[17] Once an order has become final, its vacation is beyond that agency's power. The Commission is without authority even to review and modify the order unless statutory notice of a hearing concerning the proposed modification is given to all interested parties.[18] Even during the 30 day-period *before* an order becomes "final"—in the sense of passing beyond the reach of appellate review—the Commission *may* act upon a motion to rehear, modify or reconsider its order but is

13. The terms of 12 O.S.1981 § 1031.1 provide: "*Within thirty (30) days after the rendition of a judgment, the court, of its own initiative or on motion of a party, may correct, open, modify or vacate the judgment. The court may prescribe what notice, if any, shall be given.*" [Emphasis supplied.]

14. *Matter of Chad S.,* Okl., 580 P.2d 983, 984–985 [1978] and *Orthopedic Clinic v. Jennings,* Okl., 481 P.2d 139, 141 [1971].

15. The terms of Rule 24, Corporation Commission Rules of Practice, effective August 1, 1985, provide in pertinent part:
"*RULE 24. RELIEF FROM ORDERS OF THE COMMISSION*
(a) *Within ten (10) days after an order of the Commission is entered, any person may file a motion for rehearing, or a motion to set aside or to modify the order, or for any other form of relief from the order.* * * * Such motion shall be set for hearing before the Commission, unless referred. * * *
(b) *At any time subsequent to ten (10) days after entry of an order of the Commission, an application to vacate or modify the order, or for any other form of relief from the order, filed by any person,* whether or not a party of record in the original cause, *shall be treated as a separate cause,* and shall be governed by rules applicable to the commencement of a cause...." [Emphasis supplied.]

16. *Western Okl. Chapter, Etc. v. State, Etc.,* Okl., 616 P.2d 1143, 1146 [1980] and *Garrison v.* *State,* Okl., 420 P.2d 474, 476 [1966]; see also, *Matter of Chad S., supra* note 14 at 984–985 and *Orthopedic Clinic v. Jennings, supra* note 14 at 141 for a discussion of the historical antecedents of the 12 O.S. 1981 § 1031.1.

17. After 30 days following its entry a Commission order can no longer be appealed. Art. 9, § 20, Okl.Const., *infra* note 20, provides that appeals from Commission orders must be taken within the same time as appeals from district court judgments. 12 O.S. 1981 § 990 provides that an appeal from a district court judgment must be brought within 30 days. Hence, appeals from Commission orders to this court must be brought within 30 days. Furthermore, filing a motion to modify a Commission order does not extend the 30–day period. 12 O.S. 1981 § 991(a), *infra* note 24. See also, Rule 1.86(b), Rules on Perfecting a Civil Appeal, 12 O.S.1981, Ch. 15, App. 2, which states:
"Any party desiring to procure a review of a decision of the Corporation Commission rendered in the exercise of its constitutional powers to regulate ... public utility and public service corporations may commence an appeal ... by filing a petition in error within thirty days from the date of the decision...."

18. *Crews v. Shell Oil Company,* Okl., 406 P.2d 482, 487 [1965].

not required to do so.[19] It is well established that the Commission has no power to entertain a rehearing or reconsideration request of a decision after an appeal from it has been made to this court.[20] Extant caselaw compels us to hold that, insofar as Rule 24 may be construed to empower the Commission to entertain a request to modify an appealable order *after* the lapse of 30 days from that order's issuance, its provisions plainly conflict with 12 O.S. 1981 § 991(a)[21] and are hence unauthorized by law.[22]

There are two primary reasons for according a different procedural consequence to a motion to modify a Commission order and a motion to modify a district court judgment. *The first reason* is the difference between an appeal from a district court judgment and one from a Commission order. Although Art. 9 § 20, Okl. Const., provides that an appeal from the Commission shall be taken "directly to the Supreme Court ... in the manner and in the same time in which appeals may be taken to the Supreme Court from the District Courts,"[23] this means only that appeals from the Commission are the same as appeals from the district court unless the law provides differently. Otherwise, this language conflicts with other parts of § 20 which state that an appeal from the Commission to the Supreme Court "shall be of right" and "directly to the Supreme Court" and "shall be to the Supreme Court only." These provisions assure that an appellant will have the opportunity to be heard in this court and gain access for immediate review of the Commission's order. *The second reason* is that the terms of 12 O.S. Supp.1986 § 991(a)—which provide that if a motion for a new trial is filed in the district court no appeal may be taken to this court until the trial court rules on the motion—do not apply to appeals from Commission orders.[24]

**19.** *Crews v. Shell Oil Company, supra* note 18 at 487 and *Garrison v. State, supra* note 16 at 476.

**20.** In *Southwestern Bell Telephone Co. v. State,* 181 Okl. 246, 71 P.2d 747, 748 [1937] (Syllabus 1), the court stated:

"Where the Corporation Commission of Oklahoma has jurisdiction of a proceedings [sic] to inquire into the reasonableness of the rates charged by a public utility in Oklahoma, and after a full hearing thereon has made an order, the commission has implied power and authority to entertain an application for rehearing on the matter and the power to set aside its order and upon reconsideration of the matter to enter another order; *provided such is done within a reasonable time and before an appeal from such order has been lodged in the Supreme Court and no prejudice thereby is shown.*" [Emphasis added.]

**21.** See *infra* note 24 for text of 12 O.S.1981 § 991(a).

**22.** *Transok Pipe Line Company v. Darks,* Okl., 515 P.2d 218, 219 [1973].

**23.** The terms of Art 9, § 20, Okl. Const. provide in pertinent part:

"From any action of the Corporation Commission prescribing rates, charges, services, practices, rules or regulations of any public utility or public service corporation, or any individual, person, firm, corporation, receiver or trustee engaged in the public utility business, *an appeal may be taken* by any party affected, or by any person deeming himself aggrieved by any such action, or by the State, *directly to the Supreme Court of the State of Oklahoma, in the manner and in the same time in which appeals may be taken to the Supreme Court from the District Courts,* except that *such an appeal shall be of right,* and the Supreme Court may provide by rule for proceedings in the matter of appeals in any particular in which the existing rules of law are inapplicable. If such appeal be taken by the public utility or public service corporation affected by any such action, the State of Oklahoma shall be made the appellee, but in other appeals hereunder, the public utility or public service corporation affected shall be made the appellee.

An appeal from an order of the Corporation Commission affecting the rates, charges, services, practices, rules or regulations of public utilities, or public service corporations, *shall be to the Supreme Court only,* and in all appeals to which the State is a party it shall be represented by the Attorney for the Corporation Commission, and the Attorney General, or his duly authorized representative. * * * *" [Emphasis supplied.]

**24.** The terms of 12 O.S.1981 § 991(a) provide:

"(a) The right of a party to perfect an appeal from a judgment, order or decree of the trial court to the Supreme Court shall not be conditioned upon his having filed in the trial court a motion for a new trial, but *in the*

The Commission clearly was *without jurisdiction* over its January 29, 1986 rate order now before us when it dismissed the pending motion for modification *more* than 30 days *after* that order's entry. Moreover, because the Attorney General has had ample opportunity in this appeal to make his argument for the Commission order's reversal, he has not been prejudiced by the adverse action. The May 12, 1986 dismissal was plainly mandated by lack of jurisdiction and must be affirmed.

## II

## THE COMMISSION'S INVESTIGATION INTO THE IMPACT ON OKLAHOMA RATE PAYERS OF SWBT'S STATUS AS A SUBSIDIARY OF A HOLDING COMPANY WAS LEGALLY SATISFACTORY; IN ITS TREATMENT OF FUTURE RATE RELIEF REQUESTS, THE COMMISSION'S INVESTIGATION OF SUCH IMPACT MUST BE IN ACCORDANCE WITH THE STANDARDS PROMULGATED HEREIN

The Attorney General contends that the Commission erred because it did not require SWBT to have its parent holding company, SWBC, provide information on all of the holding company's affiliates. He asserts that the Commission failed to scrutinize adequately the impact of the SWBC holding company relationship on SWBT's revenues, expenses and investments in order to ensure that SWBT's regulated operations are not subsidizing the unregulated operations of SWBC's other affiliates.

■ One of the dissents asserts that the Commission failed to execute its constitutional duty to require SWBT to provide *"[e]vidence of Oklahoma—specific costs and revenues* which are 'used and useful' in providing utility service to citizens within the State of Oklahoma."* [Emphasis theirs.] While the Commission must closely monitor SWBT's costs and revenues, the term "used and useful" is misplaced in such an examination; that concept is only applied when determining the firm's rate base.[25]

■ Throughout the United States it is recognized that a public utility's dealings with affiliates require thorough investigation and close scrutiny by a public utility commission.[26] It is generally held that, while the regulatory agency bears the bur-

---

*event a motion for a new trial is filed in the trial court* by a party adversely affected by the judgment, order or decree, *no appeal to the Supreme Court may be taken* until subsequent to the ruling by the trial court on the motion for a new trial. *This provision shall not apply, however, to an appeal from an order of the Corporation Commission."* [Emphasis supplied.]

**25.** The rate base in Oklahoma is founded upon the value of property "used and useful in [the utility's] public service business at the time the inquiry was made." *Southwestern Public Service Co. v. State, supra* note 7 at 97. Also see, *Okmulgee Gas Co. v. Corporation Commission,* 95 Okl. 213, 220 P. 28 [1923].

**26.** "As long as a Regional Holding Company is engaged in both monopoly and competitive activities, it will have the incentive as well as the ability to 'milk' the rate-of-return regulated monopoly affiliate to subsidize its competitive ventures and thereby to undersell its rivals in the markets where there is competition ... To the extent that a Regional Holding Company used the same facilities, equipment, and personnel to serve both its regulated and its unregulated activities, it would have the ability to overallocate the costs assigned to the former in order to maximize the amount that would be passed on to the ratepayers (who have no choice but to pay). Not only would this improper assignment of costs burden the rate payers; it would also enable the company profitably to charge less for its competitive products and services than do its rivals who enjoy no such subsidy." *United States v. Western Elec. Co., Inc.,* 592 F.Supp. 846, 853 [D.D.C.1984]. This view is also expressed in *Smith v. Illinois Bell Teleph. Co.,* 282 U.S. 133, 157, 51 S.Ct. 65, 72, 75 L.Ed. 255, 267 [1930]; *General Tel. Co. of Upstate N.Y. v. Lundy,* 17 N.Y.2d 373, 271 N.Y.S.2d 216, 222–23, 218 N.E. 2d 274, 278–279 [1966]; *New England T. & T. Company v. Dept. of Pub. Util.,* 371 Mass. 67, 354 N.E.2d 860, 868–869 [1976]; *Washington Water Power v. Idaho Public Util.,* 101 Idaho 567, 617 P.2d 1242, 1247–1248, 16 A.L.R.4th 435 [1980]; *Pacific Telephone and Telegraph Co. v. Flagg,* 189 Or. 370, 220 P.2d 522, 529–530 [1950] and *Town of New Shoreham v. R.I. Pub. Util. Com'n.,* 464 A.2d 730, 733 [R.I.1983].

den of proving that expenses incurred in transactions with nonaffiliates are unreasonable, the utility bears the burden of proving that expenses incurred in transactions with affiliates are reasonable.[27] While a public utility cannot make a rate confiscatory by reducing its net earnings through contracts unduly favoring affiliates, common ownership is not of itself a ground for disregarding agreements with affiliates.[28]

■ Investigation of all aspects and operations of a public utility's affiliates is not required. It is transactions between the utility and its affiliates and the allocation of expenses by the parent holding company to the regulated utility that provide an opportunity for abuse and must be investigated thoroughly.[29]

■ At issue here is whether there is substantial evidence that the Commission sufficiently investigated 1) the prices charged to or by SWBT affiliates for goods and services and 2) the allocation of expenses by SWBC to SWBT and by SWBT to Oklahoma ratepayers. For purposes of brevity these expense items will hereafter be referred to as "payments to affiliates." There is substantial evidence to demonstrate that the Commission's investigation of payments to affiliates was satisfactory.

■ In the Commission hearings the Attorney General presented no evidence that any specific payment to an affiliate was not reasonable. Matters pending before the Commission are, as in this case, generally of a complex and technical nature and should be considered and initially decided by the Commission. The Commission has the experience and expertise "to amalgamate those intricacies into specific findings and conclusions in a form presentable for review on appeal." For this reason, matters which could have been but were not presented before the Commission by "affirmative evidence, objection or proceedings for review by the Commission" are not reviewable by this court.[30]

Fred C. Buck, a certified public accountant [CPA] and Commission Staff utility supervisor, testified concerning the sufficiency of the audit performed by the Staff. He stated that his team had sufficient time to make their audit; they spent eight to ten man-months working on the audit and SWBT provided all the information that was requested.[31]

Betty Borgmier, a CPA and an outside utility analyst specializing in telecommuni-

27. *Boise Water Corp. v. Idaho Public Util. Commission [Boise Water I],* 97 Idaho 832, 555 P.2d 163, 167–169 [1976]; *Boise Water Corp. v. Idaho Public Util. Com'n. [Boise Water II],* 99 Idaho 158, 578 P.2d 1089, 1090, 1091 [1978]; *Washington Water Power v. Idaho Public Util., supra* note 26, 617 P.2d at 1251 and *Southwestern Bell v. State Corp. Com'n of Kan.,* 4 Kan.App.2d 44, 602 P.2d 131, 133 [1979].

28. *Southwestern Public Service Co. v. State, supra* note 7 at 102; *United Fuel Gas Co. v. Railroad Commission,* 278 U.S. 300, 320, 49 S.Ct. 150, 156, 73 L.Ed. 390, 401 [1929] and *Houston v. Southwestern Bell Teleph. Co.,* 259 U.S. 318, 323, 42 S.Ct. 486, 488, 66 L.Ed. 961, 964 [1922].

29. In *Boise Water I, supra* note 27 at 555 P.2d at p. 169 the court states:

"The reason for this distinction between affiliate and non-affiliate expenditures appears to be that the probability of unwarranted expenditures corresponds to the probability of collusion. In dealing with *non-affiliates* the pressures of a competitive market and the fact of arm's length bargaining for goods and ser-

vices allows us to assume, in absence of a showing to the contrary, that such operating expenditures are legitimate." [Emphasis theirs.]

See also, *Dayton P. and L. Co. v. Comm'n.,* 292 U.S. 290, 295, 54 S.Ct. 647, 650, 78 L.Ed. 1267, 1273 [1934].

30. *State ex rel. Cartwright v. Okl. Natural Gas, supra* note 7 at 1346.

31. Excerpts from the Rate Order's Summary of Evidence attest to the thoroughness of the Staff's audit.

\* \* \* \* \* \*

"By confining the audit to the last quarter, Staff was able to audit this period more intensively, and use the time saved to investigate related areas, such as Headquarters expenses, holding company/subsidiary relationships, and Bell Communications Research (BCR).

\* \* \* \* \* \*

"Staff disallowed 96.4% of advertising expenses, at an annual rate of $3,082,296. Staff reviewed all advertising copy for expenses incurred in the test year. In several instanc-

cations, was the audit team member in charge of investigating and analyzing the organizational makeup and functions of the regional holding company and its subsidiaries. The detail of her testimony shows that she thoroughly investigated the procedures and the factors used to allocate the SWBC holding company charges and SWBT headquarters charges to Oklahoma. She explained the allocation process and the audit trail of allocated expenses.[32] While she expressed concern that the allocation method used by SWBC might allocate more expenses to SWBT than is equitable, she was unable to come up with a more accurate method.[33]

Since the Commission members could not personally examine the payments to affiliates and the Attorney General produced no *specific* evidence that any particular cost or expense was improper, the Commission reasonably relied upon the Staff's and Borgmier's audit of those costs.

The Commission's investigation of the impact of SWBT's status qua subsidiary of a holding company is upheld as satisfactory. In its handling of future requests for rate relief, the Commission's investigation

es, advertisements were found which were information oriented, but they were disallowed in accordance with the Oklahoma Statutes since they did not carry the statement 'paid for by ratepayers.' Staff disallowed all contributions and club dues (annual amount of $411,176).

"Mr. Buck explained a year end composite factor of 93.47% was used to allocate SBC fourth quarter expenses to SWBT, and a composite factor of 12.20% to allocate to Oklahoma, resulting in a downward adjustment of ($77,348) for the quarter. This computed amount was then compared to the actual amount of SBC costs charged to Oklahoma, with an adjustment made for the difference. Since Staff adjustments had already been made in the area of advertising, contributions and dues, aircraft expense, and treasury department expense, these amounts were removed both from the SBC expense allocation pool and the amount actually allocated to SWBT, thus avoiding double counting. An adjustment of minus ($460,011) for the quarter was made to SBC allocated Treasury Department costs, because they were abnormally high in the last quarter. An adjustment was made to normalize SBC executive department and pensions/benefits expenses of a negative ($111,916) for the quarter. Mr. Buck further testified he used an Oklahoma prorate factor of 12.20% to allocate G.H.Q. expenses for the last quarter, resulting in an adjustment of a negative ($733,576) for the quarter.

"Mr. Buck further testified a review was made of the financial records to ascertain what records are available to support Bellcore's financial statements, its billings to its owners, and its reports of charges to work projects. This involved the examination of procedures for cost allocation, overhead cost processing and billing, and entailed the tracking of costs back through the system to the point of examining original source documents such as expense vouchers on a sample basis.

\* \* \* \* \* \*

"Ms. Borgmier explained how costs were tracked to specific activities, projects, or services. In Ms. Borgmier's analysis of the allocation factors she found the reported last quarter factors to be correct based on the original data supplied.

\* \* \* \* \* \*

"The basis for apportioning the GHQ headquarters expenses follow the principles is [sic] outlined in the 'Separations Manual' prepared by the NARUC–FCC Cooperative Committee on Communications.

\* \* \* \* \* \*

"Ms. Borgmier examined the basis for the prorate factors and made a judgment as to their reasonableness. She obtained original data used for computing the factors and recomputed the factors to ascertain that the Oklahoma portion was, in fact, based on the stated factors. She found some inconsistencies in the data reported by the states to GHQ for use in calculating the prorate factors. Her findings, together with the need for a means to year end the prorate factors, led her to calculate a composite prorate factor of 12.20 percent based on each state's year end investment and employees, and the revenues and expenses for the last quarter of 1984. She recommended this composite prorate factor be used to calculate the year end level of GHQ expense charged to Oklahoma. This resulted in an adjustment of $6,021,496 (total state) for the test year. Since Staff made several adjustments and specific expense disallowances to the prorated GHQ expense, Mr. Buck incorporated the 12.20 prorate percentage in calculating his adjustment to the GHQ expense for the test year and recommended a disallowance of $2,934,304 on an Oklahoma intrastate basis."

See Commission rate Order of January 29, 1986 at pages 17, 18 and 20.

32. See Commission rate Order of January 29, 1986 at pages 19 and 20.

33. See Commission rate Order of January 29, 1986 at pages 19 and 20.

of payments to affiliates must conform to the principles we announce today.

It is generally held that, while the regulatory agency bears the burden of proving that payments to nonaffiliates are unreasonable, the utility shall bear the onus of proving that payments to affiliates are reasonable.[34]

■■■ Although the Commission acts in a legislative capacity when engaging in rate-making and is not bound by technical rules of evidence, when the meaning of evidential terms, e.g. burden of proof, is important to the Commission's handling of an issue, these terms and their impact must be clearly defined.[35] The utility's burden of proving that payments to affiliates are reasonable includes both a burden of production and of persuasion.[36] The utility has the initial burden of producing evidence to show *prima facie* the reasonableness of its payments to affiliates—a mere showing of the expenses' incurrence will not suffice.[37] The utility must produce evidence, for example, that it charged affiliates the same amount as it did arms-length buyers.[38] Unless the utility meets this affirmative duty of showing the reasonableness of payments to affiliates, no such expenses may be allowed.[39]

If the utility sustains this initial burden of production, the burden then shifts to the Commission or the rate protestant to produce evidence showing why the payments to affiliates were not reasonable and should not be allowed. If no such challenge is made, the payments to affiliates will be allowed as an includable expense. If a payment to an affiliate is challenged, the utility will bear the burden of persuading the Commission that the payment to an affiliate should be allowed as an includable expense.

Beyond explaining the impact of the utility having the burden of proof and providing the minimum standards below, the court leaves to the Commission the task of establishing guidelines to determine whether a utility's payments to affiliates are reasonable. The Commission acts in a legislative capacity when engaging in rate-making and is not limited to any particular theory or method in fixing rates.[40] The criteria to be used in determining whether payments to affiliates are reasonable are of a complex and technical nature and their adoption is to be suited to the Commission's experience and expertise.[41]

■■■ At a minimum, the Commission must require SWBT to provide the follow-

**34.** *Boise Water I, supra* note 27 555 P.2d at 167–169; *Boise Water II, supra* note 27 578 P.2d at 1090, 1091; *Washington Water Power v. Idaho Public Util., supra* note 26 617 P.2d at 1251 and *Southwestern Bell v. State Corp. Com'n of Kan., supra* note 27 602 P.2d at 133.

**35.** *Chesapeake and Ohio Ry. Co. v. Public Utilities Com'n,* 163 Ohio St. 252, 126 N.E.2d 314, 319.

**36.** The evidentiary effect of the burden of proof imposed on public utilities with regard to payments to affiliates is discussed in *Boise Water I, supra* note 27 555 P.2d at 167–171; *Boise Water II, supra* note 27 578 P.2d at 1090–1092; *Washington Water Power v. Idaho Public Util., supra* note 26 617 P.2d at 1247–1254 and *Southwestern Bell v. State Corp. Com'n of Kan., supra* note 27 602 P.2d at 133–141.

**37.** *Boise Water I, supra* note 27 555 P.2d at 167–171; *Boise Water II supra* note 27 578 P.2d at 1090, 1091 and *Washington Water Power v. Idaho Public Util., supra* note 26 617 P.2d at 1251.

**38.** "The burden does not shift to the Commission *until* the utility makes a showing of the *reasonableness* of its expenses. In the present case, as in most, this requires more than simply showing the actual cost to the affiliate of providing the service expensed. The reasonableness of the expense to the utility, for ratemaking purposes, will depend, among other factors, on whether the services provided themselves are necessary or beneficial to Kansas ratepayers." [Emphasis theirs.] *Southwestern Bell v. State Corp. Com'n of Kan., supra* note 27 602 P.2d at 136–137.

**39.** *Southwestern Bell v. State Corp. Com'n of Kan., supra* note 27 602 P.2d at 136–137.

**40.** *Application of Valliant Tel. Co., supra* note 8 at 275 and 277.

**41.** "The commission's decisions involve the difficult problems of policy, accounting, economics and other special knowledge that go into rate making. It is equipped with a staff of assistants, with experience as statisticians, accountants and engineers. The courts have no compa-

ing information to aid in its monitoring of payments to affiliates: [42]

1. A list of all companies affiliated with SWBC or SWBT.

2. Financial statements which include balance sheets, income statements, and sources and uses of funds statements for each company.

3. A description of how and when each company was established as well as an outline of what SWBT resources were used, either directly (e.g. personnel) or indirectly (e.g. backing lines of credit).

4. A description of the types of services or products that each company provides.

5. A list and the cost of SWBT facilities that are being used, were used or are expected to be used in the future by each company.

6. Whether the telephone operating companies will be using each company's services or products and the expected cost to SWBT.

7. Whether each company will be using SWBT's services or products and SWBT's method of billing the company for such services or products.[43]

8. A list of assets transferred or sold to each company by SWBT (including any purchases made by SWBT in 1983 and 1984 from an affiliate where the telephone company received stock for compensation and then turned the stock over to SWBC or another affiliate).

9. Whether each company will use information obtained by the telephone operating companies in its business.

■ This court's appellate review of the criteria will extend no further than to determine 1) whether the criteria meet the minimum standards to be followed; 2) whether the criteria established by the Commission are within its lawful discretion; 3) whether the criteria adequately ensure that only reasonable payments to affiliates are allowed; 4) whether the criteria are sufficiently definite to apprise fairly the utility of the evidence it will have to produce to show that a payment to an

---

rable suitability for making the determination." *Southwestern Bell Tel. Co. v. State Corp. Com'n.,* 192 Kan 39, 48–49, 386 P.2d 515, 525 [1963]; *Southwestern Bell v. State Corp. Com'n of Kan., supra* note 27 602 P.2d at 135; see also, *State ex rel. Cartwright v. Okl. Natural Gas, supra* note 7 at 1346 and *Washington Water Power v. Idaho Public Util., supra* note 26 617 P.2d at 1248–1250.

**42.** These minimum guidelines are suggested in one of the dissents. The court also refers the Commission to Section XII of another dissent for further guidance in establishing minimum standards of disclosure for SWBT. Unlike the author of the latter dissent, the court does not believe that the entire rate order must be vacated and remanded. The court also disagrees with the following parts of the thesis advanced in Section XII of that dissent:
1. Income taxes paid by SWBT are not properly includable as an operating expense. [See *Oklahoma Natural Gas Co. v. Corporation Commission,* 90 Okl. 84, 216 P. 917, 922 (1923) ].
2. The court should determine SWBT's appropriate rate of return on equity.
3. The Commission Staff should conduct a detailed audit of the records of each affiliate. [While those transactions defined as "payments to affiliates" must be carefully audited, the Staff's resources are limited and they

should concentrate on conducting detailed audits of SWBT's payments to affiliates.]
4. Prepayments of operating expenses may not be included in cash working capital.
5. The court should select the appropriate depreciation method for SWBT.

**43.** One of the dissents voices well-founded concern about SWBT's method of billing its affiliates for services on an incremental cost plus contribution basis.

There are several reasons for billing affiliates for services on an incremental cost basis—the preferred method according to managerial accounting theory. For example, as in the present case, there may not be a readily ascertainable market price. Also, unless fixed assets are being used at full capacity, a corporation can always increase its overall profitability by selling additional units at a price above its incremental or variable cost for that unit. While incremental cost pricing is appropriate for transactions between two unregulated affiliates, when one of the affiliates is a regulated entity a new problem is introduced. Since ratepayers have paid the cost of the fixed assets of a regulated affiliate, they are entitled to recover from the price charged to an unregulated affiliate not only the variable costs but also the fixed costs of producing the product.

affiliate will be held reasonable;[44] and 5) whether the Commission has applied its criteria properly.[45]

## III

## THE COMMISSION ACTED WITHIN ITS LAWFUL DISCRETION WHEN IT DECIDED TO ADDRESS IN SWBT'S NEXT RATE RELIEF REQUEST THE IMPUTED BENEFIT OR VALUE TO OTHER SWBC SUBSIDIARIES OF USING THE SOUTHWESTERN BELL NAME

The Commission expressed concern in its order about the imputed benefit or value to the other SWBC subsidiaries which are allowed to use the Southwestern Bell name. Despite its concern, the Commission decided to address this issue in the future and directed the Staff to consider it in SWBT's next rate relief request. The Attorney General contends that by this deferment the Commission failed to investigate adequately the parent-subsidiary relationship between SWBT and SWBC.

▮ The Commission has wide discretion in the performance of its duties and the deferral of this issue to SWBT's next request for rate relief did not render the Commission's investigation of the parent-subsidiary relationship between SWBT and SWBC insufficient. The Attorney General cited no rule or precedent requiring the Commission to investigate specifically the value to other SWBC subsidiaries of being allowed to use the Southwestern Bell name. In fact, the Attorney General states that the only notable effect of the affiliation between SWBT and its parent holding company (SWBC) is that the relationship calls for a close Commission scrutiny of both the costs of services performed by or for other affiliates and the SWBC expenses allocated to SWBT.

Two Staff witnesses, Dr. Fish and Ms. Borgmier, recognized that other SWBC subsidiaries benefit from using the Southwestern Bell name. Because of the great difficulty in quantifying this benefit to the subsidiaries, neither recommended an adjustment to the allowed revenue requirement. They also noted that SWBT derives certain advantages from being part of a holding company. Borgmier stated that some diversification into unregulated entities will cause shareholders to see the possibility of the best of two worlds: 1) the safety of regulation and 2) the high return provided by successful unregulated subsidiaries. Although diversification into unregulated subsidiaries will increase the risk to investors and SWBT could possibly end up bearing more of the holding company expenses and other financial burdens should the ventures be unsuccessful, if the unregulated subsidiaries are successful the attraction to potential shareholders of the possibility of a higher return can mean a lower cost of capital for SWBT and lower rates for SWBT ratepayers.

Since the Attorney General could cite no rule or precedent mandating the Commission's investigation into the value to the other SWBC subsidiaries of using the Southwestern Bell name, and there is evidence indicating that SWBT derives certain advantages from the holding company relationship, the Commission did not err by deciding to address this issue in SWBT's next rate relief request.

## IV

## THE COMMISSION'S FINDINGS AND CONCLUSIONS PERTAINING TO THE IMPUTATION OF REVENUES AND EXPENSES FROM SOUTHWESTERN

**44.** *Washington Water Power v. Idaho Public Util., supra* note 26 617 P.2d at 1247.

**45.** *Washington Water Power v. Idaho Public Util., supra* note 26 617 P.2d at 1250–1251.

BELL PUBLICATIONS, INC. TO SWBT ARE SUSTAINED BY THE LAW AND SUBSTANTIAL EVIDENCE; FOR USE IN FUTURE RATE PROCEEDINGS, THE COMMISSION MUST ESTABLISH SPECIFIC CRITERIA AND PROCEDURES FOR IMPUTING DIRECTORY REVENUES AND EXPENSES

Southwestern Bell Publications, Inc., [SWB Publications] was not spun off from SWBT and established as a separate unregulated SWBC subsidiary until January 1, 1984. Because of such factors as the long-term nature of Yellow Pages contracts, two-thirds of the directory revenues and expenses imputed to SWBT for the 1984 test year were attributable to SWBT's own conduct of directory operations prior to 1984.

SWBT's Chief Accountant, T.D. White [White], testified extensively about the procedure used to impute revenues and expenses from SWB Publications to SWBT and explained that these amounts were imputed as though they were those of SWBT. In other words, actual figures were used in his recommendations. SWBT maintains a record of directory revenues and expenses for the years prior to the transfer of directory operations to SWB Publications. If the amount of directory revenues and expenses imputed from SWB Publications to SWBT differs significantly from the directory revenues and expenses of years prior to the transfer, SWBT investigates the difference. White also testified that SWBT maintains an employee at SWB Publications headquarters to ensure that the revenues and expenses imputed to SWBT are correct. The Commission Staff recommended that the Commission adopt White's figures.

The Attorney's General expert witness, Nancy Bright [Bright], testified on the issue of imputing revenues and expenses from the directory subsidiary to SWBT. Although she suggested imputing the same directory expenses, Bright recommended that an additional 7.6 million in directory revenues over actual figures be imputed. In Bright's opinion, the revenues should have been increased to raise directory profits to the level which she believed would have been obtained absent the transfer of directory operations from SWBT to SWB Publications. The only evidence she offered to support this assertion was a table showing that directory revenues had increased by 18.6% between 1980 and 1981, 25.8% between 1981 and 1982, 13.1% between 1982 and 1983, but only 2.7% between 1983 and 1984.

 The Commission ruled that the weight of the evidence did not support Bright's adjustment of imputed growth but rather supported the Staff's recommendation to adopt the actual figures shown by SWBT's exhibits and supported by White's testimony. This decision is clearly supported by law and substantial evidence.

First, the Staff relied on actual figures while Bright merely expressed concern that "the directory revenues suddenly are not increasing anymore." Although Bright seemed to believe that this might be attributable to the formation of SWB Publications, she produced no evidence to prove that was the reason.

The Attorney General states in his brief: "SWB concludes that because the Attorney General could not obtain sufficient information to prove that SWB's numbers were incorrect, SWB has met its burden of proof." Bright testified to the contrary that, although she was restricted to reviewing materials with a SWBT employee present and to taking notes rather than photo-copying the information, she eventually obtained all the information she had requested from SWBT concerning directory revenues. The Attorney General cannot rely on SWBT's supposed refusal to supply information to explain the lack of evidence produced by Bright.

Second, when White was asked if there was anything about the transfer of directo-

ry operations from SWBT to SWB Publications that would affect directory revenues' growth rate, he answered in the negative, stating that all directory sales were handled in exactly the same manner as before the transfer. The same salesmen, he said, work just as hard and call on the same customers.

Lastly, White also testified about the decrease in the growth of directory revenues. He gave two reasons for their decline—the poor state of Oklahoma's economy and the increase of competition in Yellow Pages advertising.

Bright admitted that she knew the oil and gas industry had not fared well and the Oklahoma economy had begun to falter in 1982, but she believed that if these were the reasons for the decrease in revenues the effects would have shown up earlier than 1984. As noted by the Commission's order, Bright's own testimony reflects that Oklahoma's economic downturn did affect directory revenues prior to 1984. While directory revenues increased 25.8% between 1981 and 1982, they increased only 13.1% between 1982 and 1983. The Commission was not acting improperly by considering the State's economy when making its decision.[46]

White also testified that competition in the field of Yellow Pages advertising had increased greatly, e.g. the Donnelly Co. had issued seven directories in the suburban directory area.

The Commission's investigation of the imputed revenues and expenses from the directory subsidiary to SWBT is upheld as satisfactory. For use in future rate proceedings, the Commission must develop and fashion specific criteria and procedures for imputing directory revenues and expenses.

## V

ALTHOUGH THE COMMISSION ACTED WITHIN ITS DISCRETION BY DECIDING TO ADDRESS SWBT TRANSFERRING ITS DIRECTORY OPERATIONS TO SWB PUBLICATIONS AT THE ASSETS' NET BOOK VALUE IN SWBT'S NEXT RATE RELIEF REQUEST, THE MATTER SHOULD BE ADDRESSED BY THE COMMISSION IN THE POST-REMAND HEARING

SWBT transferred its directory operations to SWB Publications at the assets' net book value without recognizing the going concern value of the directory operations. The Commission directed that its Staff investigate coincidentally with SWBT's next rate relief request why SWBT was not compensated for the going concern value.

The Commission's concerns are well founded. They are most relevant when a regulated utility transfers assets to an unregulated affiliate at the assets' net book value and that unregulated affiliate uses the assets to earn revenues that benefit only the shareholders of the parent holding company, not the ratepayers of the regulated utility. The ratepayers in that situation have, in essence, subsidized the shareholders of the parent company.[47] In the present case the revenues and corresponding expenses of SWB Publications have been imputed back to SWBT. In addition,

46. *Ohio Bell Teleph. Co. v. Public Utilities Com.,* 301 U.S. 292, 301, 57 S.Ct. 724, 729, 81 L.Ed. 1093, 1100 [1937].

47. In *United States v. Western Elec. Co., Inc., supra* note 26 at 854, the court stated:
"[a] Regional Holding Company could also subsidize its competitive ventures by transferring assets from its regulated affiliates to its unregulated affiliates at less than their cost or below their market value. Such a practice would not only adversely affect the ratepayers who ultimately fund the research and development costs of the transferred assets, but it would, once again, impede fair and effective competition in the competitive market: this cross subsidization would give the company's unregulated enterprise an obvious and improper advantage over its competitors."

48. This contribution, when allocated on an access line basis, lowers the rate by approximately $2.60 per customer per month. Commission rate order of January 29, 1986 at p. 47.
In *United States v. American Tel. and Tel. Co., supra* note 1 at 194, the court stated:
"All those who have commented on or have studied the issue agree that the Yellow Pages provide a significant subsidy to local telephone rates.... The loss of this large subsidy

the Commission imputed the intrastate investment, less accumulated depreciation, of SWB Publications into SWBT's rate base. As noted by the Commission, these imputations made a significant profit contribution and enabled the Commission to keep rates for other services lower.[48]

SWBT ratepayers have continued to benefit because directory revenues have been earned in essentially the same way as before the transfer of assets to SWB Publications. In effect, the transfer of assets was more akin to a change in corporate form than to a sale.[49] There is evidence in the record that the present arrangement could in the long run be possibly more advantageous to ratepayers than the receipt of compensation for the going concern value of the directory operations. Once such compensation is received, ratepayers can no longer expect to benefit from the imputation of directory revenues and expenses. Ratepayers will then have "cashed in their chips", so to speak, and will no longer be entitled to benefit from directory operations.

■■■ Dr. Fish, a Staff witness, opined that the directory operations were worth much more than their book value. But he, as well as other witnesses who addressed this matter, believed that there would be a great deal of difficulty in quantifying the going concern value of the directory operations and offered no basis or method for making such a computation. Given this great difficulty and the presence of evidence indicating that ratepayers benefit from the present arrangement, the Commission did not clearly abuse its wide discretion by deciding to postpone this issue's resolution until SWBT's next rate relief request.

Although the Commission's treatment of the issue would not by itself warrant a reversal, since the proceeding must be remanded for other reasons, the Commission is directed to readdress itself to this issue in the post-remand hearing.[50]

---

would have important consequences for the rates for local telephone service.... This result is clearly contrary to the goal of providing affordable telephone service for all Americans." [Footnote references deleted.]

**49.** In *United States v. American Tel and Tel Co.*, *supra* note 1 at 201 and 203, the court stated: "Those who claim that the Operating Companies should be compensated for assets transferred to AT & T misperceive both the law and the nature of the proposed reorganization. Under long-established general legal principles, the transfer of assets between a parent and its subsidiary is not an arm's length transaction for which compensation is required. Corporate law holds that such a transfer constitutes an intra-enterprise exchange for which compensation is not necessary.

\* \* \* \* \* \*

Opponents of the settlement rely on *Democratic Central Committee v. Washington Metropolitan Transit Commission*, 485 F.2d 786 [D.C.Cir.1973], as allegedly requiring a different result. To be sure, the Court of Appeals held in that case that capital gains realized on the disposition of assets do not automatically flow to the firm's investors but instead inure to the benefit of ratepayers, and opponents of the proposed decree conclude from that holding that AT & T must compensate the Operating Companies and thus, indirectly, local ratepayers. But there is a crucial difference between the disposition of assets that was involved in that case and the transfer of assets proposed here. In Democratic Central Com-

mittee, the assets were taken out of operation and out of the rate base; obviously, when this occurred a gain was realized and it then became necessary to determine to whom the benefit of that gain should inure. *But no assets are here being removed from public service: the same assets will continue to be used to provide the same services to the same ratepayers, and the assets will remain subject to the same ratemaking jurisdictions of the same regulators.*

\* \* \* \* \* \*

This result also makes sense from a practical point of view, for several reasons.

\* \* \* \* \* \*

Third, payment of compensation would convert what would otherwise be a tax-free transfer into a taxable exchange, thus exposing the Operating Companies to possibly billions of dollars in federal and state tax liabilities." [Footnote references deleted.]

**50.** As noted in section IV of one of the dissents: "... the fact remains that evaluating SWBT's property rights will not become less difficult as time goes by. Indeed it will be more difficult because the more time that elapses between the divestiture and the determination of vital facts and resolutions of critical issues, the more difficult it will be to unravel further complexities wrought by constant corporate shifting of assets and modifications of accounting principles and procedures. The sooner the issue is resolved the better."

## VI

THE COMMISSION ACTED WITHIN ITS DISCRETION BY BASING SWBT'S AUTHORIZED RATES ON A CAPITAL STRUCTURE OF 55.32% EQUITY AND 44.68% DEBT; IN ITS TREATMENT OF FUTURE RATE RELIEF REQUESTS THE COMMISSION MUST IMPUTE A HYPOTHETICAL CAPITAL STRUCTURE IF THE ONE CHOSEN BY SWBT IS MORE EQUITY–LADEN THAN NECESSITATED BY BASIC TELEPHONE OPERATIONS IN OKLAHOMA

The Attorney General contends that the Commission erred by basing SWBT's authorized rates on an excessively equity-laden capital structure.[51] As recommended by its Staff, the Commission based the authorized rates on SWBT's actual capital structure as of June 30, 1985—55.32% equity and 44.68% debt. The Attorney General recommended that a *hypothetical capital structure* of 45% equity and 55% debt be imputed.

The Attorney General contends that the debt-equity ratio used by the Commission is excessively equity-laden and forces ratepayers to bear an "unwarranted and unreasonable capital cost and taxation burden"

to enable SWBC to raise money for the support of its unregulated, non-public related activities.

■ An appropriate capital structure is one that balances properly the requirements of safety of investment, stability of dividends and availability of capital with low cost to the ratepayer.[52]

The practice of imputing a hypothetical debt-equity ratio for purposes of rate setting is accepted throughout the United States.[53] The reason for doing so is to protect ratepayers from excessive capital charges.[54] The ratepayers of a regional holding company that raises funds jointly for both its competitive ventures and its regulated services are especially in need of protection from having to pay for excessive capital charges.[55]

■ Mr. Kaufman, SWBC's Assistant Treasurer and Director of Investor Relations and Earnings Requirements, testified that the ultimate effect of an imputed capital structure is to lower the amount of revenue a public utility is allowed to collect. As noted by the U.S. Supreme Court, there is, in essence, no difference between capital costs and operating expenses. Each is a necessary cost of supplying the service

51. The debt-equity ratio "substantially affects the manner and cost of obtaining new capital. It is therefore an important factor in the rate of return and must necessarily be considered by and come within the authority of the body charged by law with the duty of fixing a just and reasonable rate of return." *New England Tel. & Tel. Co. v. State,* 98 N.H. 211, 220, 97 A.2d 213, 220 [1953]; *Communications Satellite Corp. v. F.C.C.,* 611 F.2d 883, 902–903 [D.C.Cir.1977]; Equity capital is usually more expensive than interest (debt) capital for two reasons: 1) dividend payments to stockholders are not tax deductible while interest payments are and 2) advantages are sometimes gained by leverage. Leverage is the advantage that a corporation's equity interest may possess in its ability to achieve a profit by receiving a higher rate of return on borrowed capital than the rate of interest paid. *Securities and Exch. Com'n. v. Central–Ill. Sec. Corp.,* 338 U.S. 96, 150, n. 49, 69 S.Ct. 1377, 1404, n. 49, 93 L.Ed. 1836, 1874, n. 49 [1949].

52. *Re Western Union Telegraph Co.,* 25 F.C.C. 535, 600–601, 25 P.U.R.3d 385, 465 [1958].

53. *Communications Satellite Corp. v. F.C.C., supra* note 51 at 904.

54. See *Communications Satellite Corp. v. F.C.C., supra* note 51 at 904, where the court stated: "Perhaps the ultimate authority for imputing debt when necessary to protect ratepayers from excessive capital charges is the Supreme Court's statement in *[F.P.C. v.] Hope Natural Gas Co.* [320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333, 345, (1944) ] that 'The rate-making process under the Act, i.e., the fixing of 'just and reasonable' rates, *involves a balancing of the investor and the consumer interests.'* ... The equity investor's stake is made less secure as the company's debt rises, but the consumer rate-payer's burden is alleviated." [Emphasis added.]

55. *United States v. Western Elec. Co., Inc., supra* note 26 at 863–864.

and must be paid for out of current income.[56] Since good faith is presumed on the part of public utility managers, their judgment about prudent outlays, including outlays for capital, should not be overruled unless inefficiency or improvidence on their part is shown.[57] The Commission's decision not to overrule the judgment of SWBT's managers concerning the appropriate capital structure for SWBT and impute a hypothetical debt-equity ratio for purposes of ratemaking is clearly sustained by the law and substantial evidence.

Kaufman also testified that, in connection with efforts to identify the appropriate capital structure for SWBT, SWBC asked its investment banking advisors whether SWBT's debt-equity ratio was appropriate given the business risks confronting the utility, the known rating agency criteria, and the current and expected economic environment.[58] Each consultant recommended that SWBT maintain a debt ratio of 40–45%.[59]

The Attorney General stated that one of the factors in the recommendations made by the three investment houses was SWBC's plan to diversify into unregulated areas; this was only one of the variables. The investment houses also considered the increasingly competitive nature of the telecommunications business, the danger of large customers and/or interexchange carriers bypassing the local exchange companies, the uncertainties regarding the post-divestiture environment, the unfavorable regulatory environment, and the need to maintain a credit rating high enough to have access to the capital markets on favorable terms.

All of the investment houses were concerned that an increase in SWBT's debt-equity ratio might result in a downgrading of SWBT's debt rating and thereby prevent SWBT from being able to attract capital at a reasonable cost. At the time of the rate proceeding SWBC had an AA minus rating from Standard & Poor's. Salomon Brothers stated that it has been their experience that in difficult markets issuers rated below AA sometimes have difficulty in obtaining long-term funds in substantial amounts. Salomon Brothers also noted that A-rated issuers have no margin of safety in terms of a further downgrade into the BBB category where issuers typically have significant limitations on the sources and amounts of capital they can raise and in which funds become more expensive. Further downgrades in SWBT's credit rating could increase the cost of both debt and equity enough to more than compensate for the savings obtained from a high debt-equity ratio and thereby result in a higher overall cost of capital for SWBT.

SWBT's debt-equity ratio is not unusually low. In fact, of the 21 Bell Operating Companies, only three had higher debt-equity ratios as of December 31, 1984.

Dr. Wilson, witness for the Attorney General, relied on a comparison of SWBT's capital structure with the capital structures

---

**56.** *Missouri ex rel. S.W. Bell T. Co. v. Public Serv. Com.,* 262 U.S. 276, 306–307, 43 S.Ct. 544, 552–553, 67 L.Ed. 981, 993 [1923] (Brandeis, J., concurring).

**57.** *West Ohio Gas Co. v. Public Utilities Com.,* 294 U.S. 63, 72, 55 S.Ct. 316, 321, 79 L.Ed. 761, 769 [1935].

**58.** Kaufman testified that each of SWBC's subsidiaries secures its own debt and has a unique capital structure.
See Commission rate order of January 29, 1986 at page 13.

**59.** First Boston recommended 40–43%; Morgan Stanley recommended 40–45%; Salomon Brothers recommended 40–45%.

The pertinent portions of the January 29, 1986 rate order, p. 37, state:
"Even considering that such sources and the bond rating organizations may be biased toward investor safety, their influence on the choices of investors with money to invest cannot be ignored. The effect of bond rating downgrading, particularly to below institutional investment grade, not only increases the cost of money but may cause postponement of needed repairs and expansion, all to the detriment of the customers. It appears to take a great deal longer for a company to be reinstated at a higher rating that [sic] it does to be downgraded."

of independent telephone companies and electric utilities to support his assertion that SWBT's debt-equity ratio should be higher. This is not a valid comparison. While independent telephone companies are subject to competitive and other business risks somewhat similar to those of SWBT, the generally more rural nature of their service areas makes them less vulnerable to bypass risks than SWBT. Also, these companies have been gradually reducing their debt ratios over the past few years. Electric utilities face somewhat similar business risks as SWBT, but there are significant differences.

The Commission's decision in the present cause not to overrule the judgment of SWBT's managers concerning the appropriate capital structure for SWBT is consistent with the law and supported by substantial evidence. In handling future requests for rate relief, the Commission must continue to monitor SWBT's capital structure closely.

The Attorney General asserts that the increased business risks faced by SWBT are due primarily to two factors: the increased business risk of the unregulated SWBC subsidiaries and the increased competition facing the basic telephone operations of states other than Oklahoma.[60] He contends that, since these increased business risks are not attributable to SWBT's basic telephone operations in this state, Oklahoma ratepayers should not bear their burden by paying rates based on an excessively equity-laden capital structure. Although the Commission did not address the impact of the increased competition facing the basic telephone operations in other

states, it did assess the impact of the other factor.

The Commission explained in its rate order that, even if SWBC's plans to diversify into unregulated areas was one of the factors considered by SWBT when it chose its capital structure, it was only one of several variables.[61] On this basis the Commission found the capital structure chosen by SWBT to be reasonable. It is not unpersuasive to advance the argument that, if SWBC's plan to diversify into unregulated areas were even one of the variables used by SWBT to choose a capital structure, ratepayers should be shielded from being affected by this variable by imputing a hypothetical capital structure calculated without measuring the effect of SWBC's plans to diversify into unregulated areas.

■■■ While the Commission's decision to allow SWBT to use its actual capital structure is upheld, the Commission is instructed that in its handling of future requests for rate relief it is to investigate and address the impact of the above two factors on SWBT's capital structure and to impute a hypothetical capital structure if the investigation should indicate that the capital structure chosen by SWBT is more equity-laden than necessitated by basic telephone operations in Oklahoma.

## VII

### THE COMMISSION ERRED WHEN IT DID NOT ADDRESS THE PROPER TREATMENT OF REIMBURSEMENTS RECEIVED BY SWBT FROM AT & T

The Federal Communications Commission [FCC] ruling *In the Matter of Ameri-*

---

**60.** As stated in *Southwestern Public Service Company v. State, supra* note 7 at 96:
"The reasonableness or unreasonableness of rates prescribed by the Commission for a public utility engaged in both interstate and intrastate business must be determined with reference only to the intrastate business done within the State of Oklahoma and the profits derived from the intrastate business."

**61.** The pertinent portions of the January 29, 1986 rate order, p. 37, state:
"The testimony of several of the witnesses presented comparisons with other telephone

companies and other types of regulated utilities, and with unregulated businesses perceived to have similar business risk. Consideration of this testimony together with the Commission's awareness of the increased business pressures a number of telephone and utility companies in this State are currently experiencing, due primarily to competition and reduced demand for their services, convinces this Commission it would be detrimental to the customers of those companies under our jurisdiction to increase their business risk at this time."

can Telephone and Telegraph Company [62] required AT & T to remit to the Bell Operating Companies refunds of operational shared administration expenses and pre-operational customer-premised equipment expenses. It is clear from the FCC's opinion that it intended these reimbursements to be passed on to the ratepayers of the Bell Operating Companies if the ratepayers had borne these expenses.[63] It is also clear that the FCC intended for state commissions to determine the amount of reimbursements to be given the ratepayers in each jurisdiction.[64] The Commission's order did not contain a finding concerning the reimbursements received by SWBT from AT & T.

SWBT and the Commission offer four reasons why the Commission did not make a finding concerning the reimbursements.

*First,* both SWBT and the Commission Staff used 1984 as the test year and determined the 1984 expense and revenue levels by using fourth-quarter data. Since the reimbursements were received in August 1984, they had no impact on test year revenues because they were not received in the fourth quarter. *Second,* authorized rates are designed to recover future revenues and the reimbursements were nonrecurring revenue and could have no impact on future revenues.

 In general, rate regulation is prospective. Future rates are set on the basis of forecasts of income, expenses and profits.[65] The focus of ratemaking is on wheth-

er proposed rates are just and reasonable, not on accounting for mistakes in past rates.[66] Accounting for mistakes in past rates in the setting of future rates, or retroactive ratemaking,[67] was rejected by this court in *Southwestern Public Service Co. v. State.*[68] In that case, we held that the Commission erred when it ordered a rebate of excessive charges made by a subsidiary to its parent utility company for fuel purchases covering the period prior to the effective date of the order determining the charges to be excessive. The court in *Southwestern Public Service Co.* pointed out that the utility's fuel purchases from its subsidiary conformed to a previous Commission order. Clearly, the Commission was attempting to account for mistakes in past ratemaking in the setting of future rates and thereby engaging in prohibited retroactive ratemaking.

 The treatment of the AT & T reimbursements SWBT received has nothing to do with mistakes in past ratemaking. In essence, the reimbursements represent an unexpected windfall and the relevant question posed here is who should receive the benefit of this windfall—SWBC shareholders or SWBT ratepayers. The Commission would not be engaging in prohibited retroactive ratemaking if it considered the proper treatment of the reimbursements.

 *Third,* the reimbursements were for expenses incurred in years prior to the test year. SWBT asserts that since it did

---

**62.** 91 F.C.C.2d 578, 598, 603–604 [1982].

**63.** In the *Matter of American Telephone & Telegraph Co., supra* note 62 at 593.

**64.** In the *Matter of American Telephone & Telegraph Co., supra* note 62 at 598–599 and 603–604.

**65.** *Williams v. Washington Metropolitan Area Transit Com'n.,* 134 U.S.App.D.C. 342, 415 F.2d 922, 940–941 [1968] cert. denied 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 [1969]; *In re Cent. Vermont Public Service Corp.,* 144 Vt. 46, 473 A.2d 1155, 1159 [1984] and cases there cited.

**66.** *Nader v. FCC,* 172 U.S.App.D.C. 1, 21, 520 F.2d 182, 202 [1975]; *In re Cent. Vermont Public*

*Service Corp., supra* note 65, 473 A.2d at 1159 and cases there cited.

**67.** *In re Cent. Vermont Public Service Corp., supra* note 65 at 1159.

**68.** *Southwestern Public Service Co. v. State, supra* note 7 at 102.

The United States Supreme Court and many state courts have also prohibited retroactive ratemaking. *In re. Cent. Vermont Public Service Corp., supra* note 65 473 A.2d at 1159 and cases there cited.

not earn its authorized rate of return during these years, its retention of the reimbursements would cause no overearning by SWBT. If the Commission allowed SWBT to retain the reimbursements because it did not earn its authorized rate of return in years prior to the test year, the Commission would be engaging in de facto prohibited retroactive ratemaking by setting rates that would allow SWBT to recover past losses.

◼ *Finally*, SWBT contends that it is beyond the FCC's authority to determine what the Commission should do with the intrastate portion of the refund. Even if the FCC does not have the authority to determine what the Commission should do with the intrastate portion of the refund, this does not relieve the Commission of its duty to supervise and regulate SWBT in all matters pertaining to SWBT's performance of its public duties.[69]

◼ Even assuming the Commission's and SWBT's assertions as true, they are not dispositive of the question before us— i.e., whether the Commission erred by not addressing itself to the proper disposition of the reimbursements. The Commission's findings must be sufficient in content to apprise this court of the actual basis for its ruling so that the court may determine whether the decision is supported by law and substantial evidence. If the Commission makes no finding on a necessary point, its order cannot be sustained on that point.[70] The matter at issue here is such a necessary point. This cause must hence be remanded to the Commission for consideration of the proper treatment of the reimbursements received by SWBT from AT & T for operational shared administration expenses and pre-operational customer premised equipment expenses.

Since the reimbursements were a refund of money collected in prior years, the treatment of the reimbursements is a question separate from determining SWBT's allowable future revenue requirements by using the formula $R = O + B(r)$.[71] The Commission should determine SWBT's allowable future revenue requirements under this formula without considering the effect of the reimbursements.

◼ Although the treatment of the reimbursements is a question separate from determining SWBT's allowable future revenue requirements by using the formula $R = O + B(r)$, this rate proceeding was the appropriate place for the Commission to address the proper treatment of the reimbursements. The Commission and its Staff do not cite any authority that would prohibit the Commission's consideration of such an ancillary question in a rate proceeding. The Commission must hence address the proper treatment of the reimbursements in its post-remand inquiry. The Commission's decision on the matter will in no way be dependent upon its determination of SWBT's allowable future revenue requirements by using the formula $R = O + B(r)$ and may be effectuated before such allowable future revenue requirements are determined.

◼ In its post-remand inquiry, the Commission must determine what portions, if any, of the reimbursements received were provided by ratepayers and whether these amounts should be refunded to ratepayers. The Commission must then determine the particular method by which any refund will be made. Whether the refund will be amortized over the period that the rates are expected to be in effect or other methods, such as a direct payment to each

---

**69.** The terms of Art. 9 § 18, Okl. Const. (as amended in 1985) provide in pertinent part that the Commission has the

"* * * *duty of supervising, regulating and controlling all transportation and transmission companies* doing business in this State, in all matters *relating to the performance of their public duties* and their charges therefor, and of correcting abuses and preventing unjust

discrimination and extortion by such companies...." [Emphasis supplied.]

**70.** *Southwestern Public Service Co. v. State, supra* note 7 at 100.

**71.** *Supra,* note 7.

ratepayer or a credit on each bill rendered, will be used to effectuate any refund is within the Commission's discretion.

## VIII

## THE COMMISSION ACTED WITHIN ITS DISCRETION IN ITS ADOPTION OF A UNIVERSAL SERVICE OPTION PLAN

Universal Service Option is a plan designed to provide basic telephone service to low-income individuals who otherwise would not be able to afford it. None of the parties opposed the concept of a Universal Service Option, but all of them differed concerning the form the plan should take. The Commission did not explicitly adopt any of the plans proposed by the parties, but rather adopted a plan containing elements from each of the proposed plans.

The Attorney General asserts that this part of the Commission's order should be vacated because there is no evidence in the record to support the specific plan adopted by the Commission.

There is no requirement that the Commission follow a specific plan in setting rates. Setting rate schedules for public utilities is a legislative process and the Commission acts in a legislative capacity when it establishes rate schedules.[72] Ratemaking is not an exact science involving precise mathematical calculation. The Commission is not limited to any particular theory or method in fixing rates.[73] On the contrary, the Commission has wide discretion in the performance of its duties.[74] The Commission's ruling on the adoption of a Universal Service Option Plan was within its wide discretion.

## IX

## THE COMMISSION'S FINDINGS PERTAINING TO THE INCLUSION OF PREPAYMENTS IN THE RATE BASE LEAVE TOO MUCH TO SPECULATION AND CONJECTURE

When determining the value of a utility's rate base for ratemaking purposes, an allowance for working capital is usually included.[75] Such an allowance is designed to provide the utility a return on funds that

**72.** *Application of Valliant Tel. Co., supra* note 8 at 275 and *Arkansas La. Gas Co. v. Sun Oil of Pa., supra* note 11 at 16.

**73.** *Application of Valliant Tel. Co., supra* note 8 at 277 and *Public Serv. Co. of Okl. v. Okl. Corp. Com'n.*, Okl., 688 P.2d 1274, 1282 [1984].

**74.** *Teleco, Inc. v. Corporation Commission, supra* note 10 at 212 and *Bishop v. Corporation Commission, supra* note 11 at 236.

**75.** "Working capital is defined as current assets minus current liabilities. If all of the current assets were converted to cash at their book value and all of the current liabilities paid at their book value, working capital would be the amount of cash remaining." Glenn A. Welsch, Charles T. Zlatkovich and Walter T. Harrison, Jr., Intermediate Accounting, 6th ed. [Homewood, Illinois: Richard D. Irwin, Inc., 1982], p. 113.
"Current assets are cash and other assets, commonly identified as those which are reasonably expected to be realized in cash, or to be sold or consumed during the normal operating cycle of the business or within one year from the bal-

ance sheet date, whichever is longer. The normal operating cycle is defined as the average period of time between the expenditure of cash for goods and services and the date those goods and services are converted back into cash. * * * The major items comprising current assets, in order of liquidity, are cash, short-term investments, receivables, inventories, and prepaid expenses." *Welsch, supra* at 111.
" * * * [C]urrent liabilities are short-term liabilities 'whose liquidation is reasonably expected to require the use of existing resources properly classified as current assets, or the creation of other current liabilities.' [AICPA, Accounting Research and Terminology Bulletins, Final Edition (N.Y., 1961), p. 21] * * * This definition includes items such as revenue collected in advance, which entails an obligation to 'perform or render the revenue activity' within the next year or operating cycle, whichever is longer. Also included in current liabilities are liabilities whose liquidation is expected to occur within a relatively short period of time, usually one year." *Welsch, supra* at 111. The major items comprising current liabilities are accounts payable, short-term notes payable, current maturities of long-term liabilities, collections in ad-

are used to pay expenses before the income produced by those expenses is received.

There are three methods of determining a cash working capital allowance: the lead/lag study approach, the formula approach and the balance sheet approach. Both SWBT and the Commission Staff recommended that the formula approach be used in the present case. The Attorney General recommended that no working capital allowance be included in the rate base because SWBT had not performed a lead/lag study although it had been ordered to do so in the last SWBT rate case. The Commission concluded that, since SWBT had not performed a lead/lag study as ordered and the recommendations pertaining to the amount of working capital to be included varied so widely, the only proper solution was to deny SWBT's request for a cash working capital allowance. Despite this conclusion, the Commission allowed the inclusion of $18,399,709.00 of prepaid expenses [76] in SWBT's rate base, including an allowance for Yellow Pages prepayments so as to match revenues and expenses. The Attorney General contends that this inclusion of prepayments in the rate base was not based on evidence in the record and was in contravention of the Commission's own finding that no cash working capital allowance would be included in the rate base.

The Commission made only one finding pertaining to inclusion of prepayments in the rate base: "For these items [prepayments], the Commission relies on previous Commission treatment and thus adopts Staff's proposal." [77]

Both SWBT and the Commission Staff assert that the inclusion of prepayments in the rate base was proper because prepayments are not a part of cash working capital, but rather both prepayments and cash working capital are subdivisions of working capital. In an earlier order the Commission directed that the basis for a cash working capital allowance must be a lead/lag study. Evidence was presented to show that prepayments could be included in a lead/lag study.[78] The Commission failed to make any reference to this evidence or the weight afforded it in its findings. The court is left with nothing but conjecture and speculation to explain why, if prepayments could be included in a lead/lag study, they could not also be included in cash working capital.

vance for unearned revenue, and accrued expenses for payrolls, interest, and taxes. See *Welsch, supra* at 112.

The amount of working capital is viewed as a measure of liquidity, that is, the ability of the enterprise to meet its short-term obligations. See *Welsch, supra* at 113.

76. A prepaid expense occurs when services or supplies were purchased or otherwise acquired but not consumed or used by the end of the accounting period. For example, a three-year insurance premium would not be used or consumed by the end of the accounting period in which it was purchased and would thus be a prepaid expense. Welsch, *supra* note 75 at 47.

77. Commission rate order of January 29, 1986 at p. 41.

78. Nancy B. Bright, witness for the Attorney General, stated in her prefiled testimony:

"The *working capital requirement associated with prepaid expenses*, as well as cost free capital sources, *would have been fully reflected in a valid lead/lag study*, if one were available. The Company's failure to file a lead/lag study should not give it the opportu-

nity to selectively increase rate base for prepaid expenses, with no offset for cost free capital sources such as accrued taxes. Given available evidence in this case, the appropriate cash working capital allowance, including prepayments, is zero." [Emphasis supplied.] [Ex. No. A30, p. 44, Tr. Vol. XII, p. 1504]

Mr. T.D. White, SWBT's Chief Accountant, stated in response to cross examination:

"Q. Would it be true to say that a valid lead/lag study would include prepayment expenses in its calculation?

A. A lead/lag study would include anything which involves the movement of cash one way or the other.

Q. And that would include prepayment?

A. *It could include prepayments.* Now, there is no standard way of making a lead/lag study.

Q. I understand that. But as a general premise, a prepayment is—

A. If you include prepayments as a separate item of cap structure—I mean of your rate base, I would not include prepayments in the lag study." [Emphasis supplied.] [Tr. Vol. II, p. 165]

This confusion may have resulted from the rate order's imprecise definition of working capital. Inflows and outflows of funds are typically measured in terms of either (1) cash (or cash plus short-term investments; often called the near-cash basis) or (2) working capital (i.e., current assets minus current liabilities).[79] The Commission states at page 41 of its order:

> "* * * Because of the divergent recommendations made on cash working capital, the Commission is of the opinion that *it is necessary to first define cash working capital* in the regulatory environment. For ratemaking purposes, *working capital* is the average amount of capital provided by investors in addition to other specifically identified rate base items. The *inclusion of working capital* is to bridge the gap between the time expenditures are required in order to provide service and the time collections are received for that service. * * * " [Emphasis added.]

Although the Commission states that it is necessary to define "*cash* working capital," its order instead defines "working capital." This confusion of terms leaves the actual basis of the Commission's findings in a state of uncertainty.

■■■■ The Commission's findings must be detailed sufficiently to ensure against arbitrariness and to apprise this court of the actual basis for its decision so that the court may determine whether the findings are supported by the law and substantial evidence. Findings made in general terms are insufficient.[80] The Commission's findings with respect to inclusion of prepayments in the rate base are not sufficient to apprise this court of the actual basis of its decision and are framed in general terms. While the Commission did admit evidence pertaining to prepayments, it failed to make any reference in its order to such evidence or to the weight afforded such evidence in its findings. We are hence left with nothing more than conjecture and

speculation as a basis for our review of the Commission's decision. The proceeding must hence be remanded to allow reconsideration of prepayments' inclusion in the rate base.

In its inquiry the Commission must define precisely what it intends working capital to mean. Its definition need not conform precisely to either of the typical meanings given above. The Commission is free to shape a definition of working capital particularly suited to its regulatory scheme or needs. After the Commission has clearly defined what it intends working capital to mean, it must use its definition in the disposition of the present and subsequent requests for rate relief.

## CONCLUSION

The Commission's dismissal of the Attorney's General motion for modification of the rate order *after* a lapse of 30 days from its entry is affirmed.

The Commission's rate order is legally efficacious as to issues resolved in Parts II through IV and in Parts VI and VIII and is affirmed insofar as it determines the issues discussed in these parts.

Because the Commission failed to address the proper treatment of reimbursements received by SWBT from AT & T, and since its consideration of prepaid expenses is confusing, the rate order is reversed insofar as it resolves issues outlined in Parts VII and IX. The proceeding is remanded to the Commission for further inquiry to be conducted, and findings to be made, in conformity with directions given in this pronouncement. Although Part V is legally efficacious, in the post-remand inquiry to be conducted the Commission is directed to address whether it was proper for SWBT to transfer its directory operations to SWB Publications at the assets' net book value.

If the Commission's post-remand findings prove to be inconsistent with the rate

---

**79.** See *Welsch, supra* note 75 at 822–823.

**80.** *Southwestern Public Service Co. v. State, supra* note 7 at 101.

structure declared in its original order now on review in this case, then the Commission shall modify its rate structure to conform to the post-remand findings.[81] The post-remand inquiry ordered here shall be deemed a continuation of the pre-appeal proceedings below. The present rate structure shall remain in force until the Commission has completed its post-remand inquiry and rendered its final decision.

Order affirmed in part and reversed in part; proceeding remanded with directions to conduct a further inquiry and make additional findings.

HARGRAVE, V.C.J., and LAVENDER, SIMMS, OPALA and SUMMERS, JJ., concur.

BRIGHTMIRE and GARRETT, S.JJ., sitting by designation, concur in part and dissent in part.

DOOLIN, C.J., and ALMA WILSON, J., dissent.

HODGES, J., disqualified.

KAUGER, J., recused.

BRIGHTMIRE, S.J., concurring in part and dissenting in part.

Did Southwestern Bell Telephone Company (SWBT) reach out and touch the ratepayers of this state too hard? The attorney general contends that it did. The Commission and SWBT say it did not and today this court approves a rate setting procedure employed by the Commission which I believe falls way short of that which is constitutionally acceptable.

While I agree with the result reached in Parts I and IX of the majority opinion—relating to the dismissal of the attorney general's Rule 24 motion and the AT & T refund—I dissent from most of the conclusions and dicta set out in Parts II, III, IV, V, VI, VII and VIII because in my opinion they establish unwise precedent, contain some inappropriate dicta, leave the litigants to flounder in a sea of uncertainty in critical areas, and permit the cards to remain seemingly stacked against the ratepaying public.

I

The attorney general, on behalf of the ratepaying public, prosecutes this appeal complaining that the rate increase granted SWBT is unreasonable and offers several grounds for vacating the order granting it which fall into the following broad categories: (1) The order does not facially disclose findings of fact supported by substantial evidence as required by law with regard to a number of significant matters; (2) The order fails to consider various relevant matters *entirely;* and (3) The order reaches certain erroneous conclusions of law of both a substantive and a procedural nature.

The thrust of the attorney general's contentions can be framed this way: That in rendering subject order, the Commission shirked three important constitutional duties imposed upon it, namely: (1) It failed to regularly pursue its authority; (2) It failed to make adequate findings and reach sustainable conclusions; and (3) Its order fails to disclose evidence and certify facts underlying its action which are essential for the prompt disposition of this appeal—that is, which are sufficient for us to determine whether the Commission's find-

---

**81.** In the exercise of its power under Art. 9, § 20, Okl. Const., to review the Commission's rate orders, the Supreme Court can modify the order and remand it with instructions to change or modify the order to conform to the appellate court's pronouncement. See *supra* note 23 and the text in the introduction for the pertinent terms of Art. 9, § 20, Okl. Const.

See also the terms of 17 O.S.1981 § 7 which provide in pertinent part:

" * * * If the judgment of the Commission is reversed or *modified by the Supreme Court,* the same *shall be remanded to the Commission with instruction to change or modify the former judgment* of the Commission to conform to the opinion of the Supreme Court. The *Supreme Court may remand* any case for additional evidence or rehearing, *and make such final order* or judgment in the case *as the Court may deem proper."* [Emphasis supplied.]

ings rest on substantial evidence and whether its conclusions and proceedings accord with law.[1]

## II

First, with respect to the attorney general's complaint about the dismissal of his Rule 24 motion, I want to state that while I concur with the court's affirmance of the dismissal under the circumstances of the case, I disagree with the implication that litigants before the Commission cannot extend the 30–day appeal time by filing a Rule 24 motion. The court should expressly settle the question by holding that the aggrieved party can either appeal from the Commission's order or seek Rule 24 relief during the pendency of which appeal time is extended for a reasonable period.

In urging this I accept the fact that the Commission had authority to establish internal procedural Rule 24 pursuant to the broad powers granted by art. 9, § 18, of the Oklahoma Constitution. Here both the attorney general and SWBT sought to avail themselves of the benefits of Rule 24. Thus if Rule 24 is a valid procedural rule it would appear to me that the parties had a constitutional right to invoke it. The procedural uncertainty was brought into focus by the dismissal of the attorney general's

Rule 24 motion under the circumstances of his earlier appeal from the January 29, 1986 order.[2] In affirming the Commission's dismissal of the attorney general's motion, the court emphasizes that orders "rendered by the Commission *automatically become final after 30 days*" thus implying that an appeal must in any event be filed within such 30–day period. This has the effect, it seems to me, of invalidating Rule 24 by implication, or at least leaves lingering the question of the appellate jurisdictional consequences of appealing from a timely-filed Rule 24 motion within 30 days after the rendition of an order disposing of such motion. The matter should be expressly resolved by this court one way or the other.

It is my view that Rule 24, being a constitutionally ordained creation of the Commission, can be invoked by a party without having to forfeit his constitutional right of appeal to this court. Therefore, to accommodate and protect both rights, and at the same time prevent unwarranted delay, I would hold that the timely filing of a Rule 24 motion shall extend a party's appeal time for a reasonable period but not to exceed 60 days from the date of the filing. And, if during that time the Commission fails to dispose of the motion, either party may within 30 days appeal from the origi-

---

1. Okl. Const. art. 9, § 20, reads in pertinent part:
 "The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving in [*sic*] asserted violation of any *right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts.* In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and *whether the findings and conclusions of the Commission are sustained by the law and substantial evidence.* Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from." (Emphasis added.)
 Okl.Const. art. 9, § 22, reads in relevant part:
 "The Corporation Commission shall, whenever an appeal is taken therefrom, file with the record of the case, and as a part thereof, a

written statement of the *reasons* upon which the action appealed from was based, and such statement shall be read and considered by the Supreme Court, upon disposing of the appeal.... [T]he cause shall be heard on the record made before the Corporation Commission, and the Chairman of the Commission, under the seal of the Commission, shall certify to the Supreme Court *all the facts upon which the action appealed from was based, and which may be essential for the prompt decision of the appeal,* together with all evidence introduced before said Corporation Commission, as may be selected, specified or required to be certified, by any party in interest, as well as such other evidence, so introduced before the Commission as the Chairman may deem proper to certify...." (Emphasis added.)

2. Okl.Corp. Comm'n Order No. 292337, Cause No. 23921 (Jan. 29, 1986).

nal order and this court shall exercise discretion in determining whether prosecution of the appeal shall be stayed pending disposition of the Rule 24 motion, whether the Rule 24 proceedings shall be stayed pending disposition of the appeal, or whether some other directional order will best accommodate justice.

### III

To set the other issues raised by the attorney general in proper perspective and make them more understandable, reference to some orientational historical facts is in order.[3]

The forerunner of this litigation began long ago, on January 14, 1949, when the United States government filed an action in a New Jersey federal court against the American Telephone & Telegraph Company and Western Electric Company, alleging that the defendants conspired to restrain trade in the manufacture, distribution and installation of various telephonic equipment in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 and 3 (1973).[4] The relief sought included divestiture by AT & T of its stock ownership in Western, termination of certain "exclusive relationships," divestiture of Western's interest in Bell Telephone Laboratories, and cessation of other trade-restraining conduct.[5] A prolonged period of negotiation and political activity followed ultimating in an agreement between the government and AT & T in 1955,[6] and the issuance of a consent decree on January 24, 1956, by the U.S. District Court of New Jersey.[7]

The next major development occurred November 20, 1974, when the United States filed another antitrust suit against AT & T, Western, and Bell Telephone Laboratories in the District Court for the District of Columbia. In that action, divestiture from AT & T of the Regional Bell Operating Companies (RBOCs) was sought, as well as the dissolution of the "exclusive relationships" between AT & T and Western.[8]

Trial of the case began in January 1981, and was near an end in January 1982, when the parties announced a stipulation consenting to the entry of what has come to be known as "Modification of Final Judgment" (MFJ) altering the decree previously rendered in the New Jersey action and dismissing the D.C. action.[9] The proposed statement contained detailed provisions calling for, among other things, the divestiture of the RBOCs and various structural restrictions aimed at preventing the "recurrence of the type of discrimination and cross-subsidization that were the basis of the AT & T lawsuit."[10] The New Jersey action was transferred to the D.C. court which entered a consent decree January 21, 1982, that became the foundation for events leading to this appeal.[11] Later on, in 1984, the RBOCs sought three more major modifications of the MFJ. Judge Greene, sitting in D.C., reviewed them and wrote an opinion in which cogent comments and observations were made about some of the very same problems we are dealing with today.[12]

It should especially be borne in mind that the stated objective of the divestiture was to prevent AT & T from using its control of the local telephone service monopoly to disadvantage competitors by (1) denying them

---

3. Title 12 O.S.1981 §§ 2201–2203. It should also be noted that the legislature may repeal or amend §§ 18–34, art. 9 of our constitution. Okl. Const. art. 9, § 35.

4. *United States v. Am. Tel. and Tel. Co.*, 552 F.Supp. 131, 135 (D.C.Cir.1982).

5. *Id.* at 136.

6. *Id.* at 137.

7. *Id.* at 138.

8. *Id.* at 139.

9. *Id.* at 140. *See also* Exhibit No. A59 at page 1541 of the Official Record.

10. 552 F.Supp. at 142.

11. *Id.* at 145.

12. *See also United States v. W. Elec. Co.*, 592 F.Supp. 846 (D.C.Cir.1984).

access to the local network and (2) using "profits earned from the monopoly of local telephone operations to subsidize its long-distance and equipment business in which it was competing with others." [13] In light of this the Department of Justice urged the court to ensure against such misuse of the same monopoly power by the RBOCs by barring them from entering any competitive market. The court generally agreed but introduced two exceptions which it felt would "generate a substantial subsidy for local telephone rates" with minimal anti-competitive impact or abuse of the monopoly power. The two exceptions were: (1) Marketing of customer premises equipment (CPE)—the telephone and other devices used in subscribers' homes and offices—and (2) production of the Yellow Pages advertising directories.[14]

Later, in ruling on motions of the Regional Holding Companies to waive the "line of business" restrictions in the MFJ, the federal court reiterated that under the decree (MFJ), "the Operating Companies' basic responsibility is to provide local telephone service to the public." [15]

Finally, it should be noted that the MFJ considered the telephone service entities spun off from AT & T—in this case SWBT—to be the "operating companies." [16] Transfer of operating company assets to a regional holding company does not seem to have been discussed or even contemplated by early federal decrees. SWBC was incorporated October 5, 1983, and transfer of SWBT assets to it was carried out January 1, 1984.[17] Following this the Regional Holding Companies were discussed as such by the federal court.[18]

## IV

The recent history of the cause under attack is as follows. SWBT applied for a

rate increase of $138.5 million November 12, 1982. This resulted in a $43.7 million interim increase granted May 24, 1983, presumably with regard to local telephone rates, which was made permanent December 29, 1983. On June 24, 1983, SWBT applied for another increase sufficient to generate an additional $301 million effective January 1, 1984. This request was reduced to $233.6 million at the behest of the Commission on September 16, 1983.[19]

On December 29, 1983—after criticizing "the action taken by the federal court divesting AT & T of its operating companies" —the Commission issued an order making the May 1983 interim increase permanent and granting another "interim" increase of $135,197,000—for "adjustment of rates for intrastate telephone service"—effective January 1, 1984. This huge rate hike was not based entirely on existing data or experience, but on "a budgetary report estimating" post-divestiture needs, prepared by SWBT. The Commission's reason for this was that "setting rates for a company that [is] to dramatically change on January 1, 1984, would require reliance on some projected information and data." Such rates and changes, said the Commission, were to be "reviewed ... after sufficient actual [post-divestiture] data becomes available."

Also approved in the December 1983 order as an operating expense was a request by SWBT to make what appears to be about a $6 million contribution to a so-called Central Services Organization.[20] The Commission promised, however, that SWBT would be required to demonstrate during "review of this cause [that] the services purchased by the monies allocated to

---

13. 552 F.Supp. at 223.

14. *Id.* at 224.

15. 592 F.Supp. at 861.

16. 552 F.Supp. at 139.

17. SWBT, 1983 Annual Report, Inside Front Cover (1984).

18. 592 F.Supp. at 854.

19. *See* Okl.Corp.Comm'n Order No. 250987, Cause No. 28002 at 1–3 (December 29, 1983).

20. The federal court granted permission to the seven RBOCs to organize a research and development entity for their joint use to which each would contribute. To begin with it was called Central Services Organization. Once organized it was given the name Bell Communications Research, Inc. (Bellcore). *See* Okl.Corp. Comm'n Order No. 250987, Cause No. 28002 at

CSO do indeed benefit Oklahoma ratepayers, and the costs are reasonable and proper." The amount is not disclosed but I assume it is disguised as the "Other" expense on page 10 of the December 1983 Order No. 250987 in Cause No. 28002 in the amount of $6.002 million. By the time Cause No. 29321 was heard in September 1985, the CSO had been established and named Bell Communications Research, Inc., which is referred to by the acronym "Bellcore" throughout the record. It is owned and operated by the seven operating companies in a manner strikingly similar to its celebrated predecessor—Bell Telephone Laboratories, Inc. In its January 1986 order, the Commission found that not all of SWBT's contribution to Bellcore should be allowed and said it was adopting the staff's recommendation that Bellcore "expenses relating to *applied research,* quality assurance, 800 service,[21] image enhancement, and imputed revenue" should be disallowed. In the next sentence, however, the Commission contradictorily found *that not all expenses relating to,* among others, *"applied research" should be disallowed.*[22] This court is not given the benefit of any figures so we do not know how much was allowed or disallowed. Again I have found no evidence in the record—substantial or otherwise—to support the ambiguous finding one way or the other.

On November 9, 1984, SWBT filed another application for an additional rate increase of $121.4 million. Another "interim" increase of $32,520,695 was granted

February 13, 1985, again based on no discernable evidence. A hearing was held in September 1985 eventuating in the Commission's issuance on January 29, 1986, of Order No. 292337 approving a rate increase of $80,075,256 and, without any supporting evidence, the Commission merely "approved" the $135,197,000 "interim increase" granted December 29, 1983, for a total rate increase of nearly a quarter of a billion dollars.

V

To further aid understanding of the issues to be resolved, I also draw attention at this point to several irregularities involved in the complained-of proceedings leading to the order appealed and also in the "interim" orders it approves.

First, the amount of the rate increase approved cannot be determined from a reading of the January 1986 order itself. The format of the ordering portion of the order misleadingly leaves the impression that an increase of only $47.5 million is being authorized when in fact a much larger "permanent" increase of some $215,262,256 is granted by the simple expedient of "approving" two previous "interim" orders by reference only.[23] The first was authorized December 29, 1983, in Order No. 250987, Cause No. 28002, in the amount of $135,197,000. The second, for $32,520,695, was granted in an order issued February 13, 1985.[24] This figure was deducted from $80,065,256—the *total* amount of the defi-

9 (December 29, 1983), and Okl.Corp.Comm'n Order No. 292337, Cause No. 29321 at 51 (January 29, 1986).

21. Okl.Corp.Comm'n Order No. 292337, Cause No. 29321 at 51 and 53 (January 29, 1986) (emphasis added).

22. *Id.* at 51.

23. One of these "interim" orders, No. 250987, Cause No. 28002, (Dec. 29, 1983), incidentally, gives permanent approval to an earlier increase of $43.7 million granted May 24, 1983, and made permanent December 29, 1983. This brings to $258 million the total amount of rate increases granted since May 1983. Such a large increase in such a short period of time is not

only unsupported by evidence disclosed in the order under review but points up the fact that SWBT is on a more or less "cost-plus" basis which discourages ratepayer-oriented efficiency, either managerially or cost-wise.

24. Okl.Corp.Comm'n Order No. 273137, Cause No. 28309 at 53 (February 13, 1985). It should be pointed out that the Commission said that none of the $135.5 million increase "may be imposed on local service." It authorized $478.8 million to be collected through access charges from interstate carriers and $56.3 million from "increases for vertical or competitive services." *Id.* at 23.

In this regard it may be noted that the $32.6 million "interim relief" authorized in Order No.

ciency which was found by the Commission in the January 29, 1986, order[25] to have resulted from test year revenue and expense figures found to be "appropriate," whatever that means. There is nothing in the order to indicate that such deficiency is founded on predicatory findings of "reasonable" and "necessary" foundational test year data, revenues and expenses. Moreover, there is no evidence or findings in the order supportive of the other interim increase approved—the one for $135,197,000.

Another significant irregularity "approved" by the 1986 order in my opinion is the inclusion of "income tax" in the amount of $59,546,000 as an item of operating expense to achieve the $135,197,000 revenue deficiency figure authorized by the December 29, 1983, interim order, No. 250987, Cause No. 28002.[26] Similarly, the Commission in its January 29, 1986, order,[27] deducted income taxes in the amount of $22,040,996 from "Net Operating Income Before Taxes" in arriving at the "Net Operating Income" deficiency of $80,485,352. This means that the Commission is defining fair return on the rate base as being an after income tax return. In my opinion this is error. The rate should be set on the basis of a fair return on the net plant income before income taxes of any kind—federal, state or local. The only decision in this state on the subject is *Oklahoma Natural Gas Co. v. Corporation Commission*, 90 Okl. 84, 216 P. 917 (1923), and it construed and followed, evidently as binding, pre-*Erie*

*R.R. v. Tompkins*[28] federal common law precedent promulgated by the United States Supreme Court in a diversity case arising in Texas, namely, *Galveston Electric Co. v. City of Galveston*, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678 (1922). The *Galveston* court saw no difference between operating tax expense and post-operational income taxes. Of course, in 1922 income taxes did not amount to much. But in any event the precedential effect of *Galveston* perished with the dramatic landmark change wrought by *Erie* in holding that the federal courts were bound to apply state substantive law to state law issues triable in federal court. It is my opinion that, under these circumstances, this court has never rendered any independent decision on the issue and it should take the opportunity to do so in this case by disallowing the deduction of income taxes as "operating expenses."

Another irregularity is the fact that SWBT's application in this cause, No. 29321, included a request for an increase in "intrastate access tariffs" (intrastate long-distance calls) which the Commission for some undisclosed reason decided not to consider in this cause but in Cause No. 28309. This presents the question of how the rate-related issues in this appeal can be properly reviewed without the inclusion of SWBT's revenue from its intrastate long-distance revenue.

Irregular also is an operating expense referred to in the December 1983 order as

273137 was for a "$2.27 per month increase on all of SWB's residence and business exchange access lines and $.28 per month on all SWB's centrex lines." *Id.* at 7.

In Order No. 273137 the Commission also rejected a proposed $81.9 million rate base increase said to be caused by an alleged decrease of over 1,000 access lines.

25. Okl.Corp.Comm'n Order No. 292337, Cause No. 29321 at 54 (Jan. 29, 1986).

26. Official Record, Exhibit A61B, p. 16.

27. Okl.Corp.Comm'n Order No. 292337, Cause No. 29321 (Jan. 29, 1986).

28. 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In overruling the long standing doc-

trine of *Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), the *Erie* court said:

"Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts."

"Gross Receipts Tax $1,665,000." This item does not appear elsewhere and I cannot find where such a tax is levied upon any entity except electric cooperatives, 68 O.S.1981 §§ 1801–1807; intoxicating liquors, 37 O.S.Supp.1987 § 579; and various utilities, except telephone, provided by municipalities, 68 O.S.1981 §§ 2601–2605. Another puzzling operating expense in the December 1983 order—referred to as "Independent Company Settlements 8,774,000"—is unaccompanied by supporting evidence or even an explanation as to what it is.

Among the items included on the expense list in the January 29, 1986, order is one called "Other 43,238,643." Again there is no explanation or evidence of what this "other" consists of. *See* footnote 76 for the speculatory possibility that it may be an inappropriate pension fund expense.

To make matters even more confusing the rate base approved in the order under review cannot be reconciled with either the one approved in December 1983 or the rate of return. An analysis of the figures given, the rate of return allowed and the amount of rate increase allowed cannot be reconciled.

For example, in Order No. 250987, issued December 29, 1983, the Commission found a need for an interim rate increase of $135,197,000 based on little more than speculation and the hope of later confirmatory evidence—evidence which as it turned out was never forthcoming so far as I have been able to find.

To justify this large interim rate increase the Commission found that SWBT's Oklahoma rate base (r) at the close of 1983 was $886,579,000.[29] It accepted a capital structure of 55 percent equity and 45 percent debt with an overall debt cost of 9.37 percent. It found a fair return to be 14.25 percent on equity and 12.05 percent (B) on net plant. This meant, then, that SWBT

was entitled to a return equal to $106,833,-000 (r × B). The Commission, at page 9 of Order No. 250987, found that SWBT's total revenue during the 1983 test year[30] was $482,098,000, total expenses were $406,-792,000, and total taxes were $32,783,000, for total operating expenses of $436,575,-000 (O), which it subtracted from total revenue to achieve a "total adjusted operating income of $42,523,000." This was then subtracted from the required return, $106,-833,000. To the difference, $64,310,000—designated "Return Deficiency"—was added:

| | |
|---|---:|
| Income Tax | $59,546,000 |
| Gross Receipts Tax | 1,665,000 |
| Uncollectibles | 902,000 |
| Independent Company Settlements | 8,774,000 |
| TOTAL | $70,887,000 |

to arrive at a "Revenue Deficiency" of $135,197,000. Aside from the fact that the foregoing add-ons are suspect, a larger problem is encountered when we start totaling these revenue figures, add in the additional $32,520,695 interim increase granted in February 1985 and try to reconcile with the figures set out in the January 1986 order in that the 1983 revenue plus the $135,197,000 increase granted December 29, 1983, should have achieved revenue of some $617,295,000 for 1984, but the Commission found SWBT–reported revenue of only $582,799,267 for that year.

First of all, we know that 1984 is the test year with which we are dealing. Since no further hearing was held with respect to the $135,197,000 increase it can be assumed that it was collected during 1984 and boosted the 1983 revenue of $482,098,000 to somewhere in the neighborhood of $617,-295,000. There is no evidence to the contrary. For some inexplicable reason, however, the Commission came up with total revenues for 1984 of only $582,799,267, even though each item listed in the 1983

---

**29.** For convenience I refer to the rate development formula referred to by this court in *State ex rel. Cartwright v. Oklahoma Natural Gas Co.,* 640 P.2d 1341, 1349 (Okl.1982). R (revenue

requirement) = O (operating expense) + B (rate base) × r (fair rate of return on rate base).

**30.** Staff used the 1983 calendar year. SWBT used the 1982 fiscal year ending July 1, 1983.

revenue list, except "Miscellaneous", gained significantly and the "Miscellaneous" decline was more than offset by revenue sources not considered in 1983. The question is why total revenue as found by the Commission—$582,799,267—is so far below the 1984 target of $617,295,000? Of course we know first of all that the 1983 figure was way too low because it included improper operating expenses in the revenue calculation. Beyond this there is absolutely no way that I can see to reconcile any of the figures in the two orders. There is no way this court can determine how the Commission arrived at most, if not all, of the figures it has used. In the rate formula we are unable to determine from the contents of the order what either (R), (r), (O) or (B) should be.

On its face then, the validity of the final order features serious fundamental irregularities. It undertakes to approve a large rate increase, most of which was granted in another cause, without substantial supporting evidence, findings, legally sufficient conclusions, or disclosure of the amount of the increase in the order under review. More specifically, there is no definitive evidence detailed in any of the orders which will support any of the revenue or expense figures given. As we will see, in order for this court to properly assess the issues raised it is necessary for the Commission to prepare detailed balance sheets and profit-and-loss statements for SWBC,[31] SWBT, and each of the unregulated subsidiaries, complete with understandable explanations concerning each and every item listed along with all accounting changes or choices and the evidentiary support for all of it.[32] None of this have I found.

## VI

I turn now to the issues dealt with in the majority opinion. An analysis of the record establishes, as I see it, that the court's conclusion reached in Part II—whether the Commission's "investigation into the impact on Oklahoma ratepayers of SWBT's status as a subsidiary of a holding company was legally satisfactory"—is a response to an incorrectly identified issue. The issue as I see it is not whether there was a satisfactory investigation of SWBT's subsidiary status but whether the Commission garnered available evidence and made an evidentiary-supported determination as to whether, through cross-subsidization, the ratepayers have unlawfully been permitted to become uncompensated financiers of SWBC's competitive pursuits. If this matter was addressed at all by the Commission it was given only cursory attention in Order No. 292337 (January 1986) by simply disallowing "certain corporate expenses" based on a limited unaudited review described by one witness as "balancing the books."

The Commission's failure to resolve this critical issue amounts to a failure to regularly pursue its authority. It should have specifically addressed, thoroughly explored and resolved the cross-subsidization issues arising from the implications of SWBC's parental relationship to SWBT, its impact on the telephone service in this state, and SWBT's revenue needs. This would, of course, include a careful in-depth analysis of holding company related costs and expenses paid by SWBT, headquarters expenses of both SWBT and SWBC, transactions of both with other affiliates, and allocation of costs and expenses in each category attributable to the basic telephone service rendered in Oklahoma—admittedly a difficult task. Other important matters, such as SWBT's equity-debt ratio and the rate of return on the equity in SWBT, require consideration, both of which I deal

---

**31.** Southwestern Bell Corporation, parent holding company of SWBT.

**32.** After studying the post-divestiture restructuring of the Southwestern Bell Telephone system it becomes evident that the five states in the SWBC region should consider creating an interstate communication compact commission in order to more economically obtain essential rate-related data, to coordinate resources in a manner that reduces any unfair advantages that might otherwise occur, to provide a vehicle for preventing discriminatory practices among the states, and to standardize the data required for rate design and structure.

with later on. And, of course, the foregoing is not meant to imply that the findings and conclusions of the Commission with regard to the costs and expenses it approved "are sustained by the law and substantial evidence." [33] They are not in my opinion.

In resolving the important cross-subsidization issue the Commission appears to have lost sight of the fact that it is only SWBT's financial structure and health with regard to its operation in Oklahoma that are to be considered. A distinction should have been drawn, for instance, between what might be an appropriate equity-debt ratio and rate of return on equity for SWBT of Oklahoma as distinguished from what it might be for SWBC and its worldwide operation. It is the former that must be regulated, not the latter. In other words, I do not think it was proper to set equity-debt ratios or rates of return based on the needs or wants of SWBC as appears to have been done in the 1986 order. Ironically the Commission seems to have acknowledged the reason for such a regulatory restriction in its December 29, 1983, order when it said: "Finally, Southwestern Bell [Telephone] will be operating in a largely monopolistic, regulated environment as a divested company. In this regard, it is axiomatic that regulated compa-

nies are less risky than competitive ones." [34]

To ignore these matters is, as I said, a failure of the Commission to regularly pursue its authority. [35] A fair rate is one that strikes a proper balance between the competing interests of the SWBC shareholders and the ratepayers of this state—the former in receiving maximal profits, the latter in obtaining "low-cost, high-quality telephone service," which is, incidentally, a major objective of the federal divestiture decree and any factor which may help achieve this goal should be pursued. [36]

While the exercise of the Commission's authority in this regard has been considered legislative in nature, it does not follow that it may be exercised in a manner which is unreasonable or not rationally consistent with the objectives delineated in the MFJ, or the general principles and guidelines prescribed in *Lone Star Gas Co. v. Corporation Commission*, 648 P.2d 36 (Okl.1982). It is the duty of this court when its review jurisdiction has been invoked to determine whether the Commission has properly fulfilled its constitutional obligations. And to do this, it is essential, as the court emphasized in *Lone Star Gas Co.*, that the Commission shall have made explicit, comprehensive and detailed findings, concerning all relevant and material facts, and show them to be supported by

**33.** *See* Okl. Const. art. 9, §§ 20 and 22.

**34.** Okl.Corp.Comm'n Order 250987, Cause No. 28002 at 13 (December 29, 1983). The distinction was also recognized by the court in *United States v. W. Elec. Co.*, 592 F.Supp. at 864.

**35.** Title 17 O.S.Supp. 1987 § 137, reads in relevant part:
"A. In any proceeding ... to regulate the rates of a telephone utility subject to the jurisdiction of the Corporation Commission, said Commission shall prescribe and enforce rates to provide a fair return on the fair value of the property devoted to public service in this state."
....
"I. It is the intention of the Legislature that this entire section is an amendment to, and alteration of Section [*sic*] 18 through 34, inclusive, as authorized by Section 35, Article IX of said Constitution."

**36.** *See United States v. W. Elec. Co.*, 592 F.Supp. at 875. Said the court:
"The decree assumes, as does the Court, that the Regional Holding Companies may diversify on a significant scale only as they demonstrate the centrality to their corporate life of the responsibilities imposed upon them by the decree, their firm commitment to low-cost, high-quality telephone service, and the improbability of their involvement in anti-competitive conduct based upon their monopoly status. The rules established herein are designed to achieve these objectives while also permitting the Regional Holding Companies to enter into new business ventures to the extent that this will not be a threat to the fundamental purposes of the decree."

rational reasons and substantial evidence.[37] Substantial evidence has been defined by this court as that "found to possess something of substance and of relevant consequence—something that carries with it fitness to induce conviction." *Teleco, Inc. v. Corporation Commission,* 653 P.2d 209 (Okl.1982).

As applied to subject issue, this means that in order to ensure that regulated operations do not subsidize the unregulated operations of either the holding company or its other affiliates, there must be substantial evidence that the use of SWBT's funds and other assets by SWBC or other affiliates is not only authorized by the regulatory agency, but is necessary and reasonable. I have not found such evidence.

Take for instance the transfer of the Yellow Pages operation from SWBT to SWBP. The order does not indicate that such transfer was authorized by the Commission but it does show that the consideration received by SWBT was far less than fair market value. The Commission's review of this matter, as I discuss later, was wholly insufficient.

Similarly, the order fails to disclose that consideration was given to another significant circumstance bearing on both the cross-subsidization issue as well as the issues pertaining to the equity-debt ratio and rate of return, namely, SWBC's public announcement that SWBT is apparently generating enough revenue to "internally" finance not only its own capital needs but those of SWBC as well. *See* SWCB's 1986 Annual Report.

The danger of the ratepayers of this state being unwittingly forced to subsidize SWBC's worldwide competitive enterprises is so great that the longer the Commission waits to properly and efficiently perform its constitutional duties the more difficult it will be to do so. This was recognized by the court in *United States v. Western Electric Co.,* saying:

"Under the [divestiture] decree, the operating companies' basic responsibility is to provide local telephone service to the public ... As will be seen, the vast and diverse programs the Regional Holding Companies are formulating, and the priorities the companies seem to be assigning to their programs, constitute a serious threat to their obligations under the decree and the implementing documents." [38]

The court's prophecy has in fact come to pass. And for this reason an extensive and detailed investigatory audit of SWBC's books and records as well as those of each subsidiary is urgently required at the earliest possible date to help control the situation and protect both SWBT and the rate-paying public from overreaching by SWBC. Comprehensive financial data benchmarks of both SWBT's and SWBC's entire operation beginning at least with the year 1981 need to be established for future comparative reference by the Commission, the courts and the public. There is little meaning in random, unrelated, unintegrated and isolated fragments of information, figures or statistics. To satisfy the requirements of our constitution the Commission must, in my judgment, receive evidence of and certify in detail the essential facts an investigation of SWBT's application requires, and must state definite and certain findings made on the basis of such facts along with the conclusions reached with regard to how they affect the revenue requirements of SWBT.

The burden lies with SWBT of proving with clear and convincing evidence not only the reasonableness of expenses allocated to it for both SWBT and SWBC headquarters operations and affiliated company transactions, but that each such expense or transaction was *necessary.* The necessity of allowed expenses is overlooked by the majority opinion which instead states that it is the "good faith" of a "utility's management" or its managerial abuse of discretion

---

**37.** Okl. Const. art. 9, § 22.

**38.** 592 F.Supp. at 861.

that should govern the issue.[39] It is difficult to see how managerial good faith, or for that matter its bad faith, has anything to do with resolving cost expense issues. The costs and expenditures are either necessary, reasonable, and authorized in order for SWBT to provide telephone service in this state, or they are not. And again it is with regard to this issue that the Commission's order also falls reversibly short.

There is no way, for instance, to tell from the order exactly what expenses were encountered or considered by the Commission, what their amounts were, whether they were necessary, authorized, or lawful, or how they were allocated. Nor is there any evidence or finding with respect to the effect on the basic telephone rates in this state of SWBT being held by an unregulated holding company. Again I emphasize the element of rate-related necessity.

While there was some evidence that certain accounting entries were checked by Mr. Buck, Mrs. Steel, and perhaps others, there was no evidence in the order of (a) a verified spot-check audit, in the strict sense of that term, a review of accounting work papers, or a relational comparison of the three sets of books generally kept by utility companies—one for the IRS, one for the ratepayers, and one for the shareholders; (b) a detailed study of general headquarters expenses with emphasis on the necessity and reasonableness of such items as managerial and staff salaries and perks allocated to SWBT; (c) a detailed disclosure of the necessity and reasonableness of SWBC's contributory expense allocation to SWBT; (d) a detailed disclosure of the space, premises, and equipment outlay of SWBC; or (e) a detailed disclosure of the advertising, entertainment, travel, political, and "miscellaneous" expenses handed off by SWBC to SWBT either directly or indirectly. Such evidence is essential and of critical importance in setting fair rates. The facts and circumstances in the court record as it now stands—confirmed incidentally by the public record (SWBC's annual report)—in my opinion give rise to a presumption that SWBT is subsidizing the speculative ventures of the unregulated affiliates.

The burden of both proof and persuasion is upon SWBT to overcome the presumption. In addition to the circumstances already mentioned, SWBC has further publicly disclosed in its 1983–86 annual reports, for example, that during the past few years when most of our banks, farmers, businesses, and industries were showing steady losses, with even the state itself suffering badly from a depression-like economy, SWBC has been enjoying a steady steep climb in earnings due largely to skyrocketing post-divestiture rate increases,[40] despite the fact that at the same time SWBC's unregulated affiliates, capitalized by profits from their lucrative local telephone exchanges, have suffered huge losses of nearly $36 million through September 1985.[41] When asked about such

---

**39.** The case cited in the court's opinion for the "good faith" comment is a pre-*Erie* federal common law creation in a 1935 U.S. Supreme Court decision concerning an Ohio-based controversy which, as I pointed out earlier, perished in 1938 when *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, was decided. The burdens of proof and of persuasion lie with proponents under Oklahoma law.

**40.** *See* SWBC 1985 and 1986 Annual Reports showing net income for 1984 to be $883 million; 1985 to be $996.2 million; and in 1986 it topped one billion dollars, reaching $1,022.7 million. Judicial notice of SWBT and SWBC published annual reports may be taken by this court sua sponte. 12 O.S.1981 §§ 2202 and 2203.

**41.** *The Truth About Telephone Company Diversification,* Edwin B. Spievack, president and executive director of the North American Telecommunications Association, *Public Utilities Fortnightly* 13 (May 15, 1986). He wrote:

"The data—derived from documents at the FCC and Securities and Exchange Commission (see the accompanying figure)—show that NYNEX lost $79.3 million in the first nine months of 1985. The American Information Technologies Corporation dropped $65 million on competitive undertakings. Bell Atlantic lost $58.9 million. *Southwestern Bell lost $35.8 million.* PacTel's losses totaled $47.4 million. BellSouth lost $4 million, while US West dropped $180 million on a more ambitious program. So much for the fantasy that diversification and entry into

losses during oral argument of this case, SWBT's counsel said he did not know whether the unregulated affiliates were losing money or not because SWBC keeps such information a closely guarded secret. This is incredible. Such information is vital circumstantial evidence to aid in the proper resolution of cross-subsidization issues, as well as capitalization matters. That SWBC's unregulated affiliates reported an aggregate loss of $35.8 million during the first nine months of 1985,[42] is in my view an important segment of the total picture. To conceal this from either the Commission or SWBC stockholders is *malum in se.*

The president of SWBT testified before the Commission in September 1985 that the reason SWBT needed to collect more money from Oklahoma ratepayers was because of a so-called "earnings crisis" resulting from a "new competitive telecommunica-

tions environment" created by the federal divestiture decision and "the state of the economy in Oklahoma." Implicit in this presidential testimony was the conclusion that prior to January 1, 1984, basic service rates were kept at a below-cost level through subsidization from superprofits generated by sales of non-basic services and equipment. More specifically, the president postulated that the loss of superprofits formerly generated by high pricing of such monopolistic non-basic telephone services as "long haul toll," and leasing of "customer premises equipment (CPE)" are no longer available to SWBT and all SWBT has left to generate income are "access service" charges to various long-distance carriers, intra-state long-distance (intra LATA) toll, and basic local telephone service. He omitted mention of Yellow Pages, evidently because of a transfer to SWBP. The first two, he says, do not produce

new competitive markets adds to RBOC profitability." (Emphasis added.)
The article includes the following graph:

### Local Exchange Service versus Competitive Services Operating Income in 1985*

| | Income from competitive subsidiaries | Income from telephone companies |
|---|---|---|
| AMERITECH | -65 | 1603 |
| BELL ATLANTIC | -59 | 1828 |
| BELLSOUTH | -4 | 2331 |
| NYNEX | -79 | 1699 |
| PACIFIC TELESIS | -47 | 1798 |
| SOUTHWESTERN BELL | -36 | 1379 |
| US WEST | -160 | 1590 |

= $ millions

Source: Securities and Exchange Commission Form 10 Q; FCC Form M.

*—through third quarter.

42. *Id.* at 15.

enough superrevenue to subsidize basic service rates to a level desired by SWBC. The fact is, however, that there is no evidence that such an "earning crisis" ever existed, or that one ever threatened. But in the unlikely event one took place, it should be necessary for SWBT to adjust its operation in order to thrive on a reduced scale rather than expect the ratepayers to support the former earnings level. A fair return does not imply that SWBT is entitled to sufficient rate increases for SWBC to maintain a steady upward climb of earnings and dividend declarations regardless of general economic conditions, change in corporate structure, or anything else.

A review of "selected data" published by SWBT for 1983 [43] and by SWBC for 1986,[44] incidentally, makes the president's testimony more puzzling. The data indicates that SWBT reported receiving regional operating revenue from "Local telephone service" in the amount of $3.6 billion in 1983, but only $2.8 billion in 1984 despite hefty rate hikes. It is difficult to understand how there could be such an abrupt revenue decline of this magnitude in this particular category and even more difficult to see how divestiture could adversely affect this basic source of revenue. One explanation might be that "Directory Advertising" was carried by SWBT as revenue from local telephone service in the 1983 report and SWBC removed it to an "other" category in 1984 and to "Directory Advertising" in 1986.[45] The table below also indicates that

SWBT's income from "Long-distance service" fell from $3.7 billion in 1983 to $912.4 million in 1984 which, according to the SWBT president, was due to the divestiture loss of the AT & T "subsidy". This is understandable only if AT & T's use of the ratepayer's intrastate network lines is considered as such a subsidy—a consideration that overlooks the fact that since AT & T's long-distance service consisted almost entirely of using local network lines across the nation, it was AT & T being subsidized by state ratepayers. Regardless of that, however, SWBC's 1986 Annual Report shows that such loss was largely offset with income from "network access" charges, intrastate long-distance service and "other"—whatever that is—coupled with a significant reduction in the workforce and other operating expenses.[46]

What this points up is that there are numerous data gaps in the evidentiary foundation underlying the orders being reviewed. And this is compounded by the fact that what evidence there is, is discordant, intermittent, fragmented and without cognizable referents thereby raising more questions than it answers. Such shortcomings become particularly critical when it is recalled that SWBT generates more than 90 percent of SWBC's revenue, and is allocated a major portion of the expenses while most of SWBC's efforts are involved with the worldwide competitive activities of its unregulated affiliates. Thus the Commis-

---

**43.** SWBT, 1983 Annual Report 19 (1984).

**44.** SWBC, 1986 Annual Report 34 (1987).

**45.** The 1986 SWBC Annual Report shows the following operating revenues for 1984, 1985 and 1986 at page 34. The 1983 figures are from SWBT's 1983 Annual Report at page 19.

| | 1986 | 1985 | 1984 | 1983 |
|---|---|---|---|---|
| **Operating Revenues** | | | | |
| Local telephone service | $3,147.8 | $3,036.4 | $2,837.6 | $3,678. |
| Network access | 2,797.1 | 2,656.3 | 2,237.9 | |
| Long-distance service | 892.6 | 891.3 | 912.4 | 3,752. |
| Directory advertising | 824.1 | 947.8 | 744.0 | —— |
| Other | 240.8 | 393.2 | 459.4 | 474. |
| Total operating revenues | 7,902.4 | 7,925.0 | 7,191.3 | 7,904 |

**46.** *See* SWBC, 1986 Annual Report 34 (1987).

sion's failure to vigorously take every precaution to protect the ratepayers against the clear and present danger of cross-subsidization offends the spirit as well as the letter of our constitution.[47] It is of the utmost importance that the Commission come to grips with the hard issues implicitly raised by SWBT's post-divestiture structure and render an order that contains sufficient evidentiary details and findings to enable this court to judicially determine whether the Commission has properly performed its constitutional function. If, for instance, an allocation of both SWBT's and SWBC's headquarters expenses is made to attain a fair apportionment of SWBT's operations in Oklahoma,[48] then it should be done within the statutory strictures of 17 O.S.Supp.1987 § 137, which, among other things, restrict the rate base to property dedicated to telephone service in this state.

As background for SWBT's various requests for rate increases in recent years, one should bear in mind that in 1985 SWBC advised its stockholders that the "Corporation" ended 1984 with its assets, revenues and earnings all being among the top one percent of publicly held companies in the United States,[49] and that it in fact "continues to rank as one of the largest corporations in the world," with assets at the end of 1986 of approximately $20.3 billion, revenues of more than $7.9 billion, more than 8.8 million customers and 67,490 employees of which 61,770 worked for SWBT.[50]

It is also important to bear in mind that when the SWBT president speaks of a downturn in the economy as furnishing a basis for more revenue he failed to mention that in 1983 SWBT's work force was reduced by some 8,000 people, including 2,700 transferred to AT & T, and on January 1, 1984, SWBT transferred another 18,000 employees to AT & T.[51] Whether this work force reduction was due to unneeded employees, automation, or a downturn in the economy or otherwise, it had to substantially reduce operating expenses. The testimony of SWBT's president must be viewed in the context of what SWBC told its stockholders in its 1985 Annual Report which is that "the telephone company (SWBT) now is serving more customers with fewer employees. In 1984, the telephone company reduced its work force 4.2 percent. In 1985, the number dropped another 3.4 percent. The telephone company achieved these reductions in force *while gaining more than 500,000 customer lines.*"[52]

The order in this case, as we said, refers to no hard evidence supportive of the opin-

---

**47.** There is evidence that the RBOCs' primary objective is not the fulfillment of their obligation under the federal decree "to provide low-cost, high-quality telephone service," but the "diversion of capital and managerial resources in pursuit of outside ventures." 592 F.Supp. at 862. "Diversification into various unregulated enterprises," said the court, "appears to have a negative effect on local rates." The source of funds for their high-cost ventures "is likely to be ... the local ratepayers. In recent months," said the court in 1984, "the public has witnessed a number of requests for local rate increases in all parts of the country. These requests are sometimes blamed on divestiture, but in fact they may stem from the need to raise capital for *outside ventures, lavish advertising campaigns,* and the construction of plants and the hiring of staff suitable for what the Regional Holding Companies consider themselves to be—diversified conglomerates which are fast outgrowing their modest and relatively pedestrian telephone origins." 592 F.Supp. at 863.

The holding companies' response to this is that if the ventures are successful, the ratepayers will benefit from lower capital costs. This pie-in-the-sky argument, says the court, is "erroneous in every respect," and it gives three cogent reasons why. 592 F.Supp. at 862–864.

**48.** Title 17 O.S.Supp.1987 § 137, reads in part as follows: "The Corporation Commission ... shall prescribe and enforce rates to provide a fair return on the fair value of the property devoted to public service in this state."

**49.** SWBC, 1984 Annual Report (1985).

**50.** SWBC, 1986 Annual Report 6 (1987).

**51.** SWBT, 1983 Annual Report 8 (1984).

**52.** SWBC, 1985 Annual Report 5 (1986). (Emphasis added.) In this regard it is also interesting to note what SWBT told its customers in

ions and conclusions reached either by the witnesses or the Commission. Opinions of the various witnesses, aside from being speculative and unsupported by factually-based reasons, are based on assumptions consistent with the needs of the holding company rather than SWBT. As such they have no probative force and do not constitute the quality of evidence that will sustain a finding. *Downs v. Longfellow Corp.*, 351 P.2d 999, 1004 (Okl.1960). This again demonstrates why it is impossible for this court to properly perform its constitutional review role.[53]

## VII

A kindred issue is dealt with in Part III of the majority opinion, namely, the propriety of the Commission's failure to determine the economic value which should be imputed to SWBT for the use of the SWB name and logo by the holding company and its affiliates. While the court's opinion considers early determination of this issue unimportant, I consider it to be urgent and the indefinite postponement of its resolution to be a fundamental and prejudicial irregularity.

The name and logo, which have been owned by SWBT for many years, are imbued with familiarity and good will and are therefore valuable property within the meaning of 17 O.S.Supp.1987 § 137. No rule or precedent is needed to underline the Commission's duty to determine the fair value of SWBT's property appropriated by the holding company and its unregulated affiliates—a value which must be imputed to SWBT as revenue for rate setting purposes.

Nor is the Commission's reason for postponing consideration of this matter until "the next rate relief request," on the ground that it may be difficult to "quantify," tenable. First of all, though it may be that, like the morning sunrise, another plea for a rate increase is inevitable—at least it would seem that the Commission assumes so—the fact remains that evaluating SWBT's property rights will not become less difficult as time goes by. Indeed it will be more difficult because the more time that elapses between the divestiture and the determination of vital facts and resolution of critical issues, the more difficult it will be to unravel further complexities wrought by constant shifting of corporate assets and modifications of accounting principles and procedures.[54] The sooner the issue is resolved the better.

The majority opinion points to some testimony by a couple of staff witnesses to the effect that SWBT may derive certain advantages from being part of a holding company. But aside from being speculative such "advantages" to SWBT remain unidentified. Certainly none are claimed to favor the ratepayers of this state. Indeed the only "advantage" alluded to is the possibility of SWBC stockholders being bene-

---

April 1988 on page 1 of a "Tele–Help" advertisement flyer mailed with the bills it sent out:

"In towns across Oklahoma, we continually upgrade our equipment to provide more efficient service. *It took 71 employees to maintain 10,000 phone lines in 1984; today it takes 51.* Updating our equipment means dependable service *while holding down maintenance expenses.*

As our customer, you have the right to expect good, affordable phone service...." (Emphasis added.)

**53.** *Southwestern Pub. Serv. Co. v. State,* 637 P.2d 92 (Okl.1981).

**54.** For example, just this year SWBC has completed the acquisition of an eighty percent interest in Gulf Printing Company, "the fifth largest directory printer in terms of sales and number of directives published," according to *Moody's Handbook of Common Stocks,* Summer 1988 Edition. The same source indicates Gulf will be printing the Yellow Pages and Southwest Bell Publications, Inc., will handle "marketing of directory advertising."

And, according to the source, first quarter net income fell 8.9 percent because of *"acquisition costs* associated with new cellular and paging properties," and *"higher expenses* due to *increased depreciation and accounting charges."* (Emphasis added.)

fited. Advancing the interests of SWBC stockholders as such, of course, lies beyond the scope of the Commission's constitutional obligations.

## VIII

I cannot agree with the court's treatment of the attorney general's complaints concerning the confusing Yellow Pages directory revenue situation in Parts IV and V of its opinion.

The issue of whether the Yellow Pages severance from SWBT was proper is raised by the attorney general, as well as the question of the fair cash value of the Yellow Pages directory as an ongoing, profitable business. Also challenged is the propriety of not investigating the Yellow Pages gross and net revenue data very closely and determining why a precipitous drop occurred during the 1984 test year period. All these issues have important implications for the ratepayers.[55] The propriety of the transfer is not to be judged on how it affects the stockholders but how it affects the ratepayers.

As previously noted, SWBC was created in 1983 to hold SWBT and three other subsidiaries, and to commence operations January 1, 1984. One subsidiary was Southwestern Bell Publications. SWBC caused the lucrative Yellow Pages directory business of SWBT—grossing way over a half billion dollars a year—to be transferred to SWBP along with more than 2,000 employees skilled in the production of the famous directory at a price of only $200,-000—its net book value. It did so apparently without objection on the part of the Commission.

SWBC may, of course, argue that the Yellow Pages directory is not an integral part of local telephone service in order to justify its excision from the SWBT corporate body, but we think we can say without fear of contradiction that every telephone user, particularly business subscribers, uses the Yellow Pages nearly as frequently, if not more so, than the white pages. Ratepayers have been taught by SWBT to finger "walk" their way through the Yellow Pages to discover the number and identity of those engaged in various services or businesses and they commonly do so. In this sense the Yellow Pages directory or its equivalent is essential to the full enjoyment of basic telephone service. I would hold that through custom and usage the Yellow Pages directory has become an integral part of and an essential adjunct to the full enjoyment of local telephone service.[56]

In my opinion both issues should have been addressed, heard and decided. Refusal to hear and determine whether to approve the transfer of the Yellow Pages to an unregulated affiliate, and failure to insist on a complete audit of the 1984 Yellow Pages financial experience were, in my opinion, reversible irregularities. And failure to fully investigate and obtain foundational revenue and expense data relative to the Yellow Pages allocation also means that the appealed order is without the support of appropriate findings and substantial evidence.

Handling the matter as the Commission did in subject order leaves it in limbo.

---

**55.** SWBT's chief accountant testified that there were two reasons for the 1984 decline: (1) The poor state of Oklahoma's economy; and (2) increase of competition in Yellow Pages advertising.

This is difficult to follow in that Oklahoma's economy had been poor since the price of oil fell in 1981. The second reason is also subject to serious question in view of the fact that directory advertising revenue rose from $744 million in 1984 to $974.8 million in 1985 and then backed off some in 1986 to $824.1 million according to SWBC's 1986 Annual Report. Is the 1984 revenue distorted by a shift of 1983 expenses to 1984 or deferral of 1984 revenue to 1985? This question was not answered by the Commission.

**56.** *Accord, State ex rel. Util. Comm'n v. S. Tel. & Tel. Co.,* 57 N.C.App. 489, 291 S.E.2d 789 (1982).

There is, for instance, some evidence that all the ratepayers are going to get from the Yellow Pages transfer is the revenue from existing advertising contracts and when these expire the ratepayers get no more Yellow Pages benefits. Therefore, it is urgent that the status of the Yellow Pages directory and its revenue should be determined. If the transfer is disapproved, the revenue allocated to Oklahoma will have to be determined on that basis.[57] Disapproval of the transfer from public service as a basic telephone service subsidizing segment is in keeping with the contemplations and objectives promulgated by the federal court in *United States v. Western Electric Co.*,[58] and *United States v. American Telephone and Telegraph Co.*[59] In the absence of substantial evidence that transfer of the Yellow Pages out of SWBT is beneficial to the ratepayers of this state, the Commission will be obliged to disallow it.

Again I state that the burden of proof and persuasion on these issues should be upon SWBT. The order contains no factual foundation or finding justifying the Commission's conclusion that SWBT's figures were reasonable and supported by substantial evidence. Merely generalizing about the poor state of the economy in Oklahoma and an increase in Yellow Pages advertising competition, while factors to be considered, are too indefinite and inadequate to explain the precipitous 1983–1984 drop in net Yellow Pages income which went far below the established income trend line.

IX

With regard to the equity-debt ratio, I am unable to agree that substantial evidence underlies the Commission's approval of SWBT's existing capital structure of 55.32 percent equity and 44.68 percent debt, as is concluded in Part VI of the court's opinion. On its face a 55.32 percent equity for a telephone service monopoly—one which is able to obtain sufficient rate increases to internally finance not only all of its own capital needs but those of the holding company—appears to impose excessive capital costs on the ratepayers, costs which are increased even more by the excessive return on equity (14.25 percent) authorized by the Commission. The high equity ratio also results in placing on the ratepayers a higher taxation burden since the net income of SWBT is passed to the holding company as dividends,[60] thus subjecting it to double taxation by the time SWBC shareholders receive their dividends.[61]

Again I say that most, if not all, of the problem stems from the fact that the Commission focused on the needs of SWBC rather than those of SWBT—a critical error. The assumption underlying such a high equity percentage is said to be "increased business risks faced by the appellee [SWBT], principally from the threat of bypass of the telephone network by large users and interexchange carriers." Such risk, in and of itself, should not, however, cause any significant increase in the cost of capital to a monopolistic utility able to seek rate adjustments, like it might if it were merely a competitive enterprise totally dependent upon outside venture capital. It is generally accepted that the higher the risk of a given business enterprise the greater the equity portion should be. Thus a lower-

57. Because Oklahoma is one of five states served by SWBT an issue arises as to the effect of one state's disapproval. Until this matter is clarified or all five states likewise disapprove the transfer, the Commission should treat the profit or loss resulting from the Yellow Pages operation as though no transfer had occurred.

58. 592 F.Supp. at 853, 854.

59. 552 F.Supp. at 169, 193, and 194.

60. This means of handling subsidiary income is a policy of SWBC, according to SWBT's chief accountant, Dr. White. *See* Okl.Corp.Comm'n Order No. 292337, Cause No. 29321 at 8 (January 29, 1986).

61. This is at least one reason why SWBC seeks such a high rate of return on equity—to enable it to pay a higher dividend. Again I say that the welfare of SWBC's shareholders—as distinguished from the ownership of SWBT—is not a concern of the Commission. The ratepayers of this state should not be put into a position of having to assure the prosperity of SWBC in order to protect the economic well-being of SWBT.

risk monopoly able to obtain rate increases should benefit from a higher debt share. Those who invest in utility companies generally do so more for safety of the investment than for growth and are willing to accept a lower rate of return in lieu of the increased risk of higher income or growth potential. But however this may be the ultimate fact appears to be here that SWBC has been able to obtain so much money from the ratepayers that it has internally financed both competitive ventures and regulated services.[62] As a witness pointed out there is a tendency to use the utility as a "cash cow" generating capital to use for entry of the holding corporation and its non-regulated subsidiaries into the riskier "competitive arena." In recommending a ratio of 45 percent equity and 55 percent debt for SWBT, one witness, a Dr. Wilson, explained it this way:

> "The strategy has been to try to get, try to use the utility as a cash cow and to use this cash cow to sustain and support entry into competitive markets. Now, what I am recommending is a departure from that on the part of this Commission. What I am saying is that really if there needs to be a cash infusion to posture the company for its entry into competitive arenas, that that ought to be stockholder responsibility and not something that the jurisdictional ratepayers should cross-subsidize and that's why I recommend moving to a utility type capital structure as opposed to the more competitive type capital structure on a corporate basis that Southwestern Bell is attempting to

impose for jurisdictional rate-making purposes." (Tr. 460–461).

Indeed the holding company (SWBC) was created, according to SWBT's 1983 Annual Report, "for two important reasons: [1] It allows the organization maximum flexibility in financing operations and [2] It puts the organization in the best possible position to explore new business opportunities."[63]

Even more important, however, is the fact that there is a current lack of need for expanded investment because, as we said earlier, SWBC is being totally capitalized internally—with revenue produced by SWBT—and has been for quite some time according to the following statement on page 32 of SWBC's 1986 Annual Report to its stockholders:

> "In order to provide high quality communications services to its customers, the Corporation, and in particular the Telephone Company, must make significant investments in property, plant and equipment. Construction and other capital expenditures totaled $1,970.0 for 1986, $2,090.3 for 1985 and $1,804.1 for 1984. *The Corporation had funded these construction and other capital expenditures with internally generated funds. These are defined as funds derived from operations less dividends to shareowners as shown in the Consolidated Statements of Changes in Financial Position.* The Corporation's ratio of internally generated funds to construction and other capital expenditures

---

**62.** The court discussed one aspect of this financial phenomenon in *United States v. W. Elec. Co.,* 592 F.Supp. at 864 saying:

"Thus, to the extent that a Regional Holding Company raises funds jointly for both its competitive ventures and its regulated services, the cost of capital may be lower for the competitive venture (because it will be averaged with the lower capital costs of the regulated monopoly) but higher for the regulated telephone service. The ratepayers will then, in effect, be subsidizing the activities of the

competitive venture by assuming, through higher interest rates, part of its cost. It follows that, if diversification of the Regional Holding Companies into new competitive ventures enhances their financial viability at all, the beneficiaries will more likely than not be those holding companies, their managers, and their unregulated affiliates, not the Operating Companies which provide local telephone service."

**63.** SWBT, 1983 Annual Report 4 (1984).

was 1.04 for 1986, 1.02 for 1985 and 1.05 for 1984. Management expects the level of internally generated funds to again meet projected construction and other capital expenditures of approximately $1,800.0 in 1987.

Dividends declared by the Corporation totaled $638.2 ($6.40 per common share) in 1986, $597.9 ($6.00 per common share) in 1985 and $549.0 ($5.60 per common share) in 1984. This represents a payout ratio of 62 percent in 1986, 60 percent in 1985 and 62 percent in 1984. Management will continue to monitor this payout ratio in order to ensure that it remains consistent with the expectations and requirements of shareowners and the internal requirements of the Corporation." (Emphasis added.)

Since SWBT and maybe SWBP (because of Yellow Pages) are the only two subsidiaries not losing money, it has to be that the return is sufficient to satisfy all capital requirements even *after* bearing heavy losses from the competitive operations and paying liberal dividends.

The testimony offered by SWBT concerning the conjectural opinions of various Wall Street investment counselors and economists about both capital structure and yield expectancies may have been appropriate for competitive enterprises having higher risk and growth potentials, but it had little relevance so far as low risk monopolistic telephone utility companies were concerned. The most conservative investor should be delighted with a lower rate of growth and yield from a SWBC-type company because it features the best of all possible investment worlds—the reduced risk of a regulated service monopoly able to obtain frequent substantial rate increases, and the potential of competitive growth with little or no risk of loss. The Commission was aware of this on December 29, 1983, but apprently forgot it by January 29, 1986. In its December 29, 1983, order the Commission observed:

"In reviewing the analyses performed by the expert witnesses in this cause, it appears to us that the assumptions made by Mr. Kaufman concerning investor expectations as to achieved returns for the near future and consequential dividend growth appear to have a questionable foundation. Recent higher return authorizations clearly are not evidence that such trends will continue, especially in light of lower costs of money. Further, Mr. Kaufman's substantial reliance on investment analyst projections, in our view, also appears to be misplaced. While such projections are not to be ignored, we question their validity as an indicator of investor requirements."

Under these circumstances, it does not appear that such a high rate of return as the Commission has allowed is needed for credit rating purposes as suggested by SWBT's testimony, nor, as we will see, is a SWBT equity-debt ratio greater than 45–55. Certainly the evidence does not support either the equity-debt ratio or the rate of return on equity set by the Commission in this case with regard to SWBT and SWBT alone. Indeed, one would be hardpressed to find evidence to justify a rate of return on equity in excess of 8 percent for SWBT under the depressed conditions that have prevailed in this state for the past few years.[64]

## X

The problem I have with the Universal Service Option adopted by the Commission as a plan designed to provide service to low-income individuals is that it appears to be arbitrary and discriminatory in both form and substance.

No one else seems to have come up with anything like it and there appear to be no

---

**64.** This, of course, in no way restricts SWBC in setting up whatever capital structure, debt ratio or return target it desires.

findings made or reasons given as a foundation for adopting the plan. To sustain the Commission's "plan" the court once again falls back on the rather tenuous foundation that the rate-fixing process is a "legislative function." Be that as it may, such function must rest on regularly pursued authority and substantial evidence and is subject to judicial review. There must be substantial evidence identifying and justifying any discriminatory class established. Even then it is doubtful the Commission can discriminate at all with regard to exercising its ratemaking authority. In short, I do not believe the Commission has authority to issue arbitrary orders or orders which discriminate among classes not having legally rational distinctions.

## XI

Other questions for which there are no answers in the record are these:

**65.** Okl.Corp.Comm'n Order No. 250987, Cause No. 28002 at 16 (December 29, 1983).

**66.** Okl.Corp.Comm'n Order No. 273137, Cause No. 28309 at 7 (February 13, 1985). The Commission rejected SWBT's request to increase the rate base $81.9 million as unwarranted and used the same rate base used in Order No. 250987 (December 29, 1983). The Commission also "excluded related depreciation and ad valorem taxes, and made the needed corresponding federal and state income tax adjustments."

(a) What is responsible for the rate base increasing from $886,579,000, as the Commission found it to be in the December 29, 1983,[65] and February 13, 1985, orders [66] to $1,006,522,353 in December 31, 1984, as the Commission found it to be in its order of January 29, 1986 [67]—a $119,943,353 or 13.43 percent increase in 1984—particularly in view of the Commission's finding of a decrease of over 1,000 access lines in 1984 along with a reduction of operating expenses presumably through a substantial reduction in work force and plant usage? [68] A breakdown of the rate base appears below.[69]

(b) What accounts for the fact that the Commission found that the total revenues "proper for [the December 29, 1983] proceeding" for the 1983 calendar test year

**67.** Okl.Corp.Comm'n Order No. 292337, Cause No. 29321 at 54 (January 29, 1986).

**68.** Okl.Corp.Comm'n Order No. 273137, Cause No. 28309 at 6 (February 13, 1985). *See also infra* note 76 for an excerpt from SWBC's 1985 Annual Report showing a 4.2 percent reduction in the work force (about 2,900 employees) in 1984 and an *increase of one-half million access lines!*

**69.** Rate Base

1983 Order 1986 Order
886,579,000 (12–29–83) 1,006,522,353 (12–31–84)

| Description | Dec. 29, 1983 Order | Jan. 29, 1986 Order |
|---|---|---|
| Intrastate Tel. Plant in Service | ? | $1,449,808,785 |
| Tel. Plant Under Constr. | ? | 12,255,013 |
| Total Tel. Plant | ? | $1,462,063,789 |
| Less: Reserve for Depreciation | ? | (276,697,472) |
| Materials and Supplies | ? | 14,753,528 |
| Prepayments | ? | 18,399,709 |
| Less: Customer Deposits | ? | (6,683,675) |
| Less: Deferred Inc. Tax | ? | (204,690,869) |
| Less: Unamortized Pre–71 ITC | ? | (622,666) |
| Okl. Intrastate Rate Base | $886,579,000 | $1,006,522,353 |

amounted to only $482.1 million,[70] yet SWBT published in its 1983 Annual Report that its total 1983 operating revenue in Oklahoma was $923.2 million? [71]

(c) Why is there such a large increase in expenses, especially maintenance, in view of the substantial reduction in the work force and increased automation, and why is there nearly a $10 million increase in depreciation over the 1983 anticipated amount particularly in view of fact that there were

only $12.2 million in telephone plant under construction at the close of 1984, and presumably reduced plant needs as a result of the stated decrease in access lines and transfer of a substantial portion of ratepayer financial assets to AT & T? [72] A summarized breakdown in the revenue and expense figures contained in the 1983 and 1986 orders is set out below.[73]

(d) With regard to working capital, why is there no evidence or finding with regard

70. Okl.Corp.Comm'n Order No. 250987, Cause No. 28002 at 9 (December 29, 1983).

71. SWBT, 1983 Annual Report 1 (1984).

72. The Commission recognized that SWBT would have a reduced revenue requirement by

reason of a "reduction in depreciation expense" in 1984. Okl.Corp.Comm'n Order No. 250987, Cause No. 28002 at 3 (December 29, 1983).

73.

### Summary of Revenue, Expenses and Net Income

| Revenues | Dec. 1983 Order (Est. for 1984) | Jan. 1986 Order (1984 Reported) |
|---|---|---|
| Local Services | $287,823,000 | $293,582,526 |
| Toll | 118,923,000 | 142,724,866 |
| Carrier Access | — | 59,774,697 |
| Billing/Collecting | — | 9,441,076 |
| Other Inter–Industry | — | 3,539,079 |
| Directory | — | 75,069,328 |
| Miscellaneous [?] | 78,434,100 | 6,057,379 |
| *(Less) Uncollectibles | (3,091,000) | (7,389,684) |
| Total Revenues | $482,098,000 | $582,799,267 |

*NOTE: Uncollectibles are largely from Yellow Pages—See page 25 of 1986 Order. Query: Was net or gross Yellow Pages income imputed to SWBT? If net, why the second deduction?

Expenses (page 10 of the 1983 Order and page 52 of the 1986 Order)

| (Millions) | 1983 Order | 1986 Order |
|---|---|---|
| Maintenance | $127,145,000 | $139,054,551 |
| Depreciation | 83,329,000 | 93,945,905 |
| Traffic | 39,020,000 | 34,510,861 |
| Commercial | 56,779,000 | 70,605,312 |
| General Office | 40,651,000 | 48,477,937 |
| Rents and Compensation | 13,222,000 | 11,140,417 |
| **Pensions and Benefits | 40,638,000 | — |
| General Service and License | | |
| Contributions and Club Dues | — | — |
| Other [?] | 6,008,000 | 43,238,643 |
| Interest on Customer Deposits | — | 401,021 |
| Taxes Other Than Income | — | 38,898,272 |
| | $406,792,000 | |

to the financial consequence of the fact that ratepayers pay for basic telephone service one month in advance? Is the unearned portion of such payments used as cash working capital or is it deposited in an interest-bearing account? Either way, the fund should be substantial and show up as a credit someplace in the balance sheet, or profit-and-loss statement,[74] and be considered in determining working capital needs. If, for instance, there are 2 million ratepayers in this state and one uses a figure of only $15 dollars a month, it would amount to $30 million, which equates with an average of $15 million available for SWBT's use for 30 days. This sum at 6 percent for 12 months would be $9 million dollars. Of course, business phones cost much more than $15 a month.

(e) Why is there nothing in the record about whether the operating expenses in the rate base formulation were reduced by the fact that SWBT's older high-interest-bearing bonds have been called and the debt refinanced with lower-interest-bearing debentures—as reported in the same Annual Report? [75]

(f) Why does the record fail to disclose whether or not SWBT is managerially top-

heavy to an unnecessary and unreasonable extent, and if it is, why is the effect of such inefficiency on the rates paid by the ratepayers of this state not shown?

(g) Why does the record fail to contain the "proper tariffs and rate schedules" showing approval by the Commission in compliance with the January 29, 1986, order?

(h) How can the Commission's admitted delegation to a staff member of its important non-delegable duty to approve tariffs and rate schedules be constitutionally justified? *See* Okl.Corp. Comm'n Order No. 292337, Cause No. 29321 at 64 (January 29, 1986).

## XII

The order appealed should in my view be vacated and remanded with instructions to rehear the application in accordance with the essentials mentioned above as well as the following directions:

I. For the purpose of determining rates and charges for telephone service in this state, the Commission shall treat the telephone service of SWBT as though it were a separate corporate entity operating only in Oklahoma;

Note 73—Continued

Expenses (page 10 of the 1983 Order and page 52 of the 1986 Order)

| Taxes | 1983 Order | 1986 Order |
|---|---|---|
| Fed. Inc. | (1,796,000) | |
| State Inc. | 107,000 | |
| Ad valorem | 16,094,000 | |
| Social Security | 13,601,000 | |
| Municipal Inspection | 4,378,000 | |
| Other | 399,000 | |
| Total Taxes | $ 32,783,000 | |
| Total Expenses | $439,575,000 | $480,272,919 |
| Net Oper. Inc. Before Taxes | —— | $102,526,348 |
| Less: Income Taxes | — | 22,040,996 |
| Net Operating Income | — | $80,485,352 |

**The amount of this pension allocation is about twenty percent of the entire SWBC pension expense reported in 1984. *See infra* note 76.

74. *See Oklahoma St. AFL–CIO v. State Bd. for Prop. & Cas. Rates,* 463 P.2d 693 (Okl.1970), holding, in an analogous situation, that it was error for the State Board for Property and Casualty Rates to fail to take into consideration a carrier's investment income from unearned premium and loss reserves in establishing rates.

75. SWBT, 1983 Annual Report 32 (1984).

II. To be legally sufficient, the order must specify the recorded evidence supportive of each and every finding made. Such evidence shall be accompanied by a record reference. When reaching a final permanent rate change amount—which includes one or more interim increases—such as we have in this case, it is not sufficient to simply approve an interim order by reference, but the Commission must set out the full amount of any increase or decrease being granted or made permanent and then break that figure down into whatever interim grants are being approved, or permanent grants being made;

III. If the Commission decides to use a certain year as a test year for determining a fair return on the fair value of property used to furnish the ratepayers of this state telephone service, then it must use the *full year data* and not annualize a small portion of it. Moreover, if adjustments of the test year data are made for anticipated variances, as they were in this case in favor of SWBT—for example, granting SWBT's requested adjustment of its 1984 salary expense to reflect pay raises granted in the spring of 1985—then to avoid distortion the Commission will have to adjust for all anticipated revenue and expense components; [76]

76. For example, there should have been an adjustment to reflect a reduction of work force in 1985—a reduction of nearly 2,900 employees which could amount to over $87 million given an average salary of only thirty thousand dollars plus fringe benefits, perks, taxes, and payroll handling expense.

SWBC's 1985 Annual Report reported on page 5 that:

"The telephone company now is serving more customers with fewer employees. In 1984, the telephone company reduced its work force 4.2 percent [to about 68,700 employees]. In 1985, the number dropped another 3.4 percent. The telephone company achieved these reductions in force while gaining more than 500,000 customer lines."

And at page 7 of the report SWBC says that SWBT had 65,836 employees as of December 31, 1985. It had only 61,770 as of December 31, 1986, according to SWBC's 1986 Annual Report.

Another substantial adjustment that should have been made is with regard to the excessive amount of expense pumped into the pension fund for SWBT employes in 1984 which resulted from "assuming" too low a rate of return on pension assets in 1984—the test year. The magnitude of this expense overstatement came to light in SWBC's 1986 annual report at page 39. Of course, when this matter was heard in September 1985, the major accounting standard change—SFAS No. 87—had not yet been pub-

lished. Standard No. 87 was published in December 1985 (*See* Financial Accounting Standards, Explanation and Analysis (CCH) 843) and its use was begun by SWBC effective January 1, 1986. Whether its adoption by FASB was known by SWBC's chief accountant or the Commission staff in September 1985 is not disclosed. If it was it should have been an important adjustment of the 1984 operating expenses based on an anticipated substantial decrease in the 1984 pension cost. What should have been determined, however, or at least considered, was why the 1984 pension cost was abnormally high and whether "a higher assumed investment earnings rate" that was being used in 1985 should have been used to reduce the 1984 pension cost—and consequently effect a substantial downward adjustment of the 1984 operating expenses.

But the record is silent with regard to Oklahoma's share of the pension cost except for a $40,638,000 operating expense deduction in the December 29, 1983, order. *See supra* note 73. Oklahoma's share should have been substantial.

The modified treatment of SWBC's pension expense (a deductible operating expense) after the 1984 test year furnishes a dramatic example of how changes in accounting principles and altered assumptions can result in immense changes in a company's profit-and-loss statement. It is figure juggling at its best and is shown at page 39 of the 1986 Annual Report:

| | 1984 | 1985 | 1986 |
|---|---|---|---|
| Pension Cost (millions) | | | |
| Amount capitalized in property, plant and equipment | $ 21.9 | $ 11.7 | $ (5.8) |
| Pension Cost for 1986 was broken down as follows: | | | |
| Service costs—benefits earned during period (in millions) | | | $ 90.0 |
| Interest cost on projected benefit obligation | | | 276.6 |
| Actual return on plan assets | | | (878.1) |
| Other Net | | | 452.6 |
| Net Pension Cost | | | $ (58.9) |

IV. To be constitutionally valid, the order setting a rate must comply with the following directions and guidelines and set forth specific findings with regard to these essential components of the rate to be set:

A. *Rate Base.* This must be strictly limited to the fair value of capital assets which are *necessary* and are actually being used for furnishing local telephone service in this state.

1. Original cost may be used unless the Commission specifically finds other factors, such as replacement costs, require its modification.[77]

2. The rate base may not include plant under construction which is not being used or ready for local service use at the close of the test year.[78] It may not include property used for competitive enterprises or other activities unnecessary for the rendition of local telephone service unless such enterprises or activities are regulated and their revenue is included in the rate structure.

3. Net cash working capital may be included in the rate base only if clear and cogent evidence demonstrates it is needed to meet current expenses necessary to operate local telephone service during the test year. It shall not include prepayment of operating expenses. And it shall be reduced by the amount received from ratepayers for advance telephone service payments as set out in direction No. 5 below.

4. Prepayments of expense or expensible items not actually incurred in, or expended or allocated to usage during the test year shall be disallowed.[79] Nor may stockpiled or accumulated on-hand expensi-

SWBC explained the enormous 1985 reduction in pension costs (and an even greater drop in 1986) below what was reported for the test year—1984—this way:
"*The decline in pension cost from 1984 to 1985 was due primarily to the utilization of a higher assumed investment earnings rate.* The higher rate reflects a change in the investment strategy for the pension plans' assets as well as continued increases in the actual rates of return experienced by the plans' assets. *The effect of this change was to decrease 1985 pension cost by approximately $94.4.*
"Statement No. 87 requires certain disclosures to be made reconciling the fair value of the plans' assets with amounts reported in the Corporation's balance sheets. This comparison, while intended to provide a general indication of the soundness of the pension plans' financial status, can be misleading. This is because the pension plans' assets are not general assets of the Corporation but are instead entrusted to irrevocable trust funds to provide retirement and survivor benefits.
"A point in time comparison of the fair value of the plans' net assets to the estimated projected benefit obligation has certain limitations. This is because market conditions will result in fluctuations in the fair value of the plans' net assets while having no direct effect on the actual benefits to be paid. In addition, the projected benefit obligation is based on assumptions concerning future events, conditions and payments covering a time period equivalent to the estimated life span of the existing employee work force. If actual experience differs from expectations, the benefit obligation will be affected. Consequently, a point in time comparison of the fair market value of the plans' net assets which fluctuate with market conditions to an estimated projected benefit obligation which is heavily dependent upon the ability to forecast future events should be cautiously viewed." (Emphasis added.)

**77.** *See Lone Star Gas. Co. v. Corp. Comm'n,* 648 P.2d 36 (Okl.1982).

**78.** *Southwestern Pub. Serv. Co. v. State,* 637 P.2d 92 (Okl.1981).

**79.** Sufficient capital may have been supplied by ratepayers during the 1984 test year from advance payment of monthly telephone bills, customer deposits, and the like, particularly when coupled with post-payment of most accounts payable to create a negative working capital situation. This may account for SWBT's failure to carry out the lag-time study ordered by the Commission's Order No. 250987, Cause No. 28002 (Dec. 29, 1983). Whether there should be a negative working capital allowance cannot be determined without a lag-time study. Certainly no working capital amount should be allowed until the Commission's order is complied with. Beyond this it would seem that the Commission must take appropriate action to see that the order is complied with including the potential of a negative working capital allowance after an appropriate investigation.

It follows, therefore, that it was error to include $18 million in "prepayments" in the rate base. Not only was there no justifying lag-time study but the identity of the "prepayment" item remained a mystery, evidence of its legitimacy is absent and its allowance was specifically denied prior to its inclusion in the rate base "summary."

ble assets be included in the rate base, as if they were capital assets. To hold otherwise would permit SWBT to both expense and capitalize an asset and thus realize, in effect, a double recovery or benefit by deducting the item as an operating expense and at the same time adding the unexpended remainder of the same asset to the rate base.

5. Advance customer deposits, payments on debts, and deferred income taxes

must be subtracted from the rate base.[80] The former are not assets and the latter consist of capital furnished by ratepayers.

6. Reserve for accumulated depreciation must be deducted from the rate base. It is not an asset used for furnishing telephone service supplied by SWBT. The Commission shall take appropriate steps to prevent any capital loss to ratepayers.[81] Depreciation expense shall be limited for

---

**80.** In its December 29, 1983, order, the Commission said that it "takes judicial notice, as did the Referee, that the use of flow through with accelerated depreciation would result in Southwestern Bell possibly losing its right to claim accelerated depreciation and being liable for back taxes since it first elected to use accelerated depreciation. Likewise, if Southwestern Bell treated investment tax credit (ITC) as a reduction to rate base, it would result in its possible loss of its right to claim ITC." *See* Okl.Corp. Comm'n Order No. 250987, Cause No. 28002 at 10, 11 (December 29, 1983).

Since then there have been some significant decisions relating to the problem. One is that the United States Supreme Court has rejected the FCC's earlier position that the exercise of its authority under the Communications Act of 1934 as amended, for interstate ratemaking purposes, preempted state regulatory action with regard to plant used interchangeably to provide both intrastate and interstate service. This includes regulations with respect to depreciation. 47 U.S.C. §§ 152(b), 220; *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986).

In 1986 the supreme court of New Mexico held that a regulatory commission order employing the "flow-through" method of calculating state income taxes was not an arbitrary and capricious departure from past practice and that use of the "normalization" method was a reasonable means of protecting ratepayers from future problems associated with divestiture of the parent company. *In re Rates & Charges of Mountain States Tel. & Tel. Co.*, 104 N.M. 36, 715 P.2d 1332 (1986).

*See also,* Majoros, *Telephone Company Deferred Taxes and Investment Tax Credits—a Capital Loss for Ratepayers,* Public Utilities Fortnightly 21 (September 27, 1984).

**81.** It should be noted that one of the few states to hold that income taxes are to be considered an operating expense for the purpose of determining fair telephone service rates and charges is Kansas. It so held in *State ex rel. Hopkins v. Southwestern Bell Tel. Co.*, 115 Kan. 236, 257, 223 P. 771, 781 (1924), after noting that considering "Federal income tax as an operating expense is a matter of controversy. That the tax was disallowed by the commissioner, ... but

under a recent decision of the United States Supreme Court in *Galveston Elec. Co. v. City of Galveston,* 258 U.S. 388, 399, 42 S.Ct. 351, 356, 66 L.Ed. 678 (1922), the tax should have been allowed."

*Galveston Elec. Co.* is of no precedential value, or at least is not binding because it was a pre-*Erie Railroad* diversity suit filed in a Texas federal court. The trial court disallowed the income tax items as an operating expense. The basis for the high court's conclusion was that there "is no difference between income taxes and others," a conclusion that is at war with reality.

The only other decision to follow the Kansas case is a second Kansas case decided the same year, 1924, on the basis of stare decisis. It was *Swaller v. Williamson Milling Co.*, 116 Kan. 329, 226 P. 1001 (1924). It evidently was in the appellate pipeline when *State ex rel. Hopkins v. Southwestern Bell Tel. Co.* was decided. It is interesting to note that in *Swaller* an outside auditor examined the milling company's books to determine net income and in so doing did not include income taxes as an operating expense. Both the referee and the district court agreed with the auditor.

A few states, including Oklahoma in *Oklahoma Natural Gas Co. v. Corp. Comm'n,* 90 Okl. 84, 216 P. 917 (1923), accepted the *Galveston Elec. Co.* conclusion during the pre-*Erie* era, noting that it was based upon the particular federal income tax laws concerning dividends in effect at that time. Maybe they did so feeling it was necessary as a practical matter because of stare decisis. This court should now make a post-*Erie* reappraisal of the matter and adopt the better and more realistic view that there is an obvious difference between operating expense and a post-operational tax on net income. It simply is not fair for the ratepayers of this state to be paying SWBC's income taxes or those of its stockholders.

In my opinion the U.S. Supreme Court's 1922 common law view of what state substantive law should be—that there is no difference between taxes paid in the course of operations, such as sale taxes, production taxes, various excise taxes, and the like paid during the taxable year, and post-operational taxes such as that levied on net income—is not the better view and does not accord with generally accepted accounting prin-

rate base purposes to a straight line basis extended to the service life of a given asset.

B. *Operating Expenses.* Only those expenses may be allowed which are reasonable in amount and necessary for the supplying of local telephone service in Oklahoma during the test year. The order must identify and deal with operating expenses in sufficient detail to enable the court to determine precisely what expenses the Commission finds to be necessary and reasonable along with the amount of each. Income taxes paid by SWBT or SWBC may not be included as an operating expense.

C. *Rate of Return.* The Commission shall authorize a fair return on the established rate base taking into consideration the cost during the test year of funds actually borrowed to finance SWBT's local telephone service rendered in this state plus a reasonable equity ratio economically feasible for a regulated utility furnishing a basic telephone service. In this case the evidence thus far adduced, along with that of which the Commission and this court may take judicial notice, does not warrant the high rate of return on equity allowed by the Commission for the 1984 test year—a year in which interest rates as well as corporate earnings were generally substantially down, particularly in this state.[82]

D. *Revenues and Expenses.* Both income and expenses must be identified in itemized detail using a standard format and standard references consistent with those used in earlier rate change orders and in formulating the rate base. Any deviation should be definitively explained. All entries must, of course, be based upon evidence set out in the order. Such catch-alls as "Miscellaneous," and "Other," shall be avoided. Moreover, various generic terms used such as "Traffic," "Commercial," "Maintenance," "General Office," "Depreciation," "Rents and Compensation," "Toll," "Other," "Inter–Industry," "Directory," and the like should be defined, for purposes of the order, in the sense used by the Commission.

If, for instance, there is a deviation from an annual revenue item, such as those used in determining net operating income, the Commission should disclose what the true figure is and the basis for the deviation. Unless such information is given with each item of income, expense and plant, there is no way the court can correctly perform its review obligations. It also goes without saying that each item must be premised upon a foundation of substantial evidence.

As mentioned earlier, depreciation expense must be limited to a straight line basis extended to the service life of an asset.

E. *Additional Contents of Order.* Among the details which the Commission must include in the order are the number of SWBT and SWBC directors and executives employed during test year, their titles and basic duties, specific details of what they do that is necessary for local telephone service in Oklahoma, the amount they are paid, and the amount of SWBC stock each owns directly or beneficially, and the number of wage-earning employees of SWBC and SWBT and the total wages paid. And in addition the order must contain the following orientational and comparison evidence:[83] (1) Detailed balance sheets and profit-and-loss statements for SWBC and its headquarter operation and for each individual subsidiary, complete with explanatory details for the test year

---

ciples. I would hold that income taxes may not be deducted as operating expenses.

**82.** *See* corporate earnings data in *Standard Corporation Description,* and *Standard and Poor's Stock Reports Index,* both published by Standard and Poor's Corp.

**83.** In *Smyth v. Ames,* 169 U.S. 466, 540, 18 S.Ct. 418, 431, 42 L.Ed. 819 (1898), for instance, the court recognized that reference to evidence of rates in other jurisdictions is of substantial value if evidence of all relevant elements bearing on the problems is presented.

Such operational data is available to the investing public in various publications such as *Moody's Public Utility Manual,* published annually by Moody's Investor's Service, Inc.

and the five preceeding years; (2) The following financial information concerning SWBC's operation and concerning SWBT and its telephone service operations in Oklahoma and in each of the other four states in the region—Arkansas, Kansas, Missouri and Texas—for the test year and the five calendar years preceding it:

(a) Total operating revenues;

(b) Total operating expenses;

(c) Net income;

(d) Construction in progress at year end;

(e) Total assets at year end;

(f) Total number of employees at year end;

(g) Total number of managerial employees at year end;

(h) Number of access lines at year end;

(i) Net telephone plant in use at year end;

(j) Rate base at year end;

(k) Equity-debt ratio authorized for telephone service subsidiaries;

(l) Return on equity authorized for telephone service subsidiaries;

(m) Return on net plant or total capital authorized for telephone service subsidiaries.

(n) Amount and percentage of internal financing and its source.

All of the foregoing information should be submitted with each rate change application filed by SWBT, in addition to all other data required by law, and be sworn to by SWBC's board chairman, SWBT's president and SWBT's chief accountant.

V. The Commission's order should specify definitively, and in positive terms, the evidence relied upon by the Commission to support each of its findings.

The foregoing should be considered only minimal requirements supplementing other legal obligations of the parties.

## XIII

In my opinion the dismissal of the attorney general's motion to reconsider should be affirmed because of the earlier appeal of the order to this court—but subject, however, to the further approval of a post-Rule 24 motion disposition appeal period.

Order No. 292337 should be reversed and vacated and the cause remanded with these directions: (1) SWBT should be ordered to place in escrow or post a bond in an amount equal to the sum of all revenue collected pursuant to the order appealed including the two interim rate increase orders—No. 250987 in Cause No. 28002, and No. 273137 in Cause No. 28309—made permanent in the appealed order. The cause should be remanded with directions to the Commission to rehear Cause No. 29321 and to SWBT to comply with the directions and data requirements set out in this opinion; and (2) after such compliance and hearing to prepare and publish an order which at least meets the criteria, standards, directions and requirements prescribed in this dissenting opinion.

I am authorized to state that Justice GARRETT concurs with the views expressed in the foregoing opinion.

## INTRODUCTION

ALMA WILSON, Justice, dissenting:

The Oklahoma Corporation Commission's constitutional duty to the public, (acting through its three elected Commissioners), and its scope of authority in supervising, regulating and controlling utility operations in the public interest includes the establishment of utility rates which are reasonable and just. In the performance of its public duty, and in correcting abuses and preventing unjust discrimination and extortion by such companies, the Corporation Commission, sitting as a quasi-judicial tribunal, is legally bound to hold hearings, *on the record,* the purpose of which requires:

(1) *Evidence of Oklahoma-specific costs and revenues* which are "used and useful" in providing utility service to citizens within the State of Oklahoma;

(2) Official authorization and approval by the elected Commissioners of the State

of Oklahoma of any and all proposed schedules of rates/tariffs based upon 1, *above.*

In the present case neither of these requisite duties were ever constitutionally discharged. The appellate record is devoid of evidence supporting Oklahoma-specific "used and useful" costs, and the proposed tariffs are therefore without evidentiary basis. Moreover, such proposed tariffs were never reviewed or approved by the elected Commissioners, who alone are charged with that ultimate responsibility by the people of the State of Oklahoma. Such ultimate responsibility is non-delegable. Here, the proposed rate schedules/tariffs were filed and rubber stamped "approved" by a nameless Utility Director (not an elected official) on the same day, without a hearing and/or Official Authorization by the Commissioners of the Corporation Commission who must remain responsive to the citizens of this State. The Oklahoma Corporation Commission, thus, failed to regularly pursue its ratemaking authority.

These fundamental errors of law impel my dissent in this case. Furthermore, the present case represents Oklahoma's first response to the dismemberment of the former AT & T nation-wide system of telecommunications under the dictates of federal law. Accordingly, the effectuation of divestiture, at the state level, requires judicial review in conformity with the Supremacy Clause of the United States Constitution, at Article VI, and the relevant federal case law.

## REQUISITES OF FEDERAL DIVESTITURE

On August 24, 1982, the United States District Court for the District of Columbia entered a "Modified Final Judgment" (here-inafter, the "MFJ") in the government antitrust case against American Telephone and Telegraph Company (AT & T) disposing of what is the largest and most complex antitrust action since the enactment of the Tunney Act.[1] The MFJ engendered significant structural changes in the national telecommunications network and has introduced unprecedented issues into the regulatory scheme surrounding telecommunications service and exchange access functions in every jurisdiction. The present case represents Oklahoma's first response to the dismemberment of the AT & T system under the dictates of the MFJ divestiture decree.

Fundamentally, the MFJ removed from AT & T's fully integrated telecommunications system the function of supplying local telephone service by requiring AT & T to divest itself of those portions of its twenty-two interconnected operating companies which performed that function. From an amalgamation of the twenty-two former operating companies, seven new operating companies have been created. The MFJ assigned to those seven divested companies local telephone service functions, to be performed independently of AT & T.[2] The rationale was that the divested companies, each standing alone, would operate differently than the former interconnected companies under the AT & T umbrella because of their smaller size and relative lack of complexity. In contrast to AT & T's vast, vertically integrated operating system, which dominated local telecommunications, intercity telecommunications, telecommunications research and the production and marketing of equipment, the limited monopoly status of each of the MFJ's divested operating companies is restricted to one geographic portion of one of these markets —local telecommunications.

Subsequent to the federal court's judgment ordering the divestiture of local tele-

---

1. The Tunney Act, 15 U.S.C. § 16(e) required the Court to determine whether the Modified Final Judgment was "in the public interest." Implementation thereof therefore must be effected in the manner most consistent with its purposes. The parties cannot proceed with implementation, or non-implementation, without fear of judicial interference. See, *United States v. AT & T*, 552 F.Supp. at 214–217.

2. Id, at Modification of Final Judgment, I.(A)(1.).

communications service and exchange access functions from AT & T, Southwestern Bell Telephone Company filed applications with the Oklahoma Corporation Commission requesting interim and permanent intrastate rate increases. On May 24, 1983, the Oklahoma Corporation Commission authorized, on an interim basis and subject to refund, a rate increase in the amount of $43,700,000 [million dollars]; but contemporaneously ordered Southwestern Bell to advise the Commission what the public utility's cost of service in the State of Oklahoma would be as a divested company. During the ensuing period, however, the Commission granted additional interim rate increases in the amounts of $135,197,000 [million dollars] and $32,520,695 [million dollars], subject to refund pending Southwestern Bell's accumulation of a full year's actual operating data as a divested company, and a full review thereof. On January 29, 1986, the Corporation Commission generally approved its interim rate increases and also granted an additional rate increase to Southwestern Bell in the amount of $47,-544,561 [million dollars], on an annual basis.

The Attorney General of Oklahoma, on behalf of the ratepaying public, prosecutes this appeal challenging the reasonableness of the rate increases granted Southwestern Bell and the propriety of the findings and conclusions of the Corporation Commission in ordering the increased rates. The Attorney General further contends that Southwestern Bell failed to meet its burden of proof to provide competent evidence to support its allegations that increased rates are necessary to provide Southwestern Bell an adequate return on the cost of local telephone service in Oklahoma; and that the Corporation Commission failed to regularly pursue its constitutional duties in the public interest to investigate the impact and relationship of the utility company's divested state to rates imposed upon ratepayers in this jurisdiction.

**3.** *United States v. Western Electric Company, Inc. v. American Telephone and Telegraph Com-*

## I

## BELL BACK TO BASICS—JURISDICTIONAL RAMIFICATIONS

The landmark event of divestiture of basic telephone service from the former AT & T network is extremely significant because our response will set the stage on how Southwestern Bell Telephone Company will be permitted to operate in this jurisdiction as a "stand-alone" company. The MFJ makes it clear that in the post-divestiture telecommunications environment, regulatory supervision is made increasingly vital in the public interest as entries are made by regulated telephone companies into unregulated competitive telecommunications markets such as equipment sales and mobile phones. Consequently, our judicial review of the host of important regulatory issues created by the telecommunications divestiture transition is unavoidable, considering applicable federal and state constitutional imperitives, as well as divestiture's import within the context of our local laws and procedures and practices. Our task, therefore, cannot be sufficiently addressed with reference to pre-divestiture treatment alone, but must be carried out against a backdrop of actual evidentiary experience, with respect to the federal laws and the laws of the State of Oklahoma (upon which Southwestern Bell Telephone Company's exclusive public utility grant is conditioned), which remain precedential in this jurisdiction. The discontinuance of our historical relationship with the local telephone company cannot be ignored within the principle substantive purpose of the federal divestiture decree—"to promote competition and hence to create conditions which will reduce the cost and improve the quality and reliability of telephone service."[3] As an integral component of its purpose the decree assigned and circumscribed the essential role of the divested telephone companies:

"they are to provide efficient, economical, and, if possible, technologically advanced local telephone service. *Their role is not to provide a source of ratepayer funds, credits and other assets to*

*pany,* 592 F.Supp. 846 at 867 (1984).

*finance competitive ventures, nor were they meant to be vast conglomerates in which telephone service is relegated to a subordinate place."* [4]

Within this framework, the divested companies are prohibited from diversifying on a significant scale unless they can demonstrate the centrality of their corporate life to the responsibilities imposed upon them by the decree, that is, a firm commitment to low-cost, high quality telephone service, and the improbability of involvement in anticompetitive conduct based upon their monopoly status.[5] Moreover, direct or indirect dependency upon basic telephone service rates as the underwriter for competitive ventures is clearly abhorrent to the implementation of the divestiture decree and jeopardizes the successful operation of a free market in the competitive segments of the telecommunications industry.[6] Thus, so long as Southwestern Bell retains its monopoly franchise (public grant) granting it the exclusive right to serve Oklahoma citizens by providing basic telephone service (which Oklahoma citizens have no choice but to pay) remains conditioned upon and subject to pervasive regulation in the public interest. While changes have occurred in the characteristics of the Bell Operating Companies and the environment in which they operate, these changes do not abrogate Southwestern Bell Telephone Company's part of the bargain in being awarded monopoly status in Oklahoma.

## II

THE OKLAHOMA RATEPAYER IS OBLIGED TO RELY UPON THE OKLAHOMA CORPORATION COMMISSION TO PROVIDE A COMPLETE, PERMANENT AND EFFECTIVE BOND OF PROTECTION FROM EXCESSIVE RATES AND CHARGES WHICH COULD RESULT FROM POTENTIAL ABUSES IN THE POST–DIVESTITURE TELECOMMUNICATIONS ENVIRONMENT.

The duty of the Oklahoma Corporation Commission to supervise, regulate, and control Southwestern Bell Telephone Company's operations in Oklahoma in the public interest is established by Article 9, Section 18 of the Constitution of the State of Oklahoma, which states in pertinent part:

§ 18. *Powers and duties— ...*

The Commission shall have the power and authority and be charged with the *duty* of *supervising, regulating* and *controlling* all transportation and *transmission companies doing business in this State, in all matters relating to the performance of their public duties* and their charges therefor, and of *correcting abuses* and preventing unjust discrimination and extortion by such companies; and to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences *as may be reasonable and just,* which said rates, charges, classifications, rules, regulations, and requirements, the Commission may from time to time, alter or amend. *All rates, charges, classifications, rules and regulations adopted, or acted upon, by any such company, inconsistent with those prescribed by the Commission, within the scope of its authority, shall be unlawful and void.* The Commission shall also have the right, at all times, to *inspect the books and papers of all* transportation and *transmission companies doing business in this State,* and to require from such companies, from time to time, special reports and statements, under oath, concerning their business; *it shall keep itself fully informed* of the physical condition of all the railroads of the State, as to the manner in which they are operated, with reference to the security and accommodation of the public, and shall, from time to time, make and enforce such re-

---

**4.** Id, at 874.

**5.** Id, at 875.

**6.** Id.

quirements, rules and regulations as may be necessary *to prevent unjust or unreasonable discrimination and extortion by any transportation or transmission company* in favor of, or against any person, locality, community, connecting line, or kind of traffic, in the matter of car service, train or boat schedule, efficiency of transportation, transmission, *or otherwise, in connection with the public duties of such company.* Before the Commission shall prescribe or fix any rate, charge or classification of traffic, and before it shall make any order, rule, regulation, or requirement directed against any one or more companies by name, the company or companies to be affected by such rate, charge, classification, order, rule, regulation, or requirement, shall first be given, by the Commission, at least ten days' notice of the time and place, when and where the contemplated action in the premises will be considered and disposed of, and *shall be afforded a reasonable opportunity to introduce evidence and to be heard thereon, to the end that justice may be done,* and shall have process to enforce the attendance of witnesses; and before said Commission shall make or prescribe any general order, rule, regulation, or requirement not directed against any specific company or companies by name, the contemplated general order, rule, regulation, or requirement shall first be published in substance, not less than once a week, for four consecutive weeks, in one or more newspapers of general circulation published in the county in which the Capitol of this State may be located, together with the notice of the time and place, when and where the *Commission will hear any objections which may be urged by any person interested,* against the proposed order, rule, regulation, or requirement; and every such general order, rule, regulation, or requirement made by the Commission, shall be published at length, for the time and in the manner above specified, before it shall go into effect, and shall also, so long as it remains in force, be published in each subsequent annual report of the Commission. The *authority of the Commission, (subject to review on appeal* as hereinafter provided) to prescribe rates, charges, and classifications of traffic, for transportation and transmission companies, shall *subject to regulation by law,* be paramount; but its authority to prescribe any other rules, regulations, or requirements for corporations or other persons shall be subject to the superior authority of the Legislature to legislate thereon by general laws: Provided, However, That nothing in this section may impair the rights which have heretofore been, or may hereafter be, conferred by law upon the authorities of any city, town or county to prescribe rules, regulations, or rates of charges to be observed by any public service corporation in connection with any services performed by it under a municipal or county franchise granted by such city, town, or county, so far as such services may be wholly within the limits of the city, town, or county granting the franchise. *Upon the request of the parties interested,* the *Commission,* as far as possible, to effect, by mediation, the adjustment of claims, and the *settlement of controversies, between* transportation or *transmission companies and their patrons* or employees. [*Emphasis added.*]

In the regular pursuit of its constitutionally mandated duty to supervise, regulate and control the telephone transmission company doing business in this State "*in all matters relating to the performance of public duties*", it clearly devolves upon the Corporation Commission in the post-divestiture environment, as the relevant regulatory body, to activate its scrutiny in the public interest and responsibly exercise its authority to ensure that the citizens of this State will not be charged excessive rates and charges which subsidize (through structural cross-allocation methodology and corporate procedures and transfers of stocks and/or assets) the costs of competi-

tive unregulated activities where a company is engaged in operating both regulated (monopoly) utility service and unregulated (competitive) ventures. *The ratepayer is obliged to rely upon the Commission to provide a complete, permanent and effective bond of protection from excessive rates and charges which could result from potential abuses.*[7]

## III

### THE OKLAHOMA SUPREME COURT IS OBLIGATED TO REVIEW THE ORDERS AND PROCEEDINGS OF THE CORPORATION COMMISSION WITHIN THE PROSCRIPTIONS OF THE CONSTITUTION.

Beyond these initial considerations concerning the powers and duties of the Oklahoma Corporation Commission, there is the overriding principle that this Supreme Court is obligated to review the orders and proceedings of the Corporation Commission within the proscriptions of its own constitutionally mandated responsibility. Judicial review of appealable orders of the Corporation Commission, at the threshold, involves judicial cognizance of the character of the issues, whether of constitutional origin or arising out of general statutory law or factually embedded. Since the jurisdiction conferred on the Oklahoma Corporation Commission by Article 9, Section 18 of the State Constitution, provides for the exercise of both "quasi-judicial" and "quasi-legislative" functions, the interest sought to be protected in either embracing or challenging an order of the Commission is a relevant consideration to avoid the impermissible blending of the legislative, judicial and executive powers of government in contradiction of the Federal Constitution,

as well as the express separation of powers clause at Article 4, Section 1 of the State Constitution. Accordingly, the constitutional mandate directed to this Supreme Court as Article 9, Section 20 of the Constitution of the State of Oklahoma, embodies this distinction between the Commission's treatment of constitutional interests (within the Commission's adjudicatory/quasi-judicial capacity and therefore subject to unfettered judicial review); as opposed to the Commission's factual findings and conclusions on technical or scientific matters peculiarly within its delegated expertise (promulgated pursuant to the Commission's quasi-legislative capacity and therefore accorded deference on review within the bounds of the law and evidence.) In this regard, it is frequently stated, and correctly so, that a presumption of correctness accompanies the findings of the Corporation Commission in matters in which it has expertise and frequently adjudicates;[8] and that to the extent that the Commission acts within its wide discretion there is a limitation of reviewability.[9] Yet, courts have also stated that there exists a "presumption of reviewability" unless there is clear and convincing evidence to the contrary;[10] and that a reviewing court may require an agency to *exercise* its discretion.[11] Finally, a delegation of unlimited authority and unfettered discretion to an inferior governmental agency is constitutionally impermissible. Neither the Legislature nor the Supreme Court of this State may abdicate essential legislative and judicial functions. While a governmental agency may be permitted to engage in the making of subordinate rulings and determinations of facts in the regular pursuit of constitutional and statutorily conferred standards and policies, it is ultimately for the Supreme Court to say what the law is in a given context,

---

7. *Permian Basin Area Rate Cases,* 390 U.S. 747, 794–5, 88 S.Ct. 1344, 1374, 20 L.Ed.2d 312, 352 reh'g denied, 392 U.S. 917, 88 S.Ct. 2050, 20 L.Ed.2d 1379 (1968).

8. *Teleco, Inc. v. Corporation Commission,* 653 P.2d 209, 212 (Okla.1982);

9. Id. at 212.

10. See, e.g. *Abbott Labs v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

11. Art. 9, Sec. 18, *Okla. Const.*

and it is for the Legislature to prescribe the applicable policies. Consequently, an appeal from the Corporation Commission must be characterized according to the proscriptions of Article 9, Section 20 of our Constitution, which states:

．　　．　　．　　．　　．

"The Supreme Court's review of appealable orders of the Corporation Commission shall be *judicial only* and

(I)n all *appeals involving an asserted violation* of any right of the parties *under the Constitution of the United States or* the *Constitution of the State of Oklahoma,* the Court shall exercise its own *independent judgment* as to *both* the *law and the facts.*

In all *other appeals* from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine *whether the Commission has regularly pursued its authority,* and *whether the findings and conclusions* of the Commission are *sustained by the law and substantial evidence.*

Upon review, the Supreme Court shall *enter judgment,* either *affirming or reversing* the order of the Commission appealed from. [*Emphasis added.*]

．　　．　　．　　．　　．

In the present case, the question of reviewability may be resolved with primary reference to the constitutional-specific standards delineated within Article 9, Section 20, *above.* First, it can be seen that our review is *judicial only,* that is to say that this Court is constitutionally restrained from sitting as a legislative body and exercising a legislative function in reviewing the Commission's order and proceedings. It is, rather, the province of this Court to find repose in the law in the context of the appellate record here on review. Therefore, this Court must at the outset look to

see if there is law to apply. If there is, then the action is not, on the whole, committed to Commission discretion, though due deference will be accorded the Commission's findings as to technical matters peculiarly within its expertise.

Further analysis of our fundamental constitutional directive within Article 9, Section 20, discloses that the law to apply may encompass the Constitution of the United States; the Constitution of the State of Oklahoma; or general laws of applicability as they relate to the findings and conclusions of the Commission; and laws governing the implementation of Commission authority. It is noted, moreover, that with the exception of constitutional facts and jurisdictional facts, this Court's scope of review on questions of fact is limited by the prime directive to ascertaining, on the record as a whole, whether or not the Commission's findings of fact are supported by substantial evidence. "Substantial evidence" has been variously defined as "evidence 'possessing something of substance and of relevant consequence—something that carries with it fitness to induce conviction' "; [12] as, "such relevant evidence as a reasonable mind accepts as adequate to support a conclusion"; [13] and, as "more than a mere scintilla." [14]

Article 9, Section 20, finally, requires this Court to enter a judgment, either affirming or reversing the order of the Commission appealed from. We may not enter a schedule of rates to be in force in lieu of those prescribed by the Commission, as such would constitute a regulatory prerogative, and therefore an usurpation of the legislative function. However, this Court's judicial function does demand review of the Commission's determinations of law and interpretations of rules which have the force of law. This Court's judgment on these questions of law is paramount, and may be substituted over that of the Corpo-

---

**12.** *Kuykendall v. Corp. Commission,* 634 P.2d 711 (Okla.1981).

**13.** *State ex rel. Cartwright v. Okla. Natural Gas Co.,* 640 P.2d 1341 (Okla.1982).

**14.** *Application of Valliant Tel. Co.,* 656 P.2d 273, 275 (Okla.1982).

ration Commission. Similarly, as noted earlier, constitutional facts and jurisdictional facts may be independently reviewed. When coupled with this Court's preemptive judicial function on questions of law, this confers upon the Supreme Court the power to exercise its own independent judgment as to both the law and the facts on questions of constitutional magnitude, in addition to its general judicial function to decide all other relevant questions of law. In making these determinations, in pursuance of its judicial function, this Court may review the whole record.

The initial question of law this Court is called upon to resolve concerns the scope of the Corporation Commission's authority and jurisdiction to act upon motions timely filed by both parties in the cause, requesting modification of the Commission's order.

## IV

THE OKLAHOMA CORPORATION COMMISSION HELD AN EN BANC POST-JUDGMENT HEARING TO ADJUDICATE THE MERITS OF TIMELY FILED MOTIONS FOR MODIFICATION FILED BY BOTH PARTIES, THEREFORE, THE TIME WITHIN WHICH JUDICIAL REVIEW IS GOVERNED RUNS FROM THE DATE OF THE EN BANC COMMISSION'S FINAL ACTION DISPOSING THEREOF.

Generally, judicial review becomes crystalized when administrative remedies have been exhausted. Rule 24 of the Corporation Commission's own Rules grants a party the right to finally challenge an order promulgated in that forum by filing within ten days of the order's rendition, a post-judgment motion to modify, reopen or rehear a matter.

RULE 24 RELIEF FROM ORDERS OF THE COMMISSION

A. *Within ten (10) days after an order of the commission is entered, any person may file a motion for rehearing, or a motion to set aside or to modify the*

*order, or for any other form of relief from the order.* However, a motion to reopen the record after an order has been entered shall not be considered a proper motion to seek relief from the order. The motion shall specifically state:

1. The parts or provisions of the order sought to be set aside or modified or from which relief is sought,

2. The specific modifications or other relief sought by the motion, and

3. The specific grounds relied upon for relief.

Such motion shall be set for hearing before the Commission, unless referred. A copy of the motion, including notice of the date set for hearing, shall be served by the movant on each party of record by regular mail. If any motion filed pursuant to this rule is placed on the emergency or regular docket for hearing the movant shall give at least five (5) days written notice to all respondents listed on the affidavit of mailing, and all parties of record.

B. At any time subsequent to ten (10) days after entry of an order of the Commission, an application to vacate or modify the order, or for any other form of relief from the order, filed by any person, whether or not a party of record in the original cause, shall be treated as a separate cause, and shall be governed by rules applicable to the commencement of a cause. The application shall:

1. identify the order sought to be modified or vacated,

2. state specifically the parts or provisions sought to be modified or vacated,

3. state specifically the modifications or vacations sought, and

4. state specifically the grounds upon which such relief is sought.

Notice of hearing of the application shall be served and published as required upon the commencement of the cause. The application shall be set for hearing before the Commission or Hearing Officer,

as provided in these rules as to the commencement of a cause.

C. An order of the Commission, granted *to a public utility pursuant to 17 O.S. §§ 181 through 189, approving the issuance of securities or the creation of liens on property in this state to secure the payment of evidences of indebtedness, shall not be vacated or modified pursuant to motion or application to vacate or modify filed by any person other than the public utility.*

D. With or without notice or hearing, the Commission may make or cause to be made an order nunc pro tunc to correct any clerical errors, mistakes or omissions in an order, or as to timely mailing of the order by the Commission or otherwise to cause the order to correctly reflect the judgment or action of such Commission. [*Emphasis mine.*]

In this way, a party who thinks the Commission has erred against it is enabled to call the Commission's attention to such error, so that the Commission may have the opportunity to correct it. Otherwise, this Supreme Court could spend valuable time and resources considering erroneous findings and conclusions which could have been more efficiently corrected by the Commission in view of that agency's access to pertinent resources and expertise.

An interpretation of Rule 24 which allows the Commission meaningful opportunity to correct its own mistakes *before* an appeal is decided by this Court is imminently desirable in terms of institutional (court-agency) compatibility and is legally efficacious. This precept is acknowledged by Article 9, Section 20 of our State Constitution, which provides that an appeal from the Corporation Commission shall be taken directly to the Supreme Court in the manner and in the same time which appeals may be taken to the Supreme Court from the District Courts. Article 9, § 20 states:

. . . .

§ 20. Appeals to Supreme Court—Other courts to have no jurisdiction—Mandamus and prohibition

From any action of the Corporation Commission prescribing rates, charges, services, practices, rules or regulations of any public utility or public service corporation, or any individual, person, firm, corporation, receiver or trustee engaged in the public utility or public service corporation, or any individual, fected, or by any person deeming himself aggrieved by any such action, or by the State, *directly to the Supreme Court of the State of Oklahoma, in the manner and in the same time in which appeals may be taken to the Supreme Court from the District Courts,* except that such an appeal shall be of right, and the Supreme Court may provide by rule for proceedings in the matter of appeals in any particular in which the existing rules of law are inapplicable. If such appeal be taken by the public utility or public service corporation affected by any such action, the State of Oklahoma shall be made the appellee, but in other appeals hereunder, the public utility or public service corporation affected shall be made the appellee. [*Emphasis mine.*]

. . . . .

A contrary interpretation of Rule 24 by reason of secondary statutory construction is constitutionally repugnant. The Constitution is the fundamental law and both statutory construction and case authority must conform thereto. Therefore, statutory construction of 12 O.S.1981 § 991(a) cannot, by implication, dictate this Court's interpretation of Rule 24 under the State Constitution. Because the Constitution directs that appeals from the Corporation Commission shall be taken directly to this Court in the same time which appeals may be taken from the District Courts, when the Corporation Commission took cognizance of *both parties* timely filed post-judgment motions, held a hearing thereon, and issued an order as a result thereof, the date of such order finally disposing of all matters in this cause properly governs the time of appeal. The present case illustrates the advisability of this holding:

Within ten (10) days from the rendition of the Corporation Commission's order setting rates and charges and conditions of service in this cause, both Southwestern Bell Telephone Company and the Attorney General filed motions requesting modification of the Commission's order. The Corporation Commission evidently was unable to hold a hearing on these motions to modify until April 3, 1986.[15] On that date, even though the Attorney General had filed a precautionary appeal[16] and the Commission staff had filed a motion to dismiss,[17] *the Commissioners, sitting en banc, exercised concurrent primary jurisdiction* in the matter and called the cause for full hearing on all three motions. On the date of this hearing the interpretation of Rule 24 remained an open question.

At the lengthy oral argument, the Attorney General argued for a modification of the order (1) in the area of construction work in progress (CWIP), emphasizing that since the Commission has in recent years in Bell cases taken the step of allowing certain CWIP in the rate base, it should also consider increased revenues and expenses from that CWIP; (2) that the very lauditory determination of the Commission excluding cash working capital from consideration, due to Bell's failure to provide a lead/lag study as it had been ordered by the Commission to do, has been short circuited by the allowance of prepayments in the amount of $18,000,000 million dollars in the rate base; stating that in an ordinary effective lead/lag study, prepayments would be one of the expense items included as either a plus or a minus; (3) that no evidence had been presented to account for the Commission's conclusion on page 46 of its order that "directory revenues had increased in proportion to the uncollectibles",

but that questions had been raised as to why the portion of directory revenues that Southwestern Bell had collected were accruing and uncollectible at about 1.37, and why the one quarter of the year's directory revenues that were attributable to Southwestern Bell Publication had a 9.6 uncollectible, while at the same time, revenues were staying basically flat—therefore, the Attorney General urged the Commission to review and study this area; and further (4) urged that the Commission must modify its order to include a prompt determination in this case as to the AT & T refund due Oklahoma ratepayers in accordance with the November 4, 1982 opinion and memorandum of the Federal Communications Commission, at paragraphs 69 and 70. Next, in the motion to modify, the Attorney General (5) sought reconsideration of the allocation of expenses and the separations process in determining critical charges to people jurisdictionally in Oklahoma, objecting to systemwide cost methodology that relates all services to local exchange service, thereby causing local customers to bear total costs, absent any finding of the relative benefits to Oklahoma ratepayers, asserting, e.g., that concession expenses for free or discounted service for Bell employees should be disallowed. Finally, in support of the motion for modification, (6) the Attorney General focused upon the issues of rate of return on common equity and capital structure, pointing out that in its previous order, the Commission had concluded, consistent with numerous jurisdictions, that the discounted cash flow method was the most appropriate methodology to be used. The Attorney General here asserted that on a discounted cash flow basis, without flotation and quarterly adjustment, all three of the experts' testimonies fall

---

**15.** General interpretation of the Rule 24 requirements evidently compelled the Commission to comply with constitutional notice and publication requirements therefore delaying immediate consideration thereof.

**16.** The Attorney General necessarily filed a precautionary appeal, pending interpretation of Rul2 24; otherwise a contrary ruling would preclude an appeal altogether.

**17.** The basis of the motion to dismiss was the very fact that the Attorney General had filed an appeal, thereby penalizing the Attorney General's exercise of prudence in uncharted waters per the interpretation of Rule 24.

below the 14.25 percent authorized by the Commission; and that while the actions of Southwestern Bell Corporation may have been appropriate for the corporation as a whole—including its unregulated entities—the fundamental issue here is what capital structure is appropriate for the Oklahoma jurisdiction? The Attorney General emphasized that Southwestern Bell's Oklahoma management had little or no input into the capital structure of Southwestern Bell Corporation, located in St. Louis, Missouri. The Attorney General requested the Commission to modify its order from the perspective of the capital structure that is appropriate to the Oklahoma jurisdiction.

Counsel for Southwestern Bell Telephone Company presented rebuttal arguments on behalf of the public utility and also presented the utility's own motion to modify: (1) Southwestern Bell proffered that its return on equity should be increased. Bell argued that the credibility of Bell's witness is greater than the credibility of any other return on equity witness; that the Commission's finding of 14.25 percent is woefully inadequate because of the increased financial risk and the increased business risk that Southwestern Bell faces since divestiture; Bell attributed the increased risk to post-divestiture bypass by inter-LATA carriers illegally siphoning off intra-LATA services, loss of the customer premises equipment business due to divestiture, and loss of inter-LATA business due to divestiture; (2) Bell urged the Commission to reconsider its cash working capital finding of zero cash working capital complaining that the penalty for not providing a lead/lag study as ordered by the Commission is overly harsh in this divestiture case due to changes in operating procedures; (3) Bell further urged the Commission to rethink and then adopt Bell's year ending of revenues methodology; (4) likewise, Bell assailed the methodology adopted by the Commission's order as to allocation of headquarters and corporate expenses, and instead, implored the Commission to adopt Bell's methodology which Bell asserted was more accurate; (5) Bell also took issue with the Commission's legal expense adjustment, stating that legal expenses are an ongoing, necessary part of running any business, therefore, the Commission should apply the test year legal expenses; (6) as further grounds for modification of the order, Bell challenged reduction of Bellcore expenses; and (7) Bell additionally asked the Commission to reconsider an intra-synchronization adjustment permitted by the Commission's order, avowing that it imputed a tax benefit that Bell has never had and which Bell will never get..

In response to the issues presented by the Attorney General, Bell submitted that (1) the Commission erred in not placing all of its CWIP in the rate base; and (2) reiterated Bell's position that the Commission's finding of zero cash working capital is wrong; the utility company then declared that (3) the prepayments in controversy are directory payments or monies that Bell expended before it received the services and that when this type of prepayment is placed in the rate base, it is inappropriate for a lead/lag study; and further that in order to impute the Yellow Pages net revenues to the Oklahoma jurisdiction, one must look at directory revenues, directory expenses and the prepayments as a whole; and (4) that the directory revenues grew during the test year, but not to the same extent that they had grown in prior years due to competition and the poor economy, as well as the transitional period of changing the operation to a separate subsidiary which has a different method of collecting revenues and accounting the uncollectibles; (5) that the AT & T refund dealt with years 1980, 1981 and 1982 and should be excluded as an out-of-period matter, the refund is nonrecurring, and was not received from AT & T in the last quarter of the 1984 test year; and the refund was associated with a pre-divestiture period when every relationship was entirely different than it is today; (6) Southwestern Bell also disputed the order as regards the corporate allocation process and (7) contended that its investment expenses and revenues were separated before it filed its rate appli-

cation, stating that it did not file total state, inter-state and intra-state, but only those items that are subject to the Commission's jurisdiction—intra-state operation; (8) that although Southwestern Bell initially included concession telephone service in its application date, it changed its mind and did not include concession for inter-LATA telephone calling in its permanent data, nevertheless, Bell asserted that concession telephone service has never been disallowed by this Commission in any order and that Bell had absolutely no reason to question or to understand a concession telephone service was at issue, since it was not raised by a witness, but originated from a question from the bench near the end of the cause. Moreover, protested Bell, a utility has an obligation to testify that its expenses are just, reasonable and proper, and it has no further burden unless it is put on notice that one of its items is subject to dispute or question—and it had no reason to believe concession telephone service was in this proceeding; (9) finally, Southwestern Bell asserted that a capital structure cannot be imputed to Southwestern Bell unless there is mismanagement or imprudence on the part of the corporation; and (10) that the post-divestiture rate of return authorized by the Commission is inadequate.

At the conclusion of the hearing, the Commission *en banc*, took all of the exhibits, arguments and evidence under advisement. Then on May 12, 1986, the Commission entered Order No. 297905, finally disposing of the matter. The Commission found that Staff's motion to dismiss the motions of the Attorney General and Southwestern Bell should be granted. The Attorney General appealed this Order. We consolidated this appeal with the Attorney General's prior appeal for disposition by a single opinion. However, because the Corporation Commission erroneously ruled that it was divested of jurisdiction to make

an order treating the issues raised for reconsideration, as its single reason for dismissing the motions to modify, the final order should be reversed and this cause remanded to the Corporation Commission for further consideration of the issues raised in the Motion to Modify; and in view of the legal guideposts and standards set forth herein.

V

## THE OKLAHOMA CORPORATION COMMISSION MUST PROMULGATE AN ORDER SUFFICIENT TO APPRISE THE SUPREME COURT OF THE ACTUAL BASIS UNDERLYING ITS UTILITY RATE INCREASE.

It is fundamental that a reviewing court must be apprised of the actual basis underlying a utility rate increase authorized by the Oklahoma Corporation Commission in order that it may be determined whether or not the amount of the award is sustainable. An absence of required findings is fatal to the validity of an administrative decision and findings in general terms are not sufficient.[18] Moreover, findings must be free from ambiguity.[19] On January 29, 1986, the Oklahoma Corporation Commission authorized Southwestern Bell to increase its Oklahoma jurisdictional telephone rates in the amount of $47,544,561 [million dollars], on an annual basis. The amount of $47,-544,561 is the sole amount specified in the Commission's order. *By reference only,* the Commission approved further rate increases in the amounts of $43,700,000 [million dollars] annually; $135,197,000 [million dollars]; and $32,520,695 [million dollars] annually. The order of the Corporation Commission, however, is illusory because it fails to specify these referenced amounts (and, hence make clear the total rate increases aproved and authorized) and to

---

**18.** *Southwestern Public Service Co. v. State,* 637 P.2d 92 (Okla.1981); *Southwestern Cotton Oil Co. v. Farmers Union Co–Op Gin,* 165 Okl. 31, 24 P.2d 658 (1933).

**19.** Id.

make the required findings pertaining to them in its order. The terms and consequential effect of the unstated additional rate increases, which were incorporated and approved by reference only, impacted upon the Commission's ratemaking determinations, and thus impact our review of those determinations. On the remand of this matter it should be incumbent upon the Corporation Commission to state, with specificity, in its order every amount approved, granted or authorized, together with the date and number of every other order relating thereto. A general reference to other orders or documents is insufficient. Additionally, where the Commission incorporates by reference other orders and documents, or implements the terms and conditions thereof, it should attach such orders and documents referred to. Administrative adherence to these requirements is procedurally efficient and provides valuable assistance to the Supreme Court toward an expeditious appellate review. Particularly in a case of this magnitude with numerous unprecedented issues and an extremely voluminous record, the Corporation Commission has both the power and the opportunity to, at least partially, alleviate the enormous burden placed upon this Court by fulfilling its duty to provide findings sufficient in content, and free from ambiguity.

The Commission should stand apprised that on the appeal of an order from that body which fails to provide sufficient findings, while this Court may not be precluded, under certain circumstances, from making a review of the whole record and entering the appropriate order indicated by the record in its entirety,[20] a statutory requirement that an administrative agency make findings of fact and conclusions of law is a matter of substance and not a mere technicality, and it is the general rule that if the administrative agency fails to supply such findings, its determinations will not be sustained.[21]

## VI

### THE OKLAHOMA CORPORATION COMMISSION MUST SUBSTANTIATE WITH RECORD EVIDENCE EVERY POST–DIVESTITURE ALLOCATION TO BE INCLUDED IN ITS AUTHORIZATION OF RATES TO BE CHARGED TO OKLAHOMA RATE PAYERS FOR BASIC TELEPHONE SERVICE.

What a public telephone utility company is entitled to ask is a fair return upon the value of that which is used and useful in providing basic telephone service to the public in Oklahoma.[22] In order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under the particular rates prescribed, and the sum required to meet operating expenses are all matters for consideration on the question whether the rates set are reasonable. Where costs are allocated, competent, verifiable evidence must be presented to substantiate the measure of benefit to Oklahoma ratepayers for the totality of charges allocated to this jurisdiction.[23] Pro-rata charges, like rolled-in rates in an integrated system, may be justified only to the extent that Oklahoma ratepay-

**20.** Note 18 *supra.*

**21.** Id.

**22.** It is the long standing rule in this jurisdiction that in determining the adequacy of a rate, a public utility will be held to be entitled to a fair return on the present value of its property which is *used* and *useful* in serving Oklahoma public ratepayers. *Okmulgee Gas Co. v. Corporation Commission,* 95 Okl. 213, 220 P. 28 (1923); *Southwestern Public Service Co. v. State,* 637 P.2d 92 (Okla.1981); *Lone Star Gas Co. v. Corporation Commission,* 648 P.2d 36 (Okla. 1982).

**23.** In *Lone Star Gas Co. v. Corporation Commission* we adopted the "benefits and fairness test" as announced in *Northern States Power Co. v. Hagen,* 314 N.W.2d 278 (N.D.1982).

ers derive benefit therefrom.[24] The benefit must, of course, constitute an efficient, economical and necessary component of basic telephone service only, since the federal divestiture decree excluded other services from the agenda of the local operating companies. Further, in the post-divestiture telecommunications environment, the basis of all calculations as to the reasonableness of the rates to be charged by the telephone utility, involving as it does the element of "reasonableness" *both as regards the utility company and as regards the public,* is eminently a question for judicial review, requiring due process of law for its determination insofar as the rates may be said to be confiscatory. The courts, in this respect, are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether an administrative body has regularly pursued its authority in investigating the quantum and character of proof necessary to establish a rate as reasonable, or confiscatory, within the ambit of the Constitution. It is the duty of this Court to so adjudge, and thereby give effect to the Constitution and the laws of this State. These legal guideposts demand a thorough exposition and review of the post-divestiture realities in this case of first impression.

## VII

Implementation of the federal divestiture decree required the following: Each of the twenty-two AT & T telephone operating companies were to transfer from its ownership assets which are not necessary for the performance of its new role: the provision of basic telephone service. These non-basic telephone service assets were to be transferred to other subsidiaries of AT & T. The twenty-two operating companies, however, were permitted to retain assets necessary for the performance of duties connected with basic telephone service. Simulta-

neously, the twenty-two telephone operating companies were reorganized into seven regional telephone operating companies (the divested companies) and "spun-off" from AT & T. AT & T thus achieved freedom in the competitive segments of its existing non-basic services and was relieved from a large amount of regulatory control and potential antitrust liability; however, it is now crucial to insure that AT & T's win is not a loss for common ratepayers, for such was not the intent of the MFJ. Therefore, the responsibility inures to the Oklahoma Corporation Commission to begin its post-divestiture regulatory duties by requiring proof that clearly documents the purpose, cost and service category of all allocations to basic telephone service to permit regulatory analysis of every charge to Oklahoma ratepayers. The record in this case is replete with evidence that a proper lead/lay study is the most precise method of determining expenses and revenues flowing in and out of the utility operation; but Southwestern Bell has failed to perform them as ordered. On remand, the Commission should be directed to suspend the accounting and revenues requirement issues until this study is entered into evidence. Under principles of due process of law, charges to customers for costs that will not be incurred in the course of providing utility service are confiscatory. Until the Oklahoma Corporation Commission effectuates its order to require Southwestern Bell to disclose the results of a properly conducted lead/lag study, the Corporation Commission cannot be said to have regularly pursued its constitutional authority to establish the utility's rates as reasonable.

## VIII

THE PROPRIETY OF SOUTHWESTERN BELL TELEPHONE COMPANY'S ABSORPTION BY A NONREGULATED HOLDING COMPANY SHOULD BE CONSIDERED BY THE CORPORATION COMMISSION.

In order to implement the dictates of divestiture, the MFJ provided for a plan of

---

**24.** Id. Whether viewed technically as based on cost of service or as an addition to cost of service, rates must reflect a relationship to service or benefit provided in order not to be unreasonable or to discriminate unduly among classes. *Also, See, LaRowe v. Kokomo Gas and Fuel Co.,* 179 Ind.App. 563, 386 N.E.2d 965, cited with approval by this Court in *Lone Star, supra.*

reorganization of AT & T. However, whereas the other six regional telephone companies are made up from anywhere from two to five of the former AT & T operating companies, Southwestern Bell has the unique position of being the only region encompassing only one pre-divestiture telephone operating company. Therefore, whereas the other six regional telephone operating companies may have required some kind of holding company arrangement to effect divestiture, Southwestern Bell does not. Southwestern Bell, both before and after divestiture, includes a five-state area of Texas, Missouri, Arkansas, Kansas and Oklahoma. Since the absorption of Southwestern Bell by a nonregulated holding company was not necessary to implement the terms of divestiture, the Corporation Commission is not precluded from considering such ultra vires to the interest of jurisdictional ratepayers and disregarding such if the only consequence thereof is detrimental to ratepayers, resulting in confiscatory rates in violation of rights secured by the Constitution of the United States and the Constitution of the State of Oklahoma.

The record discloses that Southwestern Bell Telephone Company is virtually managed, controlled, directed and administered in every aspect by the Holding Company, Southwestern Bell Corporation. Expenses are "allocated" among the five jurisdictions as to, e.g., accounting, legal, regulatory data, employee payroll, pension and health plans, and a multitude of "general expenses" and "miscellaneous" items. Testimony was that the general expenses had increased some two million dollars over the preceding year under the Holding Company's allocation system; but that although basic telephone operations constitutes 93.47% of the Holding Company's portfolio, much of the system data was asserted to be "proprietary" under the holding company arrangement—resulting in attribution of expenses to basic telephone service in the form of lump sums and categories of charges. Thus, under the holding company arrangement, there

does not exist a method to verify the alleged relationship of cost of service to benefit to local ratepayers who pay for the service.

Article 9, Section 18 of the Oklahoma Constitution provides, in pertinent part, that the Corporation Commission shall keep itself fully informed, and that "(t)he Commission shall have the right at all times to inspect the books and papers of all transportation and transmission companies doing business in this State, and to require from such companies from time to time, special reports and statements, under oath, concerning their business." On remand, the Corporation Commission must require evidentiary support that economic efficiency, from the ratepayers' perspective, is enhanced by the holding company relationship. Otherwise, the relationship cannot be sustained. To accomplish this, *the Corporation Commission must know the underlying costs of services.* In addition, services that use common facilities, like the loop, must also be assigned a portion of costs and the decision of what portion to assign must be determined by the Commission since the market forces (due to the monopoly nature of basic exchange service) are not sufficient to allocate these costs. A properly constructed post-divestiture service category study (lead/lag) must be presented to determine what the costs are for each major service category, including local exchange, Centrex, intra-state intra-LATA toll, intra-state intra-LATA private line, intra state access and supplemental service.

The record presently does not justify an increase in basic telephone services, rather than other non-basic services. Costs should be the basis for rate charges, however, the telephone company has failed to produce a post-divestiture cost study to determine the present relationship of rates to costs. The fundamental purpose of a service category cost study is to determine the revenue requirements for each major service category. These findings can then be used to determine which service catego-

ries require rate increases. This is an especially *critical determination given the fact that some telephone service categories have been transferred to AT & T's competitive operations while others have been retained by Southwestern Bell.* The telecommunications industry has undergone and will continue to undergo significant structural changes. While competition is now becoming more important in various areas of telecommunication, a substantial portion of Southwestern Bell's business in Oklahoma is still monopolistic and will continue to be for the foreseeable future. Under these circumstances there will be a natural tendency for regulated telephone utilities to overprice services in relatively protected monopoly markets so as to subsidize other ventures where competition is present. *This cost allocation strategy is particularly damaging to Southwestern Bell's monopoly utility ratepayers in that it enables the Company to obtain and preserve competitive business at prices far below the full costs that these services impose on the system, thus loading cross-subsidy costs onto monopoly services on a virtually perpetual basis.*

*One of the foremost goals of regulation is to ensure that rates are equitable and reasonable. Certain tools, like an up-to-date category cost-of-service study, are necessary to accomplish these goals.* Because telephone companies such as Southwestern Bell provide different products and services in distinctly different market environments, a service category cost study is needed to determine the revenue requirement for each of the individual service categories. If rates are established on the basis of cost-based service category revenue requirements, the important regulatory objective of eliminating cross-subsidization among categories will be achieved.

*The access line category loss should not be viewed as justification for any rate increase* because access is not a service but a part of exchange, intrastate intra-LATA toll intrastate access and inter-LATA access services. That is, the *access line is the common facility needed to produce exchange and toll services.* The access line category is not a service category, but rather, the collection of *costs associated with the loop,* which is a component of both toll and local service costs, and must be allocated to service categories. The effects of rate increases that were granted during 1983 and into 1984 are based on 1983 booked revenues—and do not include annualizing rate increases that were awarded in 1983 or 1984. Therefore, the 1983 cost/revenue relationship may not be reflective of the 1984 post-divestiture cost/revenue relationships and benefits of interstate customer premises equipment phase-out should be applied directly to local exchange rates.

Finally, it should be understood that total costs are not the total cost responsibility of local exchange. The interstate jurisdiction is currently responsible for 32% of those costs and intrastate toll and access service are responsible for another 20% share, unless these services are given a "free ride." The average revenue is $14 per line, total access costs are $21 per line and exchange usage is $4 per line. Comparing the combined cost of access and usage with exchange revenues is incorrect since *only local exchange, intra-LATA private line, intra-LATA toll, Centrex, other services and intrastate access are now offered by Southwestern Bell in Oklahoma.* Terminal equipment, interstate and intrastate inter-LATA toll and interstate and intrastate inter-LATA private line are offered by AT & T.

The Company's 1983 EDA indicates that a 1% increase is needed for local exchange services; a 1% increase in State toll rates and access charges, and *150% increase in private line rates* is needed to make these services compensatory. However, competent evidence to support a relationship to benefits to Oklahoma ratepayers for these increases is absent from the record. In this regard, the Company's disaggregation of local exchange service is unavailing

since neither dial tone nor usage is a separate service in and of itself, but an integral component of basic telephone service—no evidence has been presented that local ratepayers are demanding the single components of service separate from basic telephone service. The move to disaggregate these elements toward measured service has not been shown to be beneficial to local subscribers in Oklahoma. To the contrary, the record discloses that Southwestern Bell, in its divested state, has begun to engage in competitive operations, in addition to the operation of the local regulated telephone business which provides basic telephone service to the people of the State of Oklahoma. Besides the telephone operating company, Southwestern Bell has established four (known) subsidiaries. These include Southwestern Bell Publications, Southwestern Bell Telecommunications, Southwestern Bell Mobile Systems and Southwestern Bell Asset Management. These subsidiaries are engaged in publishing, equipment sales, cellular mobile telephone development and marketing, and real estate. Although Southwestern Bell refuses to provide a list of subsidiaries created since 1984, public information indicates that it has also purchased Mast Advertising and Publications, Inc. from Continental Telephone for $120,000,000 [million dollars]. The only apparent source for the capital that was used to establish these businesses was the local telephone company. The stockholders of AT & T at the end of 1983 owned Southwestern Bell Corporation, and the only assets transferred were the assets of the local regulated telephone company, Southwestern Bell Telephone Company. All of the subsidiaries were created to some extent with equity from the earnings of Southwestern Bell Telephone Company. In addition, at least two corporations (Southwestern Bell Publications and Southwestern Bell Telecommunications) were created from the telephone company's assets.

At a minimum, the Commission should require the following information in order to protect the ratepaying public from potential abuses which could result in excessive rates and charges:

1. A list of all companies or organizations affiliated with Southwestern Bell Corporation or Southwestern Bell Telephone Company.

2. A financial statement including balance sheet and income statement and sources and uses of funds statements for each company.

3. A description of how the company was established and when it was established. This should include a description of what resources of the telephone company were used, either directly, (e.g. personnel), or indirectly, (e.g. backing lines of credit.)

4. A description of the types of services or products that are being provided by each organization.

5. A list and cost of telephone company facilities that are being used, were used or expected to be used in the future by each organization.

6. Whether the operating telephone companies will be using the service or products of each organization and the expected cost of each telephone company.

7. A list of assets transferred or sold to each organization from the operating telephone companies, (including any purchases made by the operating telephone companies in 1983 and 1984 from an affiliate where the telephone company received stock for compensation and then turned the stock over to Southwestern Bell Corporation or another affiliate.)

8. Whether the organization will use information obtained by the operating companies in the business.

Finally, since Yellow Page profits are a direct result of basic exchange telephone service, local ratepayers should benefit *directly* from the profits of directory operations.

## IX

## THE HOLDING COMPANY'S CREATION OF A SEPARATE YELLOW PAGES SUBSIDIARY BREACHED JUDICIAL IMPLEMENTATION OF DIVESTITURE.

In *United States v. Western Electric & AT & T,*[25] the Court states:

> "When the Court required AT & T to turn over its Yellow Pages operations to the Operating Companies, it is assumed that the revenues from directory advertising would continue to be included in the rate base of the Operating Companies, providing a subsidy to local rates. Yet, the Regional Holding Companies, or some of them, have *breached [emphasis mine]* that understanding. Instead of funnelling Yellow Pages revenues to the Operating Companies, they have created separate subsidiaries to handle their directory publishing operations which do *not [emphasis original]* feed the revenues from these operations into the rate base."

At footnote No. 79 of the opinion, it is noted that Southwestern Bell Corporation is one of the Regional Holding Companies that has established a directory publishing operation in a separate subsidiary, in breach of the understanding referred to in the body of the opinion. At footnote No. 80, the opinion goes on to observe that revenues from Yellow Pages operations have always far exceeded the costs of publication. Moreover, if there should ever come a time when these operations are not profitable, the Regional Holding Companies could simply discontinue them. In short the arrangement does not assist the ratepayers; it assists only the Holding Company.

In the present case, the Corporation Commission was not only remiss in ignoring the impropriety of the Holding Corporation's creation of the separate subsidiary for the Yellow Pages operation, but in deferring remedial action as to the value of the Yellow Pages operation and declining to even address issues surrounding this concern until the "next" request for a rate increase. In this respect, the Commission indeed failed to regularly pursue its regulatory responsibility. Nor have I found evidentiary support in the record to substantiate the Holding Company's imputation of revenues relative to the expenses imputed to the local telephone operation as a consequence of the creation of the Yellow Pages subsidiary. Conclusory generalizations are not substitutes for competent evidence.

## X

## SOUTHWESTERN BELL'S EQUITY-LADEN CAPITAL STRUCTURE IS INAPPROPRIATE FOR RATEMAKING PURPOSES

Southwestern Bell is economically healthy. *Southwestern Bell is in sound financial condition.* Southwestern Bell's bond rating is AA–A2. During 1984 Southwestern Bell Corporation was able to raise $2,494 million, or $1,945 million after the payment of dividends, from internal sources (i.e., income, depreciation, and tax credits and deferrals) to carry out its construction and capital expenditure program, which amounted to $1,804 million. During 1984, the book value of Southwestern Bell Corporation's outstanding common stock increased by $511 million, as retained earnings rose by $334 million after the payment of $549 million in stock dividends.

On a systemwide basis, out of revenues totalling $7,191 million, the Company required $4,742 million to cover its current operating and maintenance expenses, taxes and interest payments. In other words, *Southwestern Bell Corporation's net cash flow available for stockholder dividends and investment amounted to one-third of its total revenues.*

| Total Return to Investor | = | Current Dividend Yield | + | Expected Dividend Growth Rate |
|---|---|---|---|---|

*Since an individual investor cannot control either the dividend yield or the dividend growth rate, his decision about the adequacy of returns is reflected by his buy, sell, and hold decisions.*

Because unregulated competitive enterprises are more risky than regulated utili-

**25.** 592 F.Supp. 846 (D.D.C.1984).

ties, it would be poor regulatory policy to permit utilities to earn profits in excess of or equivalent to earnings in the competitive sector.

Southwestern Bell is meeting all of its capital requirements from internal sources and there is little likelihood that the Company will be required to issue any new common stock to the public to support utility services in the foreseeable future. This means that there will be no public issuance expenses incurred and therefore, it is unnecessary to include any allowance in customer's rates. *There is no reason to charge customers for costs that will not be incurred in the course of providing utility service.*

Moreover, Southwestern Bell's common equity ratio is already more than adequate for utility service purposes and further common equity capital would not be the most economical source of additional telephone utility funds. This means that *no allowance for issuing common stock is needed since it is neither necessary nor reasonable to provide revenues to cover hypothetical costs which are not attributable to serving the needs of the Company's Oklahoma jurisdictional customers.*

Utility operations, including those of independent local exchange telephone utilities, which are substantially protected from corresponding risk through the regulatory process generally have lower common equity ratios, typically in the 40% to 45% range, (vs. Southwestern Bell's proposed 55.47% common equity ratio).

*Southwestern Bell's proposed capital structure contains an unnecessarily large share of common equity capital. The cost of the Company's decision to maintain an unnecessarily high common equity ratio in support of jurisdictional telephone utility service substantially exceeds any benefits which the Company and its customers receive as a result of that decision.*

The Company's *ratepayers should not be required to pay the unnecessary costs*

*of a chosen financing strategy,* but, instead should be held *responsible for paying only a fair return on the Company's assets devoted to public service.* The Commission therefore may use an imputed consolidated capital structure.

The excessive cost of maintaining a common equity ratio that is too high is the resulting higher overall return requirement (including income tax allowances) that is largely attributable to the higher percentage of common equity in the Company's overall capital structure.

The Bell company capital structure is more similar to non-regulated industries than to other utilities. This reflects, in part, AT & Ts traditional debt financing at the parent company level, which required less debt at the subsidiary level in order to keep the consolidated capital structure in balance. It also reflects an old Bell system regulatory strategy that has worked well for a time in some states where regulators focused on the equity return ratios. Today, it is more widely recognized that *when excessive common equity ratios are used for ratemaking purposes, utility customers are forced to bear an unwarranted capital cost and tax burden.* This is one reason why most electric utilities target their equity ratios in the 40% range.

Commissions have concluded that rates for basic utility services should not bear the higher cost of equity-rich capital structures that may be necessitated by other diversified operations in competitive markets where comparable degrees of capital structure leveraging would not otherwise be sustainable. When such capital structure issues arise, they may be resolved by reliance upon an adjusted or imputed capital structure or upon an industry average profile.

This is not to say that it is a necessary Commission role to tell the Company how or whether to bring its capital structure into line with appropriate ratemaking standards. Indeed, the Company may elect, for whatever reasons, not to do so, but that should be a matter of management discre-

tion that does not inflate allowable utility rates. Thus, *while the decision about Southwestern Bell's capital structure is one for the Company, its directors and its shareholders to make, the Commission must be concerned about the capital structure that is used for ratemaking purposes. Whether Southwestern Bell adopts a financing strategy which will produce the minimum cost capital structure is up to the Company. The Commission's ratemaking determinations in that regard should not be constrained by whether or not the Company chooses a minimum cost capital structure.*

Utilities can be permitted to make their own capital structure decisions, with the condition that stockholders (not *ratepayers) will bear any excess capital structure costs, and ratepayers will pay rates based on a capital structure that is reasonable in view of jurisdictional utility service requirements.* That is, instead of telling Southwestern Bell how to adjust its capital structure, the Commission should instead tell the Company that regardless of what capital structure its management chooses, jurisdictional rates will be determined based on a reasonable common equity ratio. *This approach keeps the regulatory and management roles distinct,* and it also leaves management and stockholders accountable for management's discretionary decisions. In this way ratepayers would pay the same amount if the utility had an efficient capital structure and utility revenues would also correspond with the consequences that would occur in a competitive capital market. This type of market-oriented approach should yield better economic efficiency and equity results than if the Commission were to follow a more aggressive interventionist role and prescribe the approach that a company should use to structure its capital optimally.

Moreover, while all telephone utilities rank well below the average unregulated firm, the various Bell Operating Companies face somewhat less equity risk than does the average independent telephone compa-ny, typically being larger and operating in a wider and more diverse service area. And while changes have occurred in the characteristics of the BOCs and the environment in which they operate, these changes do not substantially alter the relative risk relationship between the independent telephone companies and Bell companies.

The divestiture has now been in effect for a number of years. The effects of the breakup and related changes on the company's equity risk are manifest: the discontinuance of the historical relationships between the Bell Operating Companies, AT & T, and Western Electric may increase the business risk of the divested companies; however, the divestiture agreement included certain provisions which have mitigated the risk.

*First,* the Bell Operating Companies support and share the costs of a centralized organization to provide engineering, administrative, and other support services. The Regional Bell Companies have created Bell Communications Research (Bellcore) to serve this function. The Commission specifically addressed this subject in its last decision regarding Southwestern Bell:

> ... [W]hile there is no doubt that Southwestern Bell loses some significant benefits of the AT & T "umbrella", it is likewise clear that the new Central Services Organization will provide some of the lost technical support and the Bell Operating Companies are entitled to royalty free licenses to AT & T patents secured up to the date of divestiture and five years thereafter. (Oklahoma Corporation Commission, Order No. 250987, Cause No. 28002, P. 13.)

*Second,* AT & T's restructuring grouped the twenty two divested companies under seven Regional Holding Companies (RHCs), each extremely large relative to most unregulated companies and most other utilities. Taking advantage of this plan, Southwestern Bell Corporation created the following subsidiaries: Southwestern Bell Mobile Systems, Southwestern Bell Publica-

tions, Southwestern Bell Telephone Company. Other unregulated subsidiaries are bound to follow as the Corporation seeks to "(p)ursue a policy of diversification" as stated in its Mission Statement. (Annual Report of Southwestern Bell Telephone, 1983, P. 3).

*Third,* in order to allow for an orderly transition, the Modified Final Judgment (MFJ) stipulated that:

> [U]ntil September 1, 1987, AT & T, Western Electric, and the Bell Telephone Laboratories, shall, upon order of any BOC, provide on a priority basis all other support services to enable the BOCs to fulfill the requirements of this Modification of Final Judgment. (P. 3.)

Another obvious aspect of divestiture affecting the risk of the Company and other Bell Operating Companies is the resolution of the Department of Justice's antitrust case against AT & T. After eight years of great uncertainty, investors now have a clearer picture of the future prospects for AT & T and the Bell Operating Companies. Reflecting this reduction of risk, during their first year on the market, the stocks of the Regional Holding Companies experienced strong growth and popularity. Investors need no longer fear the remote, but potentially vast downside risks of a major antitrust case by the United States Government.

Moreover, as a result of divestiture, the business risk of the average Bell Operating Company has diminished: the Bell Operating Company has a reduced involvement in the relatively volatile toll business, and the bulk of its revenues will be generated from the less risky provision of local access and local exchange services—two areas where it retains a substantial degree both of monopoly power and of government protection from competition.

Furthermore, because divestiture has increased regulatory awareness of the distinctions among different types of toll routes, competitive entry into the Bell Operating Companies' remaining toll markets (intra-LATA) may be severely restricted, thereby reducing the riskiness of this portion of their business. The Oklahoma Corporation Commission has not authorized intra-LATA competition. Should this become a serious problem for the Company, the Commission might authorize a compensation plan or other mechanism to reduce the adverse effects. But even if intra-LATA competition is eventually allowed, the Company will still derive a substantial competitive advantage from its name recognition and longstanding goodwill. While I reject the most pessimistic view of the competitive forces, I recognize that some element of uncertainty has entered the picture. With the many changes in the telecommunications industry and sharply increased local telephone rates, some ratepayers are closely scrutinizing their options. In some instances, a customer can save money by constructing his own bypass system. In others he may discover readily available tariffed services, like private line services, which can serve the same purpose at an even lower cost. Such opportunities are not a new phenomenon, but customer awareness of them has been growing. To the extent that local telephone companies allow inflation of their labor and spiralling costs, they may be vulnerable to bypass and other costsaving customer options due to customer awareness of lower cost alternatives. However, bypass need not be a problem if the local telephone company adopts a properly designed and reasonable set of access charges. The Corporation Commission noted in Southwestern Bell Telephone Company's last rate proceeding in this jurisdiction that although bypass was a possible problem, it did not presently loom large. The Commission specifically stated:

> "While we are not ignorant of the alleged 'bypass' threat, very little evidence has been presented to this Commission that such a threat is currently serious in Oklahoma." (Oklahoma Corporation Commission, Order No. 250987, Cause No. 28002, P. 13.)

Accordingly, the extent of the Company's "bypass risk", at this juncture, can remain

minimal, or be largely mitigated by the Company, dependent upon an equitable and efficient balance between the interests of the Company and its investors and those of its customers. Such a balance, which occurs naturally in the world of competition, is clearly a desirable goal for regulation in the public interest.

## XI

## UNIVERSAL SERVICE OPTION

The Company's universal service option to residential customers is objectionable for two reasons. First, it is discriminatory in its implementation; and, Secondly, even if the discriminatory classification were justified, it does not insure that basic telephone service will be available to all people at comparable rates. The plan would be less discriminatory if the call allowance were set at the average number of calls for all customers. The average number of local calls per line in Oklahoma is 270 calls per month. The Company proposed a 30 call allowance. Either this should be raised to at least 90 calls per month, or the level of subsidization should be lowered to a level proportionate to regular service. The telephone company should not be allowed to charge a customer more than the regular service rate. Customers choosing the universal service option should not be billed at a level higher than the authorized flat rate service level. Low income users under the universal service option should not pay higher rates than they would if they had chosen regular flat rate service. Without these modifications, the so-called universal option plan is unconstitutionally discriminatory and merely represents a move toward local measured service.

## XII

## SOUTHWESTERN BELL'S BILLING METHOD SHOULD BE INVESTIGATED

*Southwestern Bell bills affiliates for its services on an "incremental cost basis, plus a contribution",*[26] according to its

---

**26.** A study of the cost and revenue relationship of broad categories of service for a prior calendar year. The total of these categories includes all services provided by Southwestern Bell.

*direct costs* = those costs which can be identified as being caused directly by provision of services within a specific category. If the service had not been provided then these costs would not have been incurred.

*Network access* = costs associated with *providing access into "the network."* This *access* into the network may be used *either* for *local exchange* service *or* for *state or interstate* message telephone service. It is economically inappropriate to recover these *non-traffic sensitive* costs through usage sensitive rates.

*common costs* = costs which are not direct costs since they are not directly assignable to the provision of any specific group of products or services. They are *corporate overhead costs* and as such *cannot be assigned on a cost-causative* basis.

*Embedded Direct Analysis (EDA)* assigns "booked" costs and revenues to the various service categories. This enables the EDA *to balance the books* and records of the company. Therefore for study purposes, a calendar year is chosen since year-end reports are available, year-end accruals are included, and clearing accounts are closed.

*EDA* is an *account-by-account* analysis of operating revenues, plant investments and all expenses, wages, and capital costs, so that total costs equal total revenues. The advantage of this approach is that the total result "closes to the books", that is, the EDA results are consistent with accounting and financial reports. The revenues associated with each category are first identified and quantified. Then the operating expenses taxes, and return are assigned to the various service categories on a cost-causative basis. The basis for the cost assignments fall into one of the following categories: Direct Assignments; Investment Related; Wage or Other Cost Related; Work Unit Related; and Special Studies. *EDA DEALS WITH OVERALL ACCOUNTS AND IS NOT INTENDED TO SHOW REVENUE AND COSTS BY INDIVIDUAL PRODUCTS OR SERVICE.*

EDA divides operating revenues into three broad categories: Local Service Revenues; Toll Service Revenues; and Miscellaneous Revenues. Total Operating Revenues is the sum of these three less Total Uncollectible Operating Revenues. (*The individual sources are not directly identifiable.*)

EDA, however, has a separate logic for analyzing investments and costs. Many costs (such as taxes, depreciation and return) are assigned on the basis of the related investment. EDA assigns the fixed assets of the firm to the service categories—the related investments follow. Division of revenues is therefore dif-

Accounting Opinion No. 47. There is no method specified for how one determines incremental costs. Since a "contribution" is added to move the cost to a so-called market price, the costs must be short-run. This method allows Southwestern Bell substantial flexibility in what it charges its affiliates for services. *Since ratepayers must bear the full cost of operations, there does not appear to be any great benefit to ratepayers as a result of this practice. On remand this practice should be fully investigated.*

*The total cost for Southwestern Bell Corporation activities for the test-year was $6.3 million dollars.* The Commission should not include any of these costs until Southwestern Bell can provide complete documentation and justification why its parent's charges should be passed on to Oklahoma ratepayers. Southwestern Bell has presented no reason why, for example, Southwestern Bell Corporation advertising should be paid for by local exchange ratepayers or why Southwestern Bell Corporation corporate planning is necessary for the provision of local exchange services. In response to a data request, Southwestern Bell provided a "one" word description of the basis for allocating these costs to the subsidiaries; (Exhibit A.B.–5 contains that response.) Southwestern Bell Corporation should be required to provide a complete

description of the billing method used to allocate these costs and the actual allocation to each affiliate.

# XIII

## AN INCREASE PRIMARY IN LOCAL SERVICE RATES IS NOT JUSTIFIED.

Southwestern Bell has not provided justification for increasing local exchange rates rather than access, toll centrex rates or other rates. Costs should be the basis for rates. Even if the Commission departs from costs due to public policy reasons, *the Commission should know the underlying costs of services.* In addition, services that use *common facilities, like the loop,* must also be *assigned a portion of these costs* and the decision on what portion to assign must be determined by the Commission since the market forces (due to the monopoly nature of basic exchange service) are not sufficient to allocate these costs.

*Southwestern Bell generally is urging that the entire increase be placed on local service rates.* A properly constructed post-divestiture service category should have been presented to determine what the costs are for each major service category, (e.g., local exchange, Centrex, intrastate intra-LATA toll, intrastate intraLATA private

ficult to ascertain. *Where a cost item can be attributed to several services, a cost "factor" is used to "split" the cost.* This results in near-impossibility in tracking investments and costs in the absence of the accounting working papers. THIS CAN ELIMINATE COST/REVENUE RELATIONSHIP EFFECTIVELY.

*supplemental services* = additional services *over and above* that required for *basic* residence exchange service. The majority of costs in the category are associated with providing Touch–Tone and Custom Calling Services.

*Common to Firm* = costs which are *common to all categories* and which, purportedly, are not *directly assignable to specific services* on a cost-causative basis. Executive, Legal, Financial, and Personnel expenses are included. This is impermissibly *non-specific and involves cost averaging among various services,* having little clarity as to the cost/revenue relationship.

*"hot wire" or "pair-mile"* = the term "hot wire" *fill factor* is based on the relationship of pair miles producing revenue to total pair miles in plant. Fair miles in plant per subscriber loop is based on the relationship of subscriber pair miles in plant to subscriber working pairs.

*note: The *test year* in this Cause is January 1, 1984 to December 31, 1984 (even though annualized.) It is therefore *historical at this point,* and it is *now unnecessary to make "forecasts" and "predictions"* with respect to it.

*It is no longer "forward looking" and can be detailed and quantified. No assumptions need now be relied upon.*

*fill factor* investment (or costs) = *spare capacity.* There are no other factors utilized for spare capacity other than "fill factors."

IDC = Interest During Construction. May be included in a company's CWIP.

line, intrastate access and supplemental service.)

## XIV

### SERVICE CHARGES

Southwestern Bell's service charge cost study presented the *total* -company cost of providing service connection even though about 32% of these costs are currently assigned to the interstate jurisdiction and recover from interstate rates. Another 20% is assigned to intrastate toll. The total costs presented by the Company need to be separated so that only the portion attributed to local operations is recovered from service charges. Otherwise, the Company will recover these costs twice.

In this regard, just as the Company's total cost of service must be separated and a portion allocated to the interstate jurisdiction, so must the cost of establishing telephone service. *Service is established not only in order to make local calls but also for interstate and intrastate toll calls as well.* Although the FCC has required companies to expense station connections, it has not removed those expenses from jurisdictional separations. In calculating an alternative cost-based rate, *the Company should recognize jurisdictional separations procedures.* This simply means that the rate established for service charges should reflect the actual costs allocated to the local jurisdiction that the Company must recover from local operations.

Current separations procedures would apply the subscriber plant factor to these costs; this would assign about 52% of the costs to toll services (interstate and intrastate toll) and 48% to local ... Recognizing the proposed separations allocation the cost of obtaining access should be reduced by 50% for local exchange. The other 50% should be recovered through interstate intra-LATA toll rates and carrier access charges.

There are additional reasons why the cost of establishing service should be passed on to the toll services or inter-LATA

carriers. Every time a customer begins service, that customer creates another opportunity for toll calls to be completed. In addition, consider the fact that *every new customer of Southwestern Bell also automatically becomes a customer of ATTCOM (AT & T Communications), the dominant inter-LATA carrier.* No other inter-LATA carrier receives the same treatment. To obtain service from carriers such as MCI or SPCC, a customer must contact them and obtain an account number until equal access. To use ATTCOM, however, one simply uses one's own telephone number. *Every time a customer is added to the Southwestern Bell system, a new profit center is created for AT & T—an advantage for which it should pay.*

## XV

### MAINTENANCE OF SERVICE CHARGE

The maintenance of service charge should be applied whenever the trouble is found to be in the customer's equipment, or when the trouble is found to be in the inside wire, and the customer has not subscribed to Optional Wire Maintenance Plan. *The charge should not be applied if the trouble is found to be in the telephone company line.*

## XVI

### BELLCORE

Bell Communications Research (BCR), Inc., is a Southwestern Bell Telephone affiliate, which replaces the license contract-type service, i.e., centralized services, as a result of divestiture. An economist specializing in the telecommunications industry, testified that 25.2% of the expenses which are related to new services and research by BCR should be disallowed. Several potential problems with Bellcore must be examined to determine whether Bellcore operations have caused or will cause higher local rates.

The services now performed by the holding company are those which under the

pre-divestiture system were performed by AT & T's General Department; also, those services now performed by Bellcore, called Bell Communications Research, Inc., were under the pre-divestiture system performed by Bell Laboratories. These activities were funded by the BOCs through mechanisms such as the license contract. Now various changes in AT & T's structure have led to the creation of new entities; services once performed by AT & T and BTL will now be performed by the Regional Holding Companies, which is Southwestern Bell Corporation (SWBC) for Southwestern Bell (SWB) and Bell Communications Research (BCR).

*Divestiture eliminated the centralized services agreement called the license contract.* As to licensing requirements, Judge Green in the 1982 opinion of the Federal Court said:

"*Until now, AT & T's research and development have been financed primarily through the licensing contracts with local Operating Companies.* As long as ratepayer-financed local exchange revenues were supporting this research and development, it made sense to require AT & T to share the fruits of its monopoly financing with others. But under the proposed decree, the licensing contracts will be terminated, and this rationale for exclusive licensing thus falls. Moreover, AT & T would be forced after divestiture to fund its research and development *just like other competitive enterprises —without an artificial subsidy from captive ratepayers.*" (p. 80, emphasis added.)

BCR (Bellcore) is funded, owned, and operated by the newly created Regional Holding Companies. Some activities previously funded through licensing contracts will be assumed by BCR. In addition, SWBC, the parent company, is providing certain centralized services to its operating entities, including Southwestern Bell in Oklahoma. *Bellcore is budgeted on a yearly basis.* An evaluation of every project undertaken and its corresponding budget is supposed to be conducted each year to determine whether it should continue and at what level of expenditure. *This is called zero-based budgeting.*

## XVII

## THE DOCUMENTATION OF BELLCORE ACTIVITIES FOR 1984 WAS NOT SUFFICIENTLY DESCRIPTIVE TO ASSIGN MANY OF THE ACTIVITIES TO THE SERVICE BENEFITTED.

Testimony was that BCR activities will benefit activities other than local exchange. Purportedly, BCR will be focusing on a number of activities, including research and new service concepts that do not benefit current local exchange ratepayers. About 25% of BCR costs are related to these types of activities.

Local ratepayers should not be required to pay for the creation or implementation of new services. Also, substantial portions of the BCR budget will be spent on research. Research, although it may eventually benefit local ratepayers, will benefit many different commercial operations outside the local telephone company. *This research should therefore not be paid for through Southwestern Bell's rates unless there are direct and immediate benefits to the current services provided by Southwestern Bell. The Commission must insure that future BCR expenses are not used in the same manner.*

The settlement of the antitrust case allowed, but did not require, the divested BOCs to establish BCR. BCR is similar to the license contract. The BOCs have a track record of including various competitive and new enterprise costs in the license contract. Therefore, *the Commission should require from the BCR as well as all affiliates proof that clearly documents the purpose, cost and service category benefitted to permit regulatory analysis of every charge to Southwestern Bell.* All affiliate activities are not clearly benefitted Southwestern Bell's current ratepayers should be disallowed.

We are dealing with a relatively new affiliate. The Commission should start this relationship off on the right foot by requiring that each activity of the BCR be shown to benefit the current services provided by Southwestern Bell. Activity that relates to enhancement of current services of the offering of new services should also be identified. Southwestern Bell should provide the Commission with an Annual Report that describes the activity, provides the direct and support costs separately, the purpose of the activity and the specific service or services that the activity will benefit, and how that activity benefits the service. Activities that relate to more than one service should describe why the activity relates to more than one service and which services are benefitted.

*The costs of activities related to future services or research should be recovered from future service and not passed onto current ratepayers.*

### XVIII

### WHAT SHOULD THE COMMISSION DO?

*The Commission should disallow SWBC expenses included in Southwestern Bell's test-year in this proceeding for the State of Oklahoma. The Commission should consider and examine the impact of restructuring of the Bell System into SWBC, and order the company to provide the necessary data on all affiliates. Until that complete information is provided and the Commission has determined to what extent ratepayers have funded these new enterprises, the Commission should require that any rate increase granted as a result of this proceeding be subject to refund. In addition, the Commission should recognize in this proceeding that the equity capital attributable to these new competitive subsidiaries should be separated from the local telephone operations.*

In *United States v. AT & T, supra,* the Federal Court relied upon the assumption that:

"To be sure the States are closely regulating such activities as the transfer of assets by entities within their jurisdictions and the types of business operations in which the Operating Companies may engage."

However, activation of this responsibility is overdue in Oklahoma.

ALMA WILSON, Justice, Dissenting to the Court's Order:

I dissent to the Court's Order on Rehearing for two reasons:

(1) I would grant Rehearing on the full merit of this case and rule in accordance with the dissenting opinions previously filed.

(2) The majority's *partial* granting of Rehearing for the sole purpose set forth in the Order is tantamount, in my opinion, to denying ratepayers immediate reimbursement monies as a "windfall", but rather, monies already belonging to the ratepayers to be refunded.

I have been authorized to state that DOOLIN, J., and GARRETT and BRIGHTMIRE, S.JJ., join in this dissent.